519 F.2d 821
 171 U.S.App.D.C. 172, 75-2 USTC P 9750
 James L. BUCKLEY, United States Senator from the State of
New York, et al., Plaintiffs,
v.
Honorable Francis R. VALEO, Secretary, United States Senate,
et al., Defendants.
Center for Public Financing of Elections, et al., James C.
Calaway of Houston, Texas, Intervenors.
 No. 75-1061.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 13, 1975.
Decided Aug. 15, 1975.
As Amended Aug. 29, 1975.
 
 Brice M. Clagett, Washington, D. C., and Ralph K. Winter, Jr., New Haven, Conn., of the bar of the Supreme Court of Connecticut, pro hac vice, by special leave of court, with whom John R. Bolton and Arthur F. Fergenson, Washington, D. C., were on the brief, for plaintiffs Buckley and others.
 Joel Gora, New York City, for plaintiff New York Civil Liberties Union.
 Ralph S. Spritzer, Sp. Counsel to the Federal Election Commission, Philadelphia, Pa., with whom John G. Murphy, Jr., Gen. Counsel, Washington, D. C., and Paul Bender, Sp. Counsel, Philadelphia, Pa., were on the brief, for defendant Federal Election Commission.
 Lloyd N. Cutler and Paul J. Mode, Jr., with whom William T. Lake, Roger M. Witten, Washington, D. C., and Patricia D. Douglass, San Francisco, Cal., were on the brief, for intervening defendants Center for Public Financing of Elections, League of Women Voters of the United States, and others.
 Kenneth J. Guido, Jr., with whom Fred Wertheimer, Washington, D. C., was on the brief, for intervening defendants Common Cause and John W. Gardner.
 Dennis G. Linder, Atty., Dept. of Justice, with whom Rex E. Lee, Asst. Atty. Gen., and Morton Hollander and David J. Anderson, Attys., Dept. of Justice, were on the brief, for defendants Atty. Gen. of the United States and Federal Election Commission.
 G. Roger King, Washington, D. C., for Senator Lee Metcalf as amicus curiae.
 Stuart M. Nelkin, Houston, Tex., and Al J. Daniel, Jr., Washington, D. C., entered appearances for intervening plaintiff Calaway.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges, sitting en banc.
 BAZELON, Chief Judge, filed a separate opinion dissenting from Part V-A-2 of the per curiam opinion.
 TAMM, Circuit Judge, joined by WILKEY, Circuit Judge, dissenting from the per curiam opinion, and concurring in the result only of Part V.
 MacKINNON, Circuit Judge, filed a separate opinion dissenting from Part VII of the per curiam opinion.
 Summary
 This case presents for review the latest, and by far the most comprehensive, reform legislation passed by Congress concerning the election of the President, Vice-President and members of Congress. The plaintiffs have asked this court to enter a declaratory judgment holding unconstitutional key provisions of the Federal Election Campaign Act of 1971, as amended by the Federal Election Campaign Act Amendments of 1974.
 Under the challenged legislative scheme, contributions are limited to $1000 per candidate with an overall limitation of $25,000 per contributor. The statute also establishes an overall ceiling on campaign spending by candidates and convention spending by political parties. There are also elaborate requirements for disclosure of contributions and expenditures to a newly established full-time agency the Federal Election Commission. Finally, the legislative scheme provides public funding for qualified candidates and political parties.
 Under a special statutory provision for expedited judicial review, the plaintiffs' challenge to the key provisions of the Act reached this court in the form of twenty-eight certified constitutional questions. After subjecting the issues to "exacting judicial scrutiny," the court today upholds the core provisions of the legislative scheme, holds one incidental provision unconstitutional, and declines to rule on other provisions for lack of a ripe controversy.
 Limitations on Contributions and Expenditures
 As to the statutory limitations on contributions and expenditures, the court finds that "the power of Congress to regulate federal elections embraces, in our view, the power to adopt per candidate and overall limitations on the amount that an individual or political committee may contribute in the context of federal elections and primaries." Its review of the history of campaign abuses and the evolution of a comprehensive legislative scheme designed to "preserve the purity" of the electoral process leads the court to conclude that there is a "compelling governmental interest, both as to need and public perception of need, that justifies any incidental impact on First Amendment freedoms" that results from the statutory limitations. As to the contention that disclosure requirements combined with limits on contributions are sufficient to solve the problem of campaign abuses, the court finds that a number of factors, especially the fact that "limitations on contributions and disclosure requirements pose almost insuperable enforcement problems if not supplemented by limits on expenditures," provide a "validating context for the judgment of Congress that expenditures must be subject to reasonable regulation." --- U.S.App.D.C. pp. --- - ---, 519 F.2d pp. 851-862.
 Disclosure Requirements
 In considering the certified questions concerning the disclosure requirements, the court, relying on the Supreme Court's opinions in Burroughs and Cannon v. United States and Harriss v. United States, finds that the "governmental interest in preserving the democratic process" justifies the particular disclosure scheme enacted by the Congress. The court recognizes that disclosure has an "impact on personal privacy in political association," but concludes that this is "outweighed" by the compelling state interest. "It is pertinent to the political process, as elsewhere in the marketplace of ideas, that meaningful competition depends on openness." The court also considered the argument that minor parties are constitutionally exempt from disclosure requirements since they need to be protected from presumed oppression and retaliation from the party which wins the election and from the public generally. The court concludes, however, that the provision requiring disclosure by all parties is constitutional on its face, noting that a minor party may in the future "demonstrate such harassment to itself or to its supporters as to underpin a ruling that disclosure in those circumstances cannot constitutionally be required."
 But the court does find unconstitutionally vague and overbroad a statutory provision (Section 437a of Title 2 of the United States Code) that is "susceptible to a reading necessitating reporting by groups whose only connection with the elective process arises from completely nonpartisan public discussion of issues of public importance." The court sustains the other disclosure provisions of the Act because the government has demonstrated a substantial and legitimate interest in protecting the integrity of its elections, "an interest closely connected to and plainly advanced by those provisions." But section 437a seeks to compel disclosure by groups that do no more than discuss issues of public importance on a wholly nonpartisan basis, a point at which the nexus between the governmental interest and the challenged provisions may be more tenuous. The court attempted to construe the statute narrowly, but it is unable "to supply the precision essential to constitutionality." Since "the terms of the statute inhibit free and robust discussion of issues," the court holds Section 437a unconstitutional. --- U.S.App.D.C. pp. --- - ---, 519 F.2d pp. 862-879.
 Public Financing Provisions
 The court considered a number of challenges to the public financing provisions of the Act, which establish a Fund derived from voluntary tax "check-offs" by individual taxpayers, who may, but need not, direct that one dollar of their tax liability go to the Fund. The court holds that Congress acted within its power when it "determined that providing public funding for the three stages of the Presidential selection process would advance the general welfare of the nation by reducing the reliance of Presidential candidates on large contributors, thus reducing their influence on the outcome of elections and on the operation of government." The court also finds no constitutional infirmity in the fact that the taxpayer has no freedom to designate which party or candidate will receive his checked-off dollar. "If the taxpayer wants to avoid any conception that some part of 'his' tax money will benefit candidates he does not favor, then he can simply refrain from checking off his dollar for the Fund."
 The court recognizes that "provisions for public funding of Presidential campaigns, like provisions regulating access to the ballot, could operate to give an unfair advantage to the established parties, thus reducing, to the nation's detriment, what the Supreme Court has called the 'potential fluidity of American political life.' " But after careful consideration of the public financing scheme, the court does not find it to be invidiously discriminatory. Nevertheless, it also recognizes the "necessity for all concerned to maintain a careful scrutiny as the provisions are implemented." --- U.S.App.D.C. pp. --- - ---, 519 F.2d pp. 879-887.
 The Federal Election Commission
 In the final part of its opinion, the court considers the constitutional challenge to the newly-established Federal Election Commission. The court recognizes that, "as might be expected in an area as novel and complex as this, which implicates all segments of the federal establishment, the manner of constituting (the Commission), the tasks assigned to it, and the authority conferred upon it are in many respects unique." But the court also believes that the new agency is "so essential to the effective functioning of the overall scheme" that it should not be declared unconstitutional unless "wholly without legitimacy in the very terms by which it is brought into being."
 The plaintiffs challenge the constitutionality of the method of appointing members of the Commission on the grounds that it violates the doctrine of separation of powers and Article II of the Constitution in that Congress has appointed four members of an agency that performs judicial and executive as well as legislative functions. The court concludes that the Commission is a constitutional legislative agency that performs primarily legislative functions. The court recognizes that some of the powers delegated to the Commission, "when and if exercised in a concrete context, may be in conflict with the Constitution" in that they are dominantly executive or judicial, or unrelated to the exercise of the Commission's legislative functions. But since the Commission has not yet exercised most of the challenged powers, the court postpones consideration of the constitutionality of those grants of authority until such time as there is a ripe controversy. The court does conclude, however, that the Commission does have the power to continue rendering advisory opinions, which advise certain persons as to whether planned activities or transactions will violate federal statutes governing the electoral process. --- U.S.App.D.C. pp. --- - ---, 519 F.2d pp. 887-896.
 PER CURIAM:
 
 
 1
 In this extraordinary case, plaintiffs[1] brought an action in the District Court seeking a declaratory judgment holding unconstitutional key provisions of the Federal Election Campaign Act of 1971 (FECA),[2] which was overhauled by the FECA Amendments of 1974.[3] Plaintiffs also asked that the defendants[4] be enjoined from enforcing these Acts. Three organizations and eight individuals in leadership positions with those organizations[5] have intervened in support of the challenged legislation.
 
 
 2
 Under attack are provisions that broadly require disclosure of and put ceilings on contributions and expenditures inuring to the benefit of candidates for federal office. Also under attack are the public financing provisions inserted into the Internal Revenue Code[6] so as to provide public financing for the primary, convention, and general election stages of the Presidential selection process.
 
 
 3
 District Judge Howard Corcoran, acting pursuant to 2 U.S.C. § 437h[7] (a special judicial review provision in FECA) transmitted the entire case to this court.[8] Upon joint motion of the defendants and intervening defendants, we remanded the record for completion of certain evidentiary steps and for the formulation of constitutional questions to be certified to this court.[9] Judge Corcoran, with all counsel cooperating, moved expeditiously. Constitutional questions have now been certified and the parties have addressed them in briefs and oral argument before this court en banc.[10] This novel procedure permits timely appeal to the Supreme Court.
 
 
 4
 The unique posture of this litigation requires a unique opinion, cast in a structure of twenty-eight constitutional questions or sub-questions, which we either answer or conclude are not ripe for decision. Our order is reprinted for convenience as Appendix A.
 
 
 5
 The opinion is per curiam. That term is conventionally reserved for cases of lesser significance. It also has useful application to cases like this one, where the issues are so significant and far-reaching that the crafting of the opinion reflects the fact of participation of various judges, so that no single judge could fairly be designated as the author. Compare Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700 (1973).
 
 
 6
 We have organized our discussion of the issues in this case into six major sections: a synopsis of the statutory provisions, in limine questions, questions concerning contribution and expenditure limitations, questions concerning disclosure requirements, questions concerning public financing provisions, and questions concerning the composition and powers of the newly-established Federal Election Commission. But in order to place this recent legislation in proper perspective, we begin with an overview.
 
 I. Overview
 
 7
 The statutory provisions under attack, while separable, were combined by Congress as a comprehensive approach to a set of conditions and abuses that have spread over the years to infect the nation's federal election campaigns. "Speaking broadly, what is involved here is the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process. The case thus raises issues not less than basic to a democratic society."[11] These solemn words, uttered in 1957 by Justice Frankfurter in a Supreme Court opinion considering limitations on federal election campaigns, are an apt prologue to our momentous task.
 
 
 8
 Our task is the more awesome, and these words opportune, in that we are pondering legislation passed and reviewed at a time of transition and crisis. The Nation has experienced the shock waves of momentous revelations concerning events of the last Presidential campaign. It is preparing in 1976 not only for another campaign, but for a time of bicentennial that sharpens our awareness of our heroic experiment in democracy. Abraham Lincoln has immortalized our dedication to the concept of a government of the people, by the people and for the people, our recognition that it is dependent on the consent of the governed and our resolution to take measures to preserve and to vitalize that system. What nourishes and invigorates democracy is the root of widespread popular participation.
 
 
 9
 No one can doubt the compelling government interest in preserving the integrity of the system of elections through which citizens exercise the core right of a free democracy of selecting the officials who will make and execute the laws under which we all must live.[12] Yet subjection of election campaigns to rules of law means restraints, and those restraints are assailed as a misguided undermining of the constitutional foundations of our free society.
 
 
 10
 Our vigorous and recurring election campaigns are a pulse beat of the strength of democracy. Keen men of this century have sought to preserve health by intervening against feverish excess. Justice Frankfurter's 1957 opinion recounts the origins of our present legislation in the steps taken around the turn of the century to cope with the abuses spawned by the disparities and aggregations of wealth. We identify some highlights.
 
 
 11
 The popular feeling that the power of wealth "unduly influenced politics, an influence not stopping short of corruption"[13] led to public disclosure laws. But these "were found to be futile."[14] In quest of more effective measures, Elihu Root proposed that New York prohibit contributions by corporations, to cope with "the great aggregations of wealth" seeking to influence elections toward "the advancement of their interests as against those of the public." He put it:[15]
 
 
 12
 It strikes at a constantly growing evil which has done more to shake the confidence of the plain people of small means of this country in our political institutions than any other practice which has ever obtained since the foundation of our Government.
 
 
 13
 Concern over the size and source of campaign funds in the 1904 campaign "crystallized popular sentiment for federal action to purge national politics of what was conceived to be the pernicious influence of 'big money' campaign contributions. * * * President Theodore Roosevelt quickly responded to this national mood."[16] His annual messages of 1905 and 1906 urged laws to stop political contributions by corporations, and a 1907 law enacting such a measure as to national campaigns was "the first concrete manifestation of a continuing congressional concern for elections 'free from the power of money.' "[17]
 
 
 14
 In view of the issues now pending, we add and underline President Roosevelt's 1907 address on the need for public financing of election campaigns to effectuate the underlying objective.
 
 
 15
 Under our form of government voting is not merely a right but a duty, and, moreover, a fundamental and necessary duty if a man is to be a good citizen. It is well to provide that corporations shall not contribute to Presidential or National campaigns, and furthermore to provide for the publication of both contributions and expenditures. There is, however, always danger in laws of this kind, which from their very nature are difficult of enforcement; the danger being lest they be obeyed only by the honest, and disobeyed by the unscrupulous, so as to act only as a penalty upon honest men. Moreover, no such law would hamper an unscrupulous man of unlimited means from buying his own way into office. There is a very radical measure which would, I believe, work a substantial improvement in our system of conducting a campaign, although I am well aware that it will take some time for people so to familiarize themselves with such a proposal as to be willing to consider its adoption. The need for collecting large campaign funds would vanish if Congress provided an appropriation for the proper and legitimate expenses of each of the great national parties, an appropriation ample enough to meet the necessity for thorough organization and machinery, which requires a large expenditure of money. Then the stipulation should be made that no party receiving campaign funds from the Treasury should accept more than a fixed amount from any individual subscriber or donor; and the necessary publicity for receipts and expenditures could without difficulty be provided.[18]
 
 
 16
 The tale of measures passed, and to some extent bypassed, is related in Appendix C. It suffices here to say that over a span of almost 70 years Congress enacted a number of limited statutes; provisions for disclosure and reporting of contributions and expenditures were enacted and amended; in due time Congress imposed a ban on contributions by corporations, followed by a ban on contributions by labor unions; successive statutes put limits on the amounts an individual could contribute to candidates for federal office, and in 1939 an absolute limit ($3 million) was put on annual expenditures by national political committees.
 
 
 17
 The achievements of the statutes were overmatched by what proved to be wholesale circumvention, including notably the invention and proliferation of political committees that purported to be independent and outside the knowledge and control of the candidates and designated campaign committees. The infinite ability to multiply committees eviscerated statutory limitations on contributions and expenditures.[19]
 
 
 18
 The escalation of the 1972 election and the shock of its aftermath led to a call for comprehensive corrective measures. Congress found that federal election campaigns have become enormously expensive, with costs increasing at an "alarming"[20] rate. An estimated $400 million was spent in 1972 for nomination and election campaigns almost a 300% increase since 1952, in a period when the consumer price index rose 57.6%. In 1972, Presidential campaign spending alone totaled $94.4 million up 67 percent from $56.4 million in 1968; up 147 percent from $38.1 million in 1964; and up 247 percent from $27.2 million in 1960. Findings IIA, P 51; I, PP 89, 93; Brief for Intervening Defendants at 34.
 
 
 19
 Congress found in the words of the House Report:
 
 
 20
 The unchecked rise in campaign expenditures coupled with the absence of limitations on contributions and expenditures, has increased the dependence of candidates on special interest groups and large contributors. Under the present law the impression persists that a candidate can buy an election by simply spending large sums in a campaign.[21]
 
 
 21
 The record documents the interaction of ever-increasing campaign expenditures, and reliance on large contributions from monied and special interests. By 1974, as the agreed findings establish, one percent of the people accounted for 90 percent of the dollars contributed to federal candidates, political parties and committees.[22] Just 2-3 percent, the wealthiest people in the country, are responsible for about 95 percent of the financing for Congressional elections.[23]
 
 
 22
 The sheer volume of special interest group money is enormous. The findings identify for the 1972 and 1974 elections not only the millions of total contributions by labor groups, business groups, health groups and agricultural groups,[24] but also how large they loom to individual candidates.[25]
 
 
 23
 Plaintiffs say the need to seek contributions is a democratic check on candidates. The contention has some merit, dependent on moderation. In practice, however, candidates were compelled to allot to fund raising increasing and extreme amounts of time and energy. Senator Hollings testified that survival required candidates for national office to "set down a policy where they won't go see people other than those who can give money."[26] Joseph Cole, finance chairman for the Democratic National Committee, testified from his experience in some four or five Presidential campaigns, how dog-tired candidates must arise early in pursuit of large contributions, and continue "all day long and all night long." "(How) much time do you think a Presidential candidate spends on fund raising? . . . at least 70 percent of his time, and I think all of his waking hours. It is really demeaning, demeaning to go through it."[27]
 
 
 24
 In advocating public subsidy to relieve candidates of "potentially corroding dependence on personal or family fortune or the gifts of special interest backers," Senator Biden referred to the pressure on candidates to avoid speaking out on issues lest campaign funds be cut off.[28]
 
 
 25
 Senator Russell Long pinned the pervasive problem in these words:[29]
 
 
 26
 (W)hen you are talking in terms of large campaign contributions . . . the distinction between a campaign contribution and a bribe is almost a hair's line difference . . . .
 
 
 27
 The quality of political contributions as denotive of freedom of thought and association must be reappraised realistically, so far as large contributions are concerned, in the light of the common practice of many large donors of contributing to both candidates for the same office. The agreed findings establish that during the 1974 Congressional elections, 120 registered interest groups gave contributions on 278 occasions, totaling over $676,000, to two or more candidates running for the same office.[30] Contributions to both parties were made in 1972 by Gulf Oil (illegal contributions to President Nixon, Senator Jackson, and Congressman Mills), and by American Milk Producers, Inc., a large dairy cooperative whose legal and illegal contributions were made to Nixon, Mills, and Humphrey.[31]
 
 
 28
 Large contributions are intended to, and do, gain access to the elected official after the campaign for consideration of the contributor's particular concerns.[32] Senator Mathias not only describes this but also the corollary, that the feeling that big contributors gain special treatment produces a reaction that the average American has no significant role in the political process.[33]
 
 
 29
 The concepts of political trust (trust in government) and its converse, political cynicism and alienation, are the subject of agreed findings. Illustrative is the trend revealed by the polls seeking responses to this question.Would you say the government is pretty much run by a few big interests looking out for themselves or that it is run for the benefit of all the people?[34]
 
 
 30
 Congress and the public had become informed of the various aspects of the 1972 campaign.[35] Revelations of huge contributions from the dairy industry,[36] a number of corporations[37] (illegally) and ambassadors and potential ambassadors,[38] made the 1972 election a watershed for public confidence in the electoral system. Such matters dramatize rather than define the widespread concerns over the problem of undue influence. After extensive investigation, Congress concluded that such corrupt and pernicious practices are more likely to occur when there are no effective limits on amount of campaign expenditure. In short, big-spending campaigns pull like a magnetic field.
 
 
 31
 Congress knew there were no absolute guarantees that its reforms the combination of strengthened disclosures, shrinkage of total campaign expenditures, and provision of public funds in amounts (hopefully sufficient for the purpose) authorized by taxpayers would achieve the objective of curbing the excesses of campaign financing permeated by contributions of monied and special interests.
 
 
 32
 But Congress knew, too, that the perfect can be the enemy of the good, and that inaction, for whatever reason, may breed a noxious reaction. The statute was responsive to Congress's finding of "a definite need for effective and comprehensive legislation in this (campaign finance) area to restore and strengthen public confidence in the integrity of the political process" confidence that had declined, at least in part, because of campaign financing abuses.[39]
 
 
 33
 Standard for Review of Campaign Measures Passed by Congress
 
 
 34
 It is a salient contention of plaintiffs that political contributions and expenditures are so permeated with the freedoms of speech, press and political association[40] guaranteed by the First Amendment that they are not constitutionally subject to restriction in amount.
 
 
 35
 We disagree. In our view, the pertinent standard is that set forth by the Supreme Court, albeit in another context, in United States v. O'Brien,391 U.S. 367, 376-77, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (footnotes omitted):
 
 
 36
 This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 37
 The constitutional power of Congress to regulate federal elections (including the pre-election stages) is extensive.[41] Here the Government has a clear and compelling interest in safeguarding the integrity of elections and avoiding the undue influence of wealth. Both the reality and appearance of electoral corruption justify Congressional intervention.
 
 
 38
 Ours is a nation that respects the drive of private profit and the pursuit of gain, but does not exalt wealth thereby achieved to undue preference in fundamental rights. The right to vote cannot be conditioned on a poll tax. Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). No compelling interest justifies restriction of voting on general obligation municipal bonds to real property taxpayers. Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970). In Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court held that huge filing fees as a condition of getting on the ballot were an unconstitutional impediment to candidates based on disparity of wealth. Even a moderate fee cannot be required of an impecunious candidate without providing a reasonable alternative means of ballot access. Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). The principle of equality in political suffrage rights has the constitutional footing of the "one man, one vote" principle. Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).
 
 
 39
 It would be strange indeed if, by extrapolation outward from the basic rights of individuals, the wealthy few could claim a constitutional guarantee to a stronger political voice than the unwealthy many because they are able to give and spend more money, and because the amounts they give and spend cannot be limited.
 
 
 40
 The Constitution also takes account of the governmental interest in curbing the appearance of undue influence, in order to avoid the corrosion of public confidence that is indispensable to democratic survival. In Civil Service Commission v. Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973), Justice White articulated this:
 
 
 41
 (I)t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.
 
 
 42
 There is a positive offset to plaintiffs' invocation of the First Amendment in the presentation by intervening defendants that the statute taken as a whole affirmatively enhances First Amendment values. By reducing in good measure disparity due to wealth, the Act tends to equalize both the relative ability of all voters to affect electoral outcomes, and the opportunity of all interested citizens to become candidates for elective federal office. This broadens the choice of candidates and the opportunity to hear a variety of views.
 
 
 43
 We are not here concerned with a complete ban on political activity such as has been adopted for corporations, labor unions, and government employees. In 1973 the Court reaffirmed the ban on government employees on the principle that the balance struck by Congress was permissible, in view of the important interests served, "if the Government is to operate effectively and fairly (and) elections are to play their proper part in representative government . . . ."[42] Here, however, we are not concerned with a ban on political activity, but with a limitation on amount, without any discrimination based on party or orientation of speech or activity.
 
 
 44
 To the extent that prohibitions and restraints imposed by the Act in service of the compelling government interest in insuring the integrity of federal elections against undue influence work incidental restrictions on First Amendment freedoms, these constraints, broadly considered, are necessary to assure the integrity of federal elections.[43]
 
 
 45
 Plaintiffs rely on a contention, derived from Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), that the legislature's end "can be more narrowly achieved" with "less drastic means" and less restriction on freedoms.
 
 
 46
 The doctrine of "less drastic means" has particular scope when the court is concerned with the types of regulatory methods used by the legislature. If it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000. On questions of degree, of drawing the line, sound doctrine gives Congress latitude for reasonable judgments[44] unless the degree of regulation is so stark as to border on prohibition.[45]
 
 
 47
 Ultimately it is plaintiffs' position that the legislation under attack is doomed by its comprehensiveness[46] and that reporting and disclosure are sufficient intrusion. However, the combination of measures reflects a legislative conviction that the intermesh of reinforcing measures is needed to cope with the grave abuses. We see no principled basis on which a court can displace the legislative judgment that reporting and disclosure are necessary, but not sufficient, remedies to achieve the objective of trammeling "the pernicious influence of 'big money' campaign contributions."[47] The judgments of Theodore Roosevelt and Elihu Root[48] have been borne out by our experience for in large part the circumvention of this century's legislation has led in practice to little more than reporting requirements. If to some extent more recent measures would have closed earlier gaps, there remains the inherent dilemma of handling the familiar phenomenon of contributions consummated and reported in the closing stages of a campaign. More important still is the legislative conviction that full reporting will not cope with the undue influence problem inherent in the conditions of the 1970's, with massive campaigns escalating in volume, and candidates increasingly driven to concentrate on ever-mounting contributions. The wiles of ambitious office seekers and their supporters are not easily cabined.
 
 
 48
 The provisions for public financing, which will be discussed in some detail, are not to be viewed in isolation, but as part of a series of reinforcing measures to protect elections against the abuse of corruption and undue influence. So, too, with the mechanism provided by Congress for monitoring its objectives the Federal Election Commission. Certain constitutional questions are presented by this agency's structure, and they will be considered. In assessing the past ineffectiveness of federal election legislation, Congress was rightfully concerned with the need for continuous bi-partisan monitoring, and with the problems posed if total responsibility is assigned to a President whose election may be the product of practices that demand review.
 
 
 49
 Defendants go too far in saying that this is ordinary legislation, entitled to the conventional presumption of validity that would be applicable, say, to economic regulation. In view of the interests involved, both the compelling government interest needed to sustain such provisions, and the associational freedoms that are impinged, strict judicial scrutiny of the challenged provisions is appropriate.
 
 
 50
 The need for exacting judicial scrutiny is underscored by the plaintiffs' contention that the legislation is a composite of measures that serve the interests of the "ins" members of Congress already elected in resisting the incursions of the "outs." Such a contention, if substantial, is a warning signal that dilutes the deference courts give to legislatures, at least until the matter is painstakingly considered. In any event, we are aware that serious constitutional questions are raised by measures that may inhibit potential candidates.[49] And in pondering the certified questions we have closely scrutinized plaintiffs' contentions.
 
 
 51
 In the light of this scrutiny, we do find one section, 2 U.S.C. § 437a, unconstitutional on First Amendment right of association and free speech grounds. Section 437a was injected by the Conference Committee, is not a core section and is plainly severable from the balance of the legislation. With this exception, it is the view of the court, considering only those challenged provisions now ripe for judicial examination because they exert an "inhibitory effect"[50] by their very existence, that the core provisions of the challenged acts do not violate the First Amendment's guarantees of fundamental freedoms. We discuss them briefly below, especially those provisions the facial meaning of which has given us difficulty; we leave for future litigation framed in the context of concrete facts the validity of other provisions and of all provisions as applied.
 
 
 52
 II. Synopsis of the Key Provisions of the Challenged Acts
 
 
 53
 Because the statutory provisions in suit are complex, comprehensive, and interrelated, we present a brief outline of the statutory framework before turning to the certified constitutional questions.
 
 Contribution and Expenditure Limitations
 
 54
 A person[51] may make a contribution[52] of up to $1000 to a candidate[53] for a federal office[54] in his or her primary race, and another contribution of up to $1000 for his or her general election. 18 U.S.C. § 608(b)(1). This is because the law treats general, special, primary, and runoff elections as separate, distinct elections. Id. § 591(a). There is an exception to this rule for the various state Presidential primaries, which are all treated as a single primary for contribution purposes only. Id. § 608(b) (5).[55]
 
 
 55
 The law allows an individual to make contributions of up to $25,000 in any calendar year, id. § 608(b)(3), which would mean, for example, $1000 for a Presidential candidate's primary, $1000 for a Presidential candidate's November election, and up to twenty-three other primary or general election contributions of up to $1000 to candidates for federal office (Senate and House) around the country. For purposes of the $25,000 ceiling, the law treats all contributions made in connection with the same election season as made in the year of the general election. Id. And it treats contributions to a Vice Presidential candidate as contributions to his Presidential running mate. Id. § 608(b)(4)(B). No contribution of currency may, in the aggregate, exceed $100. Id. § 615(a).
 
 
 56
 In addition to making political contributions of up to $25,000 per year, a person may make unlimited outlays to voice his views on public issues and campaign issues, subject only to the limitation that if he makes an expenditure[56] "relative to a clearly identified candidate" and "advocating the election or defeat of such candidate" all expenditures relative to that candidate may not exceed $1000. Id. § 608(e). There is no provision analogous to the $25,000 ceiling on contributions, so presumably a person may make expenditures of up to $1000 relative to an unlimited number of candidates for federal office.
 
 
 57
 A political committee[57] may make contributions of up to $5000 to a candidate, provided that the committee has been registered with the Federal Election Commission for more than six months. Id. § 608(b)(2).
 
 
 58
 Candidate expenditure ceilings permit overall spending of $10,000,000 in all Presidential primaries, although in any given state the ceiling is twice the Senatorial primary ceiling. Id. § 608(c)(1)(A). Candidates for President in the general election may spend no more than $20,000,000. Id. § 608(c)(1)(B). Those seeking nomination for election as Senator may expend only eight cents times the voting age population of the state, or one hundred thousand dollars if that sum is larger. Id. § 608(c)(1)(C). In Senatorial general elections, the expenditure limitation is twelve cents times the voting age population, or one hundred fifty thousand dollars if that sum is larger. Id. § 608(c)(1)(D). In House races in states entitled to only one Representative, the Senatorial limits apply. Id. § 608(c)(1)(C), (D). In all other House races, the candidate may spend seventy thousand dollars in the primary, and the identical sum in the general election. Id. § 608(c)(1)(E).[58] In addition to the sums specified above, each candidate may spend up to twenty per cent of the applicable expenditure limit under section 608(c) solely for the purpose of soliciting contributions, without those disbursements being considered "expenditures" and therefore without their being counted against the candidate's overall expenditure ceiling. Id. § 591(f)(4)(H).
 
 
 59
 Notwithstanding any of the above provisions or limitations, the national committee of a political party and a state committee or its geographic subdivisions may make the following expenditures with respect to the general elections of affiliated candidates for federal office:
 
 
 60
 1. For President: not greater than two cents times the voting age population (VAP) of the United States by the national committee only (at the present time, the VAP of the United States is approximately 141 million, providing a sum in excess of $2.8 million).
 
 
 61
 2. For Senator, or Representative in a state entitled to only one Representative: two cents times the voting age population of the state, or $20,000 if greater.
 
 
 62
 3. For all other House races: $10,000.
 
 
 63
 Id. § 608(f). The expenditure ceilings set for candidates and national and state party committees shall be annually adjusted to reflect changes in the Consumer Price Index. Id. § 608(d).[59]
 
 
 64
 As indicated above, no national bank or corporation organized by authority of any law of Congress may make political contributions or expenditures of any sort in any federal, state, or local election. Id. § 610. All corporations and labor organizations are prohibited from making any contribution or expenditure in Presidential, Senatorial or House primaries, caucuses, conventions or general elections. Id. Voluntary segregated funds to which shareholders of a corporation or members of a labor union contribute are excepted from this ban and treated as political committees. Id.; see id. § 591(d).
 
 
 65
 Section 9008 of Subtitle H limits the national convention expenditures of national committees of major and minor parties to $2 million, adjusted annually for changes in the cost of living. 26 U.S.C. § 9008. The Commission may authorize an exception to this limitation if, "due to extraordinary and unforeseen circumstances, such expenditures are necessary to assure the effective operation of the presidential nominating convention by such committee." Id. § 9008(d)(3).
 
 
 66
 In addition to the individual contribution and independent expenditure limits discussed above, the law tightly limits the use of personal and immediate family funds by candidates. No more than $50,000 of such monies can be expended by a candidate for President or Vice President, $35,000 in the case of a Senatorial candidate or a House candidate in a state entitled to only one Representative, and $25,000 in the case of a House candidate in any other state. 18 U.S.C. § 608(a)(1). This ceiling is an overall limit, and thus the candidate may not apply it to each separate stage of the electoral process, i. e. nomination, convention, and election. Id. Immediate family "means a candidate's spouse, and any child, parent, grandparent, brother, or sister of the candidate, and the spouses of such persons." Id. § 608(a)(2).
 
 Disclosure Requirements
 
 67
 Political committees must keep detailed records of individuals contributing in excess of $10, and these nondisclosed records are subject to audit by the Commission. 2 U.S.C. §§ 432, 438. The political committee must disclose the name, occupation and principal place of business of anyone who contributes in excess of $100. Id. § 434(b)(2). All persons who contribute or expend in excess of $100 must file with the Commission if their transaction was not with a political committee or candidate. Id. § 434(e). Members of Congress, however, are not required to report either as contributions received or expenditures made, the value of photographic or recording services furnished to officeholders by the House and Senate bureaucracies or the national party Congressional committees, except in the year of an election. Id. § 434(d).
 
 
 68
 Persons (other than individuals) who expend funds or do acts directed to the public for the purpose of influencing the election or advocating election or defeat of candidates shall file with the Commission in the same manner as a political committee. Id. § 437a. Government publications, news stories, commentaries, and editorials in bona fide publications are exempt. Id.
 
 Public Financing
 
 69
 Unlike the contribution and expenditure limitation provisions and the disclosure requirements, which apply to all campaigns for federal elective office, the public financing provisions apply only to contests for the Presidency.
 
 
 70
 The Presidential Election Campaign Fund, established by section 9006 of Subtitle H, is funded with revenue monies that are transferred to the Fund by the Secretary of the Treasury in accord with the wishes of taxpayers checking off one and two dollar sums on their income tax returns under 26 U.S.C. § 6096. Individuals and joint taxpayers may express only a desire to transfer monies to the Fund, or to withhold them; unlike earlier proposals, the statute does not authorize them to indicate a candidate or party preference.
 
 
 71
 Federal funds are to be applied to three stages of ballot access and election in the Presidential campaign: Presidential primaries, nominating conventions, and the general election itself. Pursuant to priorities established in id. §§ 9008(a), 9037(a), monies must first be expended to finance the national nominating conventions, then the general election, and, if sums remain, the primary races.
 
 
 72
 Chapter 95 of Subtitle H establishes three categories of parties major parties, minor parties, and new parties for the purpose of allocating monies from the Presidential Election Campaign Fund. A major party is defined as one whose candidate in the preceding Presidential election received 25 percent or more of the total popular vote. Id. § 9002(6). A minor party is defined as one whose candidate for President in the previous election received 5 percent or more of the popular vote, but less than 25 percent. Id. § 9002(7). All other parties are deemed "new parties." Id. § 9002(8).
 
 
 73
 Section 9008 of Subtitle H, which limits major party convention spending to $2 million, provides an identical sum as the public funding entitlement of a major party for its national convention. The convention financing entitlement of a minor party is determined by computing the ratio between the minor party's share of the previous popular vote and the average share of all major parties. No comparable funding is provided for nominating conventions for new parties, or for parties which choose not to conduct a convention, or for independent candidacies. Major and minor parties may receive payments beginning on July 1 of the year prior to the convention. Id. § 9008(e).
 
 
 74
 The major-minor-new party division, which attempts to apportion public funding for conventions without allowing raids upon the Fund by wholly frivolous or doomed candidacies, is also used to establish threshold requirements for general election funding. A provision of Subtitle H provides equal general election funding of $20 million for all major party candidates. Id. § 9004(a). As a condition of public funding, however, a candidate must agree to furnish to the Commission, upon request by the Commission, certain books, records, and evidence of qualified expenses (defined at id. § 9002(11)), and also to submit to a Commission audit of his qualified campaign expenses. Id. § 9003(a). Further, a major party candidate may not incur qualified campaign expenses in excess of his public funding entitlement. Id. § 9003(b)(1). And a major party candidate must certify that he will not accept private funding, except to the extent that the Fund is incapable of providing the full entitlement of public monies. Id. § 9003(b)(2).
 
 
 75
 The entitlement of the minor party candidates to public funding in the general election is computed on the basis of the ratio of the minor party's share of the popular vote in the previous Presidential election to the average share of the major parties. Id. § 9004(a)(2)(A). Unlike major party candidates, those of minor parties, who are not entitled to full public funding, need not certify that they will not accept private funding, but must certify that they will abide by the overall Presidential expenditure ceiling. Id. § 9003(c).
 
 
 76
 Subtitle H also provides for retroactive payments to candidates of minor or new parties who either garner more votes than their track record would have indicated (minor parties) or who had no previous track record (new parties). To discourage frivolous campaigns designed to obtain public funding, 5 percent of the total popular vote is the minimum cutoff for public financing, and candidates who fail to meet that cutoff are not entitled to retroactive funding. Minor party candidates receiving pre-election funding are entitled, post-election, only to the difference between the entitlement based upon previous track record and the entitlement reckoned on actual vote count. Id. § 9004(a)(3).
 
 
 77
 Subtitle H establishes different paths to general election funding by defining "candidate" in two different ways: either the nominee of a major party, or an individual qualified to have his name (or those of electors pledged to him) on the ballot of 10 or more states. Id. § 9002(2). Thus, while candidacies of independents, new parties, or minor parties not holding conventions are not entitled to any analog of public funding for conventions, they may be entitled to general election funding (albeit after the election in the case of a nonestablished candidacy).
 
 
 78
 The third stage of the Presidential selection process which may receive public funding is the nominating primary (actually a series of state-by-state primaries). Because the number of participants is largest at this earliest stage of a campaign, the law imposes stringent threshold requirements to restrict public expenditures to the category of serious contenders.
 
 
 79
 Chapter 96 of Subtitle H is known as the Presidential Primary Matching Payment Account Act. As with general election funding, certification that the candidate will abide by the overall and state-by-state expenditure ceilings is a prerequisite for eligibility. Id. § 9033. Public payments for primaries draw upon a simple matching fund; for every qualified dollar raised in private contributions, the Account will give the candidate one dollar in public funds. Although every eligible candidate is entitled to receive contributions of up to $1000 from every individual, 18 U.S.C. § 608(b)(1), the Act provides matching funds only for the first $250 of each contribution. 26 U.S.C. § 9034(a).
 
 
 80
 The threshold formula is also somewhat complex. Chapter 96 clearly deems eligible for matching funds only a candidate "seeking nomination by a political party for election to the office of President of the United States." Id. § 9033(b)(2) (emphasis added). Thus, any candidate claiming to pursue an independent (nonparty) route to the ballot is ineligible for this portion of public financing. To be eligible for matching, a candidate is required to have raised $5000 in private primary contributions in each of at least 20 states, and only the first $250 of any person's contribution counts toward this $5000.
 
 
 81
 The public funding provisions of Subtitle H manifestly dovetail with the contribution and expenditure ceilings set in FECA, and they should be viewed as complementary stratagems.
 
 III. In Limine Questions
 
 82
 Our first inquiry must be into the meaning and application of the major review provision of FECA, section 315(a), codified as 2 U.S.C. § 437h.[60] By its plain words, the first sentence is a broad grant of legislative standing to sue,[61] embracing any individual eligible to vote in any election for the office of President. However, this does not entitle the eligible plaintiffs to raise any conceivable constitutional issue with respect to the Act and the relevant criminal sections, no matter how remote or speculative. We perceive no congressional intent to waive article III's requirement that there be a present "case or controversy."[62] The declaratory judgment, often seen as the outer limits of article III jurisdiction, nevertheless requires that there be an actual controversy.[63]
 
 
 83
 In answer to Constitutional Question No. 1,[64] therefore, we reply that since nothing in the first sentence of Section 437h must be read to require rendering an advisory opinion, no violation of the "case or controversy" requirement of article III, section 2 appears. Congress was concerned with the inhibitory effect of a massive rearrangement of regulations operating upon federal campaigns and elections,[65] and wanted election participants to be permitted expeditiously to test the facial validity of limitations and requirements imposed by the challenged Acts. Consistent, however, with the underlying need for "case or controversy," actions are not to be decided unless the inhibitory effects of the challenged provisions are "definite and concrete," "touching the legal relations of parties having adverse legal interests," and "admitting of specific relief through a decree of a conclusive character."[66]
 
 
 84
 Seen through the lens of "inhibitory effect," Question No. 2[67] may be answered, "Yes, subject to considerations of ripeness." Each of the plaintiffs has shown enough injury to maintain a "case or controversy" as to one or more issues but not for all issues, since a number of issues are held not ripe for resolution in the factual context underlying certification.
 
 IV. Contribution and Expenditure Limitations
 Limitations on Contributions
 
 85
 The ample power of Congress to regulate federal elections[68] embraces, in our view, the power to adopt per candidate and over-all limitations on the amount that an individual or political committee may contribute in the context of federal elections and primaries.
 
 
 86
 Question 3(b)[69] certifies the question whether FECA's limitations on contributions to or for a candidate are constitutional. We believe that in the context of past abuses and present needs the statutory contribution limit of $1,000 per candidate per election[70] (with primary and general elections counted as two separate elections)[71] serves a compelling governmental interest. Nor do we find constitutionally infirm the provision limiting to $25,000 the total contributions permitted in any calendar year.[72]
 
 
 87
 Limitations on Independent Expenditures Relative to a Clearly Identified Candidate
 
 
 88
 Question 3(d)[73] inquires as to the validity of the $1,000 limitation upon expenditures "relative to a clearly identified candidate,"[74] (as distinguished from contributions[75].
 
 
 89
 This provision is new, and its importance arises from the strict limitation in FECA upon contributions for the benefit of a candidate, whether made directly, to an agent, or to any political committee supporting him. 18 U.S.C. § 608(b) (6). Prior to FECA, the limitations on contributions were widely circumvented by the multiplication of so-called independent committees. With FECA's closing of this loophole, Congress foresaw another: that large independent expenditures by individuals and groups advocating the candidate's election or urging defeat of his opponent might effectively circumvent the individual contribution limitations of section 608(b) and the candidate expenditure ceilings of section 608(c). An expenditure may obviously inure to the benefit of a candidate even though the expenditure was not directed by the candidate and the candidate was not in control of the expenditure or of the goods or services purchased.
 
 
 90
 We hold that the limitation on expenditures relative to a clearly identified candidate is a necessary and constitutional means of closing a loophole that would otherwise destroy the effectiveness of other statutory provisions.[76] But section 608(e) is a loophole-closing provision only, and it bars only those expenditures directly relative to a clearly identified candidate. We underline the statute's phrase "advocating the election or defeat of such candidate" and give it a restrictive reading.
 
 
 91
 Section 608(e) parallels the general $1,000 limit on contributions so as to cover an expenditure by a person that is "relative to a clearly identified candidate" even though it was not made at the request of a candidate or his agent or authorized committee. The term "clearly identified" requires a clear reference to the candidate either by name, photograph, or drawing, or some other unambiguous reference. In our view, in addition to a clear and unambiguous reference, the expenditure must clearly be "advocating the election or defeat of such candidate." Further, expenditures relative to clearly identified candidates stand in contradistinction to expenditures relating primarily to issues of public policy, and the latter are not limited at all by the challenged Acts. An expenditure relating primarily to issues of public policy does not become subject to the $1,000 limitation merely because it contains a clear and unambiguous reference to a candidate, unaccompanied by a message advocating election or defeat; e. g., a list of those in support of or in opposition to the relevant issue position. The test, then, is whether the expenditure (or the publicity which it buys) taken as a whole amounts to a clear advocacy of the election or defeat of a clearly identified candidate.
 
 
 92
 Limitations on Use of Personal Funds of Candidate and Family
 
 
 93
 We next consider Question 3(a)[77], which focuses on the provisions in section 608(a)[78] limiting candidate out-of-pocket and out-of-family-pocket expenditures. These provisions were added by the FECA of 1971[79] to a scheme that did not then include either contribution limits or overall expenditure ceilings.
 
 
 94
 Plaintiffs attacked these provisions in the First Amended Complaint as too restrictive,[80] and in brief as a lax loophole in the $1,000 contribution ceiling.[81] Clearly, the personal and family funds expenditure limitation of the FECA of 1971 and the contribution limitations of the FECAA of 1974 operate together to avoid any gaping loophole such as plaintiffs suggest. In fact, the out-of-pocket and out-of-family-pocket expenditure provisions merely serve to relax the $1,000 per candidate contribution limit for a candidate and his immediate family. Section 608(a) does not serve, however, to relax the section 608(b)(3) $25,000 contribution ceiling. The latter provision, enacted after the limitation on out-of-pocket and out-of-family-pocket expenditures, contains no exception for a candidate's family members. Thus, a family member's participation in the candidate's § 608(a)(1) expenditures must be deemed a "contribution" under § 608(b), and counted against the family member's § 608(b)(3) $25,000 contribution ceiling.
 
 
 95
 Similarly, § 608(c),[82] which establishes the candidate's overall campaign expenditure ceilings, was enacted after the FECA of 1971 personal funds limitation and contains no exception for personal and family funds. Thus, a candidate entitled to make expenditures from personal or family funds in his race for federal office must count those expenditures towards the applicable overall expenditure ceiling.
 
 
 96
 Furthermore, section 608(a) does not affect at all the operation of section 608(e),[83] which was enacted after the FECA of 1971 and which limits expenditures relative to a clearly identified candidate to $1,000. Candidates and their family members are treated identically with other persons; the right of family members to make up to $1,000 in independent expenditures relative to a clearly identified candidate (whether within the family or not) is unfettered.
 
 
 97
 Thus read, it can be seen that the chief strength of these provisions is that they provide a candidate the opportunity to raise quickly, free of the $1,000 limitation on loans as well as gifts,[84] a portion of the applicable overall expenditure limit for use as either "seed money" or an end-of-campaign countercharge cushion.[85] We believe that Congress may treat the personal monies of a candidate and family monies attributed to a candidate differently, to some extent, from monies raised from the public at large, and could conclude with good reason that the flexibility section 608(a) provides a candidate is beneficial. Manifestly, the core problem of avoiding undisclosed and undue influence on candidates from outside interests has lesser application when the monies involved come from the candidate himself or from his immediate family. Congress was not acting unreasonably when it chose to make some reasonable distinction on this basis and to give the candidate and family a greater latitude to "contribute" while still subjecting such intrafamily transactions to the flat contribution ceiling and to the limitation upon independent expenditures.
 
 
 98
 If these provisions governed only the personal funds of candidates, they might favor the wealthy, but given the number of individuals who are considered to be within his "immediate family", even a candidate in modest circumstances obtains the flexibility to raise useful sums, while a wealthy one is restricted by the family ceiling as to the percentage of family assets that may be brought to bear. Moreover, the ratio of permitted family expenditures to overall expenditure ceilings is such that in all federal election campaigns not wholly publicly-funded, a candidate desiring to conduct a hard-hitting campaign will be compelled to go to the populace to raise most of his funds. Thus, section 608(a) establishes additional candidate options without raising barriers to more modestly circumstanced candidacies and without substantially undermining movement toward equalized spending by very rich and very poor candidates.
 
 
 99
 Limitations on Volunteers' Incidental Expenses
 
 
 100
 Question 3(c)[86] asks whether constitutional rights are violated by the provisions of 18 U.S.C. § 591(e)[87] and § 608(b),[88] which limit the incidental expenses that volunteers working in a political campaign may incur to amounts specified in the statute. As background, we note that the challenged provisions treat volunteer campaign assistance differently from the donation of money. We believe that it is rational for Congress to do so, because the history of campaign abuses recently brought to light reflects major abuses in campaign financing, not in volunteer activities. Plaintiffs contend that donation of money and volunteering of services must be treated similarly because they are substantially fungible. But we believe that the differences outweigh the similarities, particularly with respect to the potential for abuse, and that those differences are a valid basis for differential treatment. The possibility of abuse in volunteer activities is at present conjectural and speculative. When and if such abuses develop, the court, taking into account whatever Congress does or fails to do, can consider such legal attacks as may then lie.
 
 
 101
 With the basis for this distinction in mind, we turn to the specific issue raised by the certified question. Under section 591(e)(5)(A), "the value of services provided without compensation by individuals who volunteer a portion or all of their time" is specifically excluded from the definition of "contribution." Thus, no estimate is made of the dollar worth of a volunteer's time nor is that amount counted against the volunteer's section 608(b) per candidate contribution limitation of $1,000. But certain categories of financial outlays by volunteers are excluded from the definition of "contribution" only to the extent that they do not exceed $500. Thus, if a volunteer provides a candidate or political committee with coffee-klatch type functions in the volunteer's residence, see id. § 591(e)(5)(B), or supplies food or beverages to the campaign at cost (thereby foregoing a normal vendor's profit), see id. § 591(e)(5)(C), or makes unreimbursed travel expenses while rendering personal services, see § 591(e)(5)(D), the value of those activities will be deemed a contribution from volunteer to candidate to the extent that it exceeds $500. That contribution is then chargeable to the volunteer's section 608(b) limit of $1,000 with respect to the recipient candidate.
 
 
 102
 It can readily be seen that "contribution" treatment for incidental volunteer expenses in excess of some reasonable amount is a necessary loophole-closing provision, designed to prevent contributions by indirection. To allow a volunteer no financial elbow room would tend to reduce desirable political participation, but the specific sum chosen as the cutoff point for non-contribution treatment is reasonable legislative line-drawing. We view this loophole-closing device in light of the concerns of the Congress, and we conclude that it allows sufficient flexibility for effective volunteer campaign assistance, without opening the door to wholesale circumvention of contribution and expenditure limits.
 
 Limitations on Convention Expenditures
 
 103
 Question 3(f)[89] asks whether Subtitle H violates constitutional rights in that it limits a national committee's expenditures with respect to its national nominating convention for President.[90] That limitation is contained in 26 U.S.C. § 9008(d), which establishes a $2 million ceiling on convention expenditures for both major and minor parties.[91] If public funding is available,[92] major parties are entitled to receive $2 million, and minor parties are entitled to a pro rata share based on voting success in the preceding Presidential election. All entitlements are subject to cost-of-living adjustments.
 
 
 104
 The primary purpose of a national convention is, of course, to select a party's candidates for President and Vice-President. The national convention, a democratic and open feature of the American political process, is thus a great occasion when the adherents of a party come together from the various states, formally and informally, to weld a national party.
 
 
 105
 Clearly, the legislation challenged in this suit reflects a recognition by Congress of the value of and need for national nominating conventions. Indeed, in establishing limitations on convention expenditures, Congress sought to assure an adequate source of funds for conducting the convention while at the same time preventing massive convention expenditures that would serve to launch and promote the campaign of its nominees.[93] We do not believe that Congress acted unreasonably in attempting to prevent circumvention of the limitations in section 608 on candidate campaign expenditures, especially given Congressional awareness of the ingenuity displayed in the past in circumventing campaign control measures.
 
 
 106
 As is often the case with loophole-closing provisions, the question thus becomes one of degree. On the basis of the record before us, especially in light of the fact that no party has challenged the $2 million ceiling as inadequate on the ground that it does not provide sufficient funds with which to conduct a convention, we have no basis for holding that the statutory limitation is unconstitutional.
 
 
 107
 Time Restriction on Higher ($5,000) Contribution Limit For Political Committees
 
 
 108
 Question 3(h)[94] asks whether there is a constitutional violation in the statute's requirement, 18 U.S.C. § 608(b)(2),[95] that a political committee be registered for "not less than 6 months" before being entitled to the higher ($5,000) contribution limit under the challenged Acts. Clearly, this provision only incidentally impedes the freedom of association protected by the First Amendment, because it does not prevent individuals from drawing together to act as a political committee at any time. Rather, it is a loophole-closing provision intended to prevent proliferation of dummy committees, each of a few persons, in support of federal candidacies. Otherwise, two or three persons could acquire the $5,000 committee contribution authority of section 608(b)(2) merely by organizing themselves as a political committee. The challenged Act limits such bootstrapping by interposing a six-month protective shield. During the waiting period, such political committees would be subject to the reporting and disclosures provisions of 2 U.S.C. § 434.
 
 
 109
 Suggestion that "Contribution" Definition Limits News Stories
 
 
 110
 Question 3(g) asks whether there is a constitutional infirmity in specifically exempting news stories, commentaries, and editorials from limits applied to "expenditures," without a parallel exemption from "contribution" treatment.[96] Plaintiff Human Events, Inc., a publisher of political matter, contends that its First Amendment rights are violated by this unequal statutory treatment. It suggests that it will be exposed to charges of illegal corporate contributions based on publication of copy respecting candidates for federal office. This contention, however, is based on a misunderstanding. The concept of "contribution"[97] extends only to placing something of value into the control of a candidate or his agents. Since a news story, commentary, or editorial is not within the control of the candidate or his agents, it is not a contribution, despite the obvious fact that it might redound to his benefit. The plain and simple reality is that Congress had no intention of controlling an independent press by this statute.
 
 
 111
 Since the concept of "expenditure"[98] is far broader, however, including even spending by a private citizen in support of a candidate where nothing of value is placed within the candidate's control, publishing a news story, commentary, or editorial might arguably constitute an expenditure to benefit a candidate for federal office, and the specific exemption to foreclose that reading therefore makes sense. With the statute thus explained, plaintiffs have no reason to fear exposure to charges of illegal corporate contributions based on the publication of copy respecting a candidate for federal office.
 
 Limitation on Expenditures by Candidates
 
 112
 Question 4(a)[99] asks about limitations upon overall campaign expenditures by candidates, provisions that in large measure track those addressed to contribution limits. Plaintiffs suggest that the governmental interest in preserving the purity of the electoral process by limiting skyrocketing campaign expenditures is not compelling. Moreover, plaintiffs argue that corruption can be controlled by less restrictive measures, such as bribery statutes and disclosure requirements. We disagree, and uphold the expenditure ceilings imposed by 18 U.S.C. § 608(c)[100] as an essential ingredient in the regulatory scheme propounded by this comprehensive legislation, one which reduces the incentive to circumvent direct contribution limits and bans.
 
 
 113
 From 1911 through the repeal of the Federal Corrupt Practices Act by FECA in 1972, overall expenditure ceilings were in effect for Senate and House races.[101] In the only prosecution ever brought thereunder, ceilings were held unconstitutional as applied to primary elections, on the ground that a party primary was not a federal election. Newberry v. United States, 256 U.S. 232, 247, 258, 41 S.Ct. 469, 65 L.Ed. 913 (1921). Federal authority to regulate primaries for federal office was established in the case of United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). After Newberry, Congress acted to update federal election law, and enacted the Federal Corrupt Practices Act, which contained expenditure ceilings for general elections. Upholding that Act in Burroughs & Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934), the Supreme Court said: "(I)t seems plain that the statute as a whole is calculated to discourage the making and use of contributions for purposes of corruption." Id. at 548, 54 S.Ct. at 291. Although Burroughs did not involve a First Amendment challenge, and although the Court did not specifically discuss the overall expenditure ceilings, the case has been cited with approval by the Supreme Court in upholding the strictures of the Federal Regulation of Lobbying Act against attack on the grounds of denial of freedom of speech and association. United States v. Harriss, 347 U.S. 612, 625, 74 S.Ct. 808, 98 L.Ed. 989 (1954). From the repeal of the Federal Corrupt Practices Act in 1972 until the effective date of the FECAA of 1974, Congress tried limitations upon media expenditures (which are presumably easier to track) in place of overall campaign ceilings.[102] In the FECAA of 1974, however, Congress again imposed overall limits.
 
 
 114
 Plaintiffs suggest that Congress lacks the power to decide when a candidate for office has had "too much communication with the voters." They argue that if the public is to benefit from full and robust debate of public issues and personalities, then the range of debate may not be limited. But given the power of money and its various uses, and abuses, in the context of campaigns, there is a compelling interest in its regulation notwithstanding incidental limitations on freedom of speech and political association.
 
 
 115
 Plaintiffs would buttress their argument by asserting that overall expenditure ceilings also infringe the right of potential donors to participate in the political process, by making it impossible or nugatory for them to give additional dollars to a candidate or campaign which has reached its expenditure limit. This latter argument avails plaintiffs nothing, for 2 U.S.C. § 439a[103] permits an officeholder or successful candidate for federal office to apply unspent contributions to "defray any ordinary and necessary expenses incurred by him in connection with his duties as a holder of Federal office," or to contribute those funds in turn to any organization described in 26 U.S.C. § 170(c), or to use the funds for any other lawful purpose. Such applications of unspent contributions must be disclosed to the Federal Election Commission. Under this provision, the private citizen is not deterred from giving his statutory maximum contribution, even if the maximum has already been spent on the campaign by the candidate. Further, if there are any political advantages to the donee candidate in receiving such donations, or in the association symbolized by accepting them, they can be realized. Overall expenditure ceilings allow the candidate to be selective as to which donors' gifts he will accept.
 
 
 116
 In the context of overall expenditure ceilings, therefore, a discussion of the rights of the contributor is misplaced; overall expenditure limits primarily bear upon the candidate's putative right to unlimited campaigning and the right of access to the political system for candidates of only modest means, since unlimited spending by an opponent may discourage challengers.
 
 
 117
 In the broad, our answer to the question concerning the limitation on candidate campaign expenditures is set forth in Part I of this opinion. The material there amply demonstrates a compelling governmental interest, both as to need and public perception of need, that justifies any incidental impact on First Amendment freedoms. Plaintiffs argue that the Congressional objective may be achieved by a refined disclosure statute.[104] In view of the history of federal election laws and their circumvention, we have no principled basis for displacing the considered judgment of Congress that what was required in the national interest was a broader, more comprehensive approach.Claims of Discrimination in Favor of Incumbents
 
 
 118
 We have considered the charge that the limits set by Congress work an undue discrimination in favor of incumbents. Although plaintiffs sought findings in support of this theory, Judge Corcoran properly declined to provide such findings in light of the speculative nature of the assertions. The material available to the court looks both ways.[105] The political scientists draw diametric conclusions from the available information. Plaintiffs contend that only by immense expenditures can an unknown candidate compete. This may be correct for some candidates, in some situations. But it also is true that at other times a newcomer has achieved political momentum without large contributions. In a broad sense, the statute may favor relative newcomers, by limiting the access of incumbents to large donations.[106] Any advantage gained by incumbents from service to their constituents is neither novel nor pernicious. Indeed, this may be a vindication of the principles of democracy.
 
 
 119
 Plaintiffs say that limits on contributions by individuals, with disclosure, suffice to avoid abuses of large contributions, and there is no warrant for controlling expenditures, with attendant restrictions on communication. Congress was of the view that limitation on expenditures was a key ingredient in control of abuses. Realistically, limitations on contributions and disclosure requirements pose almost insuperable enforcement problems, if not supplemented by limits on expenditures. The huge and escalating expenditures are a magnet for large contributions, and for circumventions. Expenditures must come out in public, at least when significant. Candidates who wish to forge links of association, and widen political appeal, are free to solicit modest contributions without limit. These several considerations provide a validating context for the judgment of Congress that expenditures must be subject to reasonable regulation.
 
 V. Disclosure
 A. Major Provisions
 1. General Application
 
 120
 Question 7[107] asks the court to rule on the validity of the provisions in the challenged statutes requiring disclosure, in connection with elections for federal office, of contributions and expenditures in excess of stated cut-off points. Question 7(a)[108] addresses the statutory requirement that political committees keep, and make available for inspection and audit, lists of individuals who contribute more than $10.[109] The major disclosure provision, section 434(b),[110] is the subject of Question 7(b).[111] This provision requires candidates and political committees[112] to disclose the name, occupation, and place of business of any person contributing in excess of $100.
 
 
 121
 Reporting and disclosure provisions were among the earliest measures passed by Congress (in 1910) and they have persisted, with changes from time to time, to the present day. The validity of such measures was sustained in Burroughs and Cannon v. United States, 290 U.S. 534, 547-48, 54 S.Ct. 287, 78 L.Ed. 484 (1934). Although the precise issue there decided was different from those urged today, the Burroughs opinion brings out the importance of the underlying governmental interest:
 
 
 122
 The power of Congress to protect the election of President and Vice-President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress. . . . Congress reached the conclusion that public disclosure of political contributions, together with the names of contributors and other details, would tend to prevent the corrupt use of money to affect elections. The verity of this conclusion reasonably cannot be denied. When to this is added the requirement . . . that the treasurer's statement shall include full particulars in respect of expenditures, it seems plain that the statute as a whole is calculated to discourage the making and use of contributions for purposes of corruption.
 
 
 123
 Burroughs was cited with approval twenty years later in United States v. Harriss, 347 U.S. 612, 625, 74 S.Ct. 808, 816, 98 L.Ed. 989 (1954), where the Court, speaking through Chief Justice Warren, upheld against a First Amendment challenge an act requiring disclosure of contributions for lobbying:
 
 
 124
 (Congress) acted in the same spirit and for a similar purpose in passing the Federal Corrupt Practices Act to maintain the integrity of a basic governmental process. See Burroughs & Cannon v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 290, 78 L.Ed. 484.
 
 
 125
 Now another twenty years has passed and we are asked to say that those decisions are subject to intervening rulings on the First Amendment freedom of political expression. We shall discuss this issue presently. It suffices at this juncture to say that, as a division of this court recently held, the Burroughs and Harriss decisions establish the facial validity of FECA's requirement for reporting disclosure of contributions, in the absence of a factual record undercutting their standing. United States v. Finance Committee to Reelect the President, 165 U.S.App.D.C. ---, 507 F.2d 1194 (1974). We are broadly in accord with the reasoning in Stoner v. Fortson, 379 F.Supp. 704 (N.D.Ga.1974), where a three-judge district court found that the governmental interest in preserving the democratic process justified a state statute requiring disclosure of contributions of $101 or more.
 
 
 126
 With that general background, we turn to particular aspects of FECA, and begin with the record keeping and auditing provisions that permit the Federal Election Commission to inspect the lists kept by political committees of individuals who contribute more than $10. These audit provisions neither explicitly nor implicitly authorize disclosure by the Commission of contribution records. Consequently, the confidential status of those records precludes any claim of real or threatened injury to plaintiffs' First Amendment interests arising from public disclosure. We discern no basis in the statute for authorizing disclosure outside the Commission in the absence of probable cause to suspect a violation, and hence no substantial "inhibitory effect" operating upon plaintiffs at this time. Whether upon discovery of an apparent violation disclosure may be made as an incident of audit is a question that does not have sufficient "ripeness" at this time. The point of audit is soon enough to raise specific issues about the constitutionality of the audit provisions.
 
 
 127
 As to the provisions for disclosure of contributions over $100, plaintiffs suggest that they do not disagree that the concept of disclosure is constitutional, but argue that the threshold values in FECA are too low, and therefore not minimally intrusive. We disagree. Since the individual contribution limit is set at $1000, disclosure limited to amounts in excess thereof would be tantamount to requiring those committing a crime to file reports of their offense. A disclosure law serves the function of informing the electorate,[113] and must also function as an effective enforcement tool and loophole-closing device. Unless the disclosure threshold is set substantially below the contribution limit, patterns of giving (such as by all or most of the members of an interest group) will pass unnoticed. The legislature must have reasonable latitude as to where to draw the line.
 
 
 128
 In this case, the legislature dispensed with routine reporting of contributions of $100 or less an exemption that reaches a large percentage of contributions, permits substantial participation by those concerned with political privacy, and provides elbow room for parties to raise substantial funds from modest contributions. In view of these considerations, we have no basis for holding that this approach by the legislature to the complex problems involved in drawing the line exceeded the bounds of reasonable latitude.
 
 2. Minor Parties
 
 129
 The argument is made that whatever the validity of the reasons for disclosure with respect to major parties they have no application to minor parties, new parties and independents, and that new parties and independents in particular should be allowed to carry on their financial affairs secretly to protect their contributors from presumed oppression and retaliation from the party who wins the election and from the public generally; otherwise, their contributors will be discouraged from contributing.[114]
 
 
 130
 We begin by noting that the record in this case presents only scant evidence tending to show a "chilling effect" resulting from the major disclosure requirements, and only a skimpy indication of harassment of those whose contributions were disclosed[115] in the 1972 and 1974 elections where almost identical provisions applied.[116] This showing is not sufficient to override the application of provisions that are facially constitutional and supported by compelling governmental interests informing the electorate and preventing the corruption of the political process. Although disclosure of contributions has an impact on personal privacy in political association, this is outweighed by the compelling state interest in disclosure to the public.[117] Indeed, it would be ironic if First Amendment rights were extended so as to prevent the kind of public awareness that is the overreaching objective of the First Amendment.
 
 
 131
 Disclosure laws are predicated on the proposition that money effectively used can influence voters and that the voters sought to be influenced ought to know where the money is coming from, and be able to take into account the social, economic, and political interests of the contributors. It is pertinent to the political process, as elsewhere in the marketplace of ideas, that meaningful competition depends on openness.
 
 
 132
 The FECA disclosure provisions are reasonably calculated to prevent the election secrecy so essential to the appearance and reality of influence dealing. They require disclosure of contributions that are substantial in amount, albeit below the $1000 maximum, in order to prevent the disguising of a pattern of substantial giving by "splitting" contributions among members of a group. They apply to parties and candidates across the board, be they majority and established or minority and newly formed. Equal treatment of differently circumstanced parties is not always appropriate, but here we approve in the broad Congress's consistent and long-standing approach of providing uniform treatment. Minority and independent candidacies have a real impact on the election process that cannot be measured by tallied votes alone. They can affect election outcomes by diverting votes from better supported candidates as well as by occasionally winning the contested office.[118] They can be deliberately formed to take a stalking horse role, or their position can be used to that end by others. Any broad exemption from disclosure could subvert the interlocking regulatory provisions of FECA by increasing the incentives to exploit the consequent lax area of regulation, while underlining public suspicions that any opportunity for evading the regulatory scheme will be utilized.
 
 
 133
 We recognize that disclosure may prompt some potential donors to reduce their contributions to minority parties.[119] This may, indeed, also apply to contributions to major parties, although this is not a matter addressed by the record. So far as unpopular minor parties are concerned, disclosure does indeed infringe their First Amendment freedom to associate to advocate unorthodoxy. Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). But the right of political association is subject to reasonable restriction for reasons of compelling state interest, and the opinion of Chief Justice Warren in Sweezy must be read alongside his statement in Harriss indicating approval of disclosure requirements in federal corrupt practices legislation. So, too, with Justice Frankfurter's concurrence in Harriss.[120]
 
 
 134
 The public stake in the election process is a basic premise of our democratic society, and those seeking to influence it directly are proper objects of public concern. We do not perceive a tenable rationale for assuming that the public interest in minority party disclosure of contributions above a reasonable cut-off point is uniformly outweighed by potential contributors' associational rights. New parties and candidates are not always what they pretend to be. Disclosure requirements may have a prophylactic effect in deterring or exposing stalking horses or "dirty tricks." The present law reflects an effort to tighten pertinent provisions and enhance their effectiveness.
 
 
 135
 It may well be that a party (or candidate) can demonstrate such harassment to itself or to its supporters as to underpin a ruling that disclosure in particular circumstances cannot constitutionally be required. Compare NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Whether the Commission through its regulations or its advisory opinions can appropriately address this situation is a question we do not decide in the absence of concrete facts. In any event, courts sit to act in such cases when presented with a proper record.
 
 3. Other Issues
 
 136
 Question 7(c)[121] addresses the provisions in 2 U.S.C. § 434(d)[122] exempting from reporting requirements the value of certain services rendered by Congressional recording studios, by an individual in the pay of either chamber, or by the parties' congressional committees. It specifically does not apply to services furnished during the calendar year in which the member could run for reelection. Such services rendered in other years obviously have some political worth, but the line drawn by the legislature was intended to separate activities designed to win elections from activities designed to make a Congressman known and available to his constituents. It is certainly appropriate for Congress to assure that steps taken to diminish incumbency advantage do not have the result of eroding representation or the effectiveness of a legislator in communicating with his constituents.
 
 
 137
 Question 7(d)[123] bids us consider section 434(e)[124], which requires every person (other than a political committee or candidate) who makes contributions or expenditures in excess of $100 per calendar year, other than by contribution to a political committee or candidate, to file a report with the Commission disclosing those contributions or expenditures. This presumably would include volunteers whose incidental expenses exceed $600 (a $500 exemption under § 431(e) and a $100 exemption under this provision). Such disclosure assists in the enforcement of limitations set out in 18 U.S.C. § 608(e) (dealing with expenditures relative to a clearly identified candidate), and parallels the threshold for disclosure of direct contributions to political committees or candidates. Further, it takes away from independent expenditures any cloak of secrecy which would otherwise make them favored over direct contributions. Our scrutiny leads us to find no objection to this provision. If, as we hold, Congress has both the authority and a compelling interest to regulate independent expenditures under section 608(e), surely it can require that there be disclosure to prevent misuse of the spending channel.
 
 B. Reports by Certain Persons: Section 437a
 
 138
 We therefore uphold the major disclosure provisions of the Act. Those thus far examined are carefully tailored to minimize intrusion upon interests sheltered by the First Amendment. They exact disclosure only when plainly and closely related to a substantial governmental interest long recognized by the courts: protection of the integrity of federal elections. Compare Burroughs and Cannon v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934); Stoner v. Fortson, 379 F.Supp. 704, 712 (N.D.Ga.1974).
 
 
 139
 The same cannot be said for section 308 of the Act, codified as 2 U.S.C. § 437a, which is the subject of Question 7(e).[125] That section, by its terms, covers a much broader range of groups and activities than do the core disclosure requirements. It provides in part:
 
 
 140
 Any person (other than an individual) who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office), or otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate shall file reports with the Commission as if such person were a political committee. The reports filed by such person shall set forth the source of the funds used in carrying out any activity described in the preceding sentence in the same detail as if the funds were contributions within the meaning of section 431(e) of this title, and payments of such funds in the same detail as if they were expenditures within the meaning of section 431(f) of this title.[126]
 
 Analysis Of The Section
 
 141
 Dissecting the statutory language, it is seen that section 437a's demand for disclosure is activated without any "expend(ing) (of) any funds" whatever[127] (1) by "any act directed to the public for the purpose of influencing the outcome of an election"; or (2) by "any material" "publishe(d) or broadcast( ) to the public" which "refer(s) to a candidate (by name, description, or other reference)" and which (a) "advocat(es) the election or defeat of such candidate," or (b) "set(s) forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office)," or (c) is "otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate." Notwithstanding the exemption of some activities, subsequently considered,[128] the scope of section 437a is potentially expansive.
 
 
 142
 Clearly a group engaging in "any act directed to the public for the purpose of influencing the outcome of an election" must file the statutory report. So also, with equal clarity, must a group publishing or broadcasting to the public "any material" in reference to a candidate which "advocate(s) the election or defeat of such candidate" or which is "otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate." In each of these instances, the activity summoning the report is calculated to exert an influence upon an election. But section 437a is susceptible to a reading necessitating reporting by groups whose only connection with the elective process arises from completely nonpartisan public discussion of issues of public importance. For while the reporting requirement plainly obtains when a group publishes or broadcasts to the public material "set(ting) forth a candidate's position on any public issue, his voting record, or other official acts" with a "design() to influence" voting at an election, it is not at all certain that the requirement is inoperative where those activities are unaccompanied by any such design.[129]
 
 
 143
 Thus section 437a calls for disclosure, for example, by plaintiff Human Events, Inc., the publisher of a weekly newspaper devoted primarily to events of political importance and interest, and to discussion of public issues, public officials, political leaders and candidates. Findings III, Winter P 2. In its offerings to the public, Human Events endorses, explicitly or implicitly, candidates for federal office, id. PP 5, 8, an activity "advocating the election . . . of (a) candidate." But even if Human Events discontinued that kind of advocacy, it still might be subject to section 437a because it also takes positions on issues and attempts to influence public opinion. The latter may be deemed activities which are "directed to the public for the purpose of influencing the outcome of an election," and which are "designed to influence individuals to cast their votes for . . . candidate(s)."
 
 
 144
 As another example, section 437a may also demand disclosure by plaintiff New York Civil Liberties Union. The District Court found that this organization is forbidden by the constitution and policies of its parent body from endorsing or opposing any candidate for public office, but that it does engage publicly in nonpartisan activities which "frequently and necessarily refer to, praise, criticize, set forth, describe or rate the conduct or actions of clearly identified public officials who may also happen to be candidates for federal office." Findings III, Glasser PP 3-4. The organization also publicizes in newsletters and other publications the civil liberties voting records, positions and actions of elected public officials, some of whom are candidates for federal office. Id. PP 5, 8. Since the published material regularly gives "candidate(s') position(s) on . . . public issue(s), (their) voting record(s), or other official acts," the organization may be subject to section 437a.[130]
 
 
 145
 In no lesser degree, section 437a may affect group activity extending from one end of the spectrum of public issue-discussion to the other. If the section is given the widest scope its language could bear, the result would be an enormous interception of groups and activities not unlike that which the Second Circuit found likely in the wake of another provision of the 1971 Act. "(E)very position on any issue, major or minor, taken by (any candidate) would be a campaign issue and any comment upon it in, say, (an unexempted) newspaper editorial or an advertisement would be subject to proscription unless the registration and disclosure regulations of the Act . . . were complied with." United States v. National Committee for Impeachment, 469 F.2d 1135, 1142 (2d Cir. 1972).[131] We might add to the list of publications potentially affected by such comment trade and professional journals, campus newspapers, union newsletters and even church bulletins, among a host of others. Indeed, "every little Audubon Society chapter (might) be (intercepted), for 'environment' is an issue in one campaign or another. On this basis, too, a Boy Scout troop advertising for membership to combat 'juvenile delinquency' or a Golden Age Club promoting 'senior citizens' rights' (might) fall under the Act." Id.
 
 
 146
 To be sure, section 437a specifies exemptions for "any publication or broadcast of the United States Government," and for "any news story, commentary, or editorial distributed through the facilities of a broadcasting station or a bona fide newspaper, magazine, or other periodical publication."[132] The latter exception, however, cannot be construed so broadly as to materially curtail the section's application to activities of issue groups. For, after stating that exemption, section 437a expressly qualifies and narrows the definition of "bona fide . . . periodical publications" in such fashion as to leave but a scant reduction in the group activities affected. It first provides that, for the purposes of the section, a publication is not "bona fide" if it "is primarily for distribution to individuals affiliated by membership or stock ownership with the (group) distributing it or causing it to be distributed, and not primarily for purchase by the public at newsstands or by paid subscription." 2 U.S.C. § 437a(1). Thus, for example, the newsletter which is commonplace among issue groups like the New York Civil Liberties Union continues to bind the organization to the disclosure requirements of the Act, as it does with respect to countless other groups. Section 437a further provides that the exemption shall not apply if "the news story, commentary, or editorial is distributed by a (group which) devotes a substantial part of (its) activities to attempting to influence the outcome of elections, or to influence public opinion with respect to matters of national or State policy or concern." Id. § 437a(2). So, as another example, Human Events remains within the ambit of section 437a as long as its newspaper retains its present format. Similarly, section 437a still requires disclosure by any issue group placing an advertisement mentioning candidate positions with nearly any newspaper or magazine, to say nothing of pamphleteering in any of its innumerable forms. And, seemingly, section 437a also imposes its disclosure demands on the newspapers and magazines with respect to publication of their own materials.[133]
 
 Constitutional Doctrine
 
 147
 It is well established that compelled disclosure of the kind of information section 437a exacts can work a substantial infringement of the associational rights of those whose organizations take public stands on public issues. E. g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. Little Rock, 361 U.S. 516, 522-524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). To say this is not to denigrate our action upholding the Act's disclosure requirements applicable to "political committees" and to "contributions" and "expenditures" as those terms are defined therein. We have sustained those provisions although compliance with them may impose a burden that is more than trivial, and may portend a deterrence that arouses some concern. Our holdings supporting the Act's central disclosure requirements are grounded on our recognition that the government has demonstrated a substantial and legitimate interest in protecting the integrity of its elections, an interest closely connected to and plainly advanced by those provisions.
 
 
 148
 Section 437a, however, seeks to impose the same demands where the nexus may be far more tenuous. As we have said, it may undertake to compel disclosure by groups that do no more than discuss issues of public interest on a wholly nonpartisan basis. To be sure, any discussion of important public questions can possibly exert some influence on the outcome of an election preceding which they were campaign issues. But unlike contributions and expenditures made solely with a view to influencing the nomination or election of a candidate, see 2 U.S.C. §§ 431(e), 431(f), issue discussions unwedded to the cause of a particular candidate hardly threaten the purity of elections. Moreover, and very importantly, such discussions are vital and indispensable to a free society and an informed electorate. Thus the interest of a group engaging in nonpartisan discussion ascends to a high plane, while the governmental interest in disclosure correspondingly diminishes.
 
 
 149
 The Supreme Court has indicated quite plainly that groups seeking only to advance discussion of public issues or to influence public opinion cannot be equated to groups whose relation to political processes is direct and intimate. In United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), the Court upheld a resolution authorizing a House committee to inquire into lobbying activities after construing it narrowly to apply only to representations made directly to Congress, and not to indirect efforts to influence legislation by changing the climate of public opinion. On that basis it affirmed the reversal of a conviction for failure to furnish the committee with financial records of an organization. In the course of its opinion, the Court stated:
 
 
 150
 Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment.
 
 
 151
 Id. at 46, 73 S.Ct. at 546. Cf. United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).
 
 
 152
 More recently, in Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), the Court struck down a state statute prohibiting publication of any newspaper editorial on election day despite its obvious propensity under ordinary conditions to sway the outcome of the election. Said the Court:
 
 
 153
 Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.
 
 
 154
 Id. at 218-219, 86 S.Ct. at 1437.
 
 
 155
 Two additional decisions addressing a disclosure feature of the Federal Election Campaign Act of 1971 point up the grave constitutional difficulties section 437a engenders. In United States v. National Committee for Impeachment, supra, the government argued that the defendant organization was a political committee, within the meaning of section 301(d) of the 1971 Act, (codified at 2 U.S.C. § 431(d), and left substantially unchanged by the FECAA of 1974) on the basis of an advertisement placed in The New York Times criticizing President Nixon's actions in Vietnam, calling for his impeachment, and reciting an "Honor Roll" of members of Congress who had supported an impeachment resolution. Section 431(d) defines "political committee" as including organizations accepting "contributions" or making "expenditures" exceeding $1,000 annually, and sections 431(e) and (f) define "contributions" and "expenditures" as distributions "made for the purpose of influencing" federal nominations and elections.[134] The government sought to enjoin acceptance of contributions and disbursements of monies by the organization until it filed the report described in the Act. Recognizing that such a broad reading of the definition of "political committee" would raise serious constitutional problems, the court construed the term as applicable only where the group acted with consent or authorization of a candidate or where the major purpose of the group was the nomination or election of candidates. 469 F.2d at 1139-1142. Likewise, in ACLU v. Jennings, 366 F.Supp. 1041 (D.D.C.1973), vacated as moot sub nom. Staats v. ACLU, --- U.S. ---, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975), a three-judge district court in this circuit was faced with a similar challenge. It perceived the same constitutional obstacles and adopted the same narrow interpretation of section 431(d) propounded in National Committee for Impeachment, 366 F.Supp. at 1054-1057.
 
 
 156
 In the latter two cases, the courts were able to avoid a decision on constitutionality of the statutory provision involved by construing it narrowly enough to eliminate doubt on that score. And here it is our duty to follow the same path if section 437a may fairly be limited in that fashion. E. g., United States v. Rumely, supra, 345 U.S. at 45, 73 S.Ct. 543; United States v. CIO, 335 U.S. 106, 120-121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). Accordingly, we have given special attention to language in the section which at first glance appears to allow for a limiting construction.
 
 
 157
 Section 437a initially demands disclosure when a group acts publicly "for the purpose of influencing the outcome of an election."[135] It then seems to call for disclosure by any group which publishes or broadcasts, inter alia, "a candidate's position on any public issue, his voting record, or other official acts"[136] without more a very sweeping provision. But the clause immediately following speaks of material "otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate."[137] Although the extent of this qualification is not entirely clear from the structure of the sentence, it is possible to read it as applicable to the previous clause as well that is, that disclosure is required only of groups publicizing information of the quoted types with a "design( ) to influence" individuals in casting their votes. For present purposes we adopt that reading as the narrowest interpretation feasible. The pivotal element, then, is the "purpose" or "design( )" "to influence," and we believe that such a "purpose" and such a "design ( )" are functionally identical. The question thus is whether the requirement of "purpose" or "design( )" "to influence" is sufficiently certain in meaning to save section 437a from constitutional condemnation.
 
 Validity of The Section
 
 158
 The principles charting our course are well settled. "Vague laws in any area suffer a constitutional infirmity," Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966) (footnote omitted), and commonly in the First Amendment area doubly so. There, perhaps more than elsewhere, statutory vagueness and statutory overbreadth are constitutional vices often related and sometimes functionally inseparable. See, e. g., NAACP v. Button, 371 U.S. 415, 423-433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). For " where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms' it 'operates to inhibit the exercise of (those) freedoms,' " Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972), quoting in turn Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) and Cramp v. Board of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); and "(u)ncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden area were clearly marked.' " Grayned v. City of Rockford, supra, 408 U.S. at 109, 92 S.Ct. at 2299, quoting Baggett v. Bullitt, supra, 377 U.S. at 372, 84 S.Ct. 1316, in turn quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (footnote omitted). See also Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Speiser v. Randall, supra, 357 U.S. at 526, 78 S.Ct. 1332; NAACP v. Button, supra, 371 U.S. at 433, 83 S.Ct. 328. "The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform (citizens of) what is being proscribed." Keyishian v. Board of Regents, supra, 385 U.S. at 604, 87 S.Ct. at 684.
 
 
 159
 Consequently, "standards of permissible statutory vagueness are strict in the area of free expression." NAACP v. Button, supra, 371 U.S. at 432, 83 S.Ct. at 337. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity,"id. at 433, 83 S.Ct. at 339; "(p)recision of regulation must be the touchstone in (that) area . . . ." Id. at 438, 83 S.Ct. at 340. See also Keyishian v. Board of Regents, supra, 385 U.S. at 603-604, 87 S.Ct. 675. "(T)he statute must be carefully drawn or be authoritatively construed to (proscribe) only unprotected speech and not be susceptible of application to protected expression." Gooding v. Wilson, supra, 405 U.S. at 522, 92 S.Ct. at 1106; Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "When First Amendment rights are involved," a court must "look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." Ashton v. Kentucky, supra, 384 U.S. at 200, 86 S.Ct. at 1410 (footnote omitted).
 
 
 160
 Section 437a, with a "purpose of influencing" and a "design( ) to influence" as criteria undertaking to partially shape its operation, does not meet the governing standards. These criteria do not mark boundaries between affected and unaffected conduct "with narrow specificity"; they do not "clearly inform . . . (of) what is being proscribed." Rather, they leave the disclosure requirement open to application for protected exercises of speech, and to deterrence of expression deemed close to the line. Public discussion of public issues which also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections. In this milieu, where do "purpose" and "design( )" "to influence" draw the line? Do they connote subjectively a state of mind, or objectively only a propensity to influence? Do they require, irrespective of state of mind, a capability of influencing, and if so how substantial a capability? What do they demand with respect to materials which "advocat(e) the election or defeat of (a) candidate," or which "set( ) forth the candidate's position on (a) public issue" or "his voting record," beyond the inherent tendency of those materials to influence? What references to "other official acts" of the candidate, with what mental element, bring the section into play? To these questions, among a multitude of others, neither the text nor the legislative history of section 437a supplies any clear answer. And while we have continued our struggle for an interpretation of section 437a which might bypass its vagueness and overbreadth difficulties, we have been unable to do so.
 
 
 161
 The crucial terms, "purpose of influencing the outcome of an election" and "design( ) to influence" individuals in voting at an election, are not defined in the section. Ordinarily we would seek guidance, then, from the judicial interpretation of highly similar language in National Committee for Impeachment and ACLU v. Jennings, supra. Those cases, we reiterate, construed the words "made for the purpose of influencing (the nomination or election of federal candidates)" as applicable only to expenditures made under the control or with the consent of a candidate, and to contributions received and expenditures made for the major purpose of nominating or electing such candidates. If we were to look only to section 437a itself, such an interpretation of its key language might indeed be possible, and it might avoid the constitutional difficulties which arise from the apparent reach of the section to purely issue-discussion groups.
 
 
 162
 But we cannot view section 437a in isolation, and therein lies the reason why those cases do not save the day here. Construction of section 437a in the fashion just advanced would reduce it to a pale repetition of the major disclosure provisions of the Act. With trivial exceptions,[138] any group thus required to report under section 437a would already be required to report under section 434(a); having made expenditures under the control of a candidate, or having received contributions or made expenditures for the major purpose of nominating or electing candidates, such a group would already be a political committee as defined in section 431. While we have some latitude in interpreting the words of a statute, we cannot construe them in such a fashion as to reduce them to elaborate redundancy. See Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307-308, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961); Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 135-136, 479 F.2d 842, 856-857 (en banc ), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).
 
 
 163
 Moreover, a construction of section 437a which would merely reproduce almost identically the requirements of section 434 would be particularly inappropriate here, where Congress has made it abundantly clear that it intended section 437a to reach beyond the other disclosure provisions of the Act. For example, a group covered by section 437a is to report "as if it were a political committee," a directive making no sense if the section touches only the groups which are already political committees. The legislative history indicates even more emphatically the congressional intent to command disclosure for group activities not otherwise covered. The report of the Conference Committee, which formulated section 437a and inserted it into the Act, describes its breadth in no uncertain terms.[139] On the floor of the House, following the action in conference, Representative Frenzel, a conferee, specifically named "Common Cause, the American Conservative Union, the American Civil Liberties Union and the environmental groups which sponsor the 'dirty dozen' list" as groups encompassed by section 437a, and declared that "(t)his provision is to apply indiscriminately and will bring under the disclosure provisions many groups, including liberal, labor, environmental, business and conservative organizations." 120 Cong.Rec. H10333 (daily ed., Oct. 10, 1974).[140] We are satisfied that by the addition in 1974 of section 437a to the Act, Congress intended to range far beyond the 1971 disclosure requirements.[141]
 
 
 164
 Thus the crucial terms "purpose of influencing the outcome of an election" and "design( ) to influence" voting at an election stand without any readily available narrowing interpretation. Viewing this section against the backdrop of section 434(a), and keeping in mind the unmistakable congressional intention to broaden section 437a beyond section 434, we are unable to supply the precision essential to constitutionality by a limiting construction.[142] Were uncertainty about the breadth of section 437a without further consequence, we might consider waiting for interpretations from the Federal Election Commission in the hope that constitutional problems would be dissipated. See Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 575, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). But the problem is not merely one of awaiting application through enforcement proceedings, since the terms of the statute as such inhibit free and robust discussion of issues. Besides, as we have stated elsewhere, "if the words of the statute or its legislative history ma(k)e it indisputably clear that Congress intended a result which is unconstitutional, we would have to exercise our responsibility to invalidate the law." United States v. Thompson, 147 U.S.App.D.C. 1, 9, 452 F.2d 1333, 1341 (1971). We face up to that responsibility here; we hold section 437a unconstitutional and answer Question 7(e) in the affirmative.
 
 
 165
 The only question remaining is whether the invalidity of section 437a destroys the entire Act or just that section. We encounter no difficulty in concluding that only the section is affected. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). The basic disclosure provisions derive from the 1971 Federal Election Campaign Act, and were in effect for three years before section 437a was added by the 1974 Amendments. Even in 1974, the section 437a provision was injected by the Conference Committee when the amending process had been virtually completed. The Act contains an express severability clause, 2 U.S.C. § 454, and the plaintiffs concede that this section is severable.[143] We accordingly hold section 437a invalid, but severable, and the rest of the statute stands for consideration.
 
 VI. Public Financing and Subtitle H
 
 166
 The major constitutional objections lodged against the public financing provisions[144] may be categorized under two heads: first, that providing public funds for Presidential campaigns[145] and party conventions exceeds the bounds of Congress's powers to tax and spend under article I, section 8, clause 1 of the Constitution;[146] and second, that even if Congress has power to provide for public financing of elections, the scheme used here discriminates against minor and new parties and independent candidates.[147]
 
 
 167
 A. Congress's Power to Provide for Public Financing
 
 
 168
 The Supreme Court has held that the power of Congress to tax and spend for the "general Welfare of the United States" is entitled to a broad construction. That power is not limited to the direct grants of legislative power found in the Constitution. United States v. Butler, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936). The Congress has determined that providing public funding for the three stages of the Presidential selection process would advance the general welfare of the nation by reducing the reliance of Presidential candidates on large contributors, thus reducing their influence on the outcome of elections and on the operation of government. We are in no position to quarrel with that judgment. As the Supreme Court has observed in a slightly different context: "Viewing the myriad governmental functions supported from general revenues, it is difficult to single out any of a higher order than the conduct of elections at all levels to bring forth those persons desired by their fellow citizens to govern." Bullock v. Carter, 405 U.S. 134, 148-149, 92 S.Ct. 849, 858, 31 L.Ed.2d 92 (1972).
 
 
 169
 The plaintiffs suggest, however, that the particular means chosen by Congress to allocate tax monies to the Presidential Election Campaign Fund requires that we invalidate the overall spending scheme. The Fund derives from voluntary "tax checkoffs" by individual taxpayers, who may, but need not, direct that one dollar of their tax liability go to the Fund. 26 U.S.C. § 6096. Payments from the Fund issue on the basis of objective formulae established in 26 U.S.C. §§ 9004, 9006, 9008 and 9034, regardless of candidate or party preferences of the taxpayers who have checked off the dollars. The objection seems to be that the voluntary checkoff is not sufficiently voluntary, that the taxpayer must have the freedom to designate which party or candidate will receive his checked-off dollar.
 
 
 170
 It is true that some plans for public financing, such as the " voucher" system suggested by Senator Metcalf (see Brief for Amicus Curiae Senator Lee Metcalf at 24-25), do allow the taxpayer this choice. We assume that Congress might well have adopted that system, without constitutional objection, but we cannot say that the Constitution requires that the taxpayer have such an option. If it is established that the Congress has power under article I, section 8, clause 1, to expend money to fund candidate campaigns, then surely Congress could do so simply by appropriating the sums to the Presidential Election Campaign Fund without giving individual taxpayers any control at all. A fortiori Congress can establish a system which gives the taxpayer some choice in affecting the total amount of public funds to be distributed on the Congressional formula without going all the way to permit each taxpayer complete authority over the disposition of his dollar of tax obligation. If the taxpayer wants to avoid any conception that some part of " his" tax money will benefit candidates he does not favor, then he can simply refrain from checking off his dollar for the Fund.
 
 
 171
 B. Discrimination Against Third Parties and Independents
 
 
 172
 A more serious objection to the public financing provisions lies in the charge that they unfairly discriminate against minor and new party candidates and against independents. The federal courts have often indicated the importance to the American political system of minor parties and independent candidates. See Sweezy v. New Hampshire, 354 U.S. 234, 250-251, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion of Mr. Chief Justice Warren); Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). More recently the Supreme Court has emphasized that legitimate governmental interests in protecting the electoral process "must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." Lubin v. Panish, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). To this end, the courts have traditionally scrutinized carefully state schemes for regulating access to the ballot, and have not hesitated to strike down a scheme when it placed unreasonable obstacles in the way of candidates or parties. Williams v. Rhodes, supra; Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849 (1972).
 
 
 173
 We are, of course, well aware that provisions for public funding of Presidential campaigns, like provisions regulating access to the ballot, could operate to give an unfair advantage to established parties, thus reducing, to the nation's detriment, what the Supreme Court has called the "potential fluidity of American political life." Jenness v. Fortson, 403 U.S. 431, 439, 91 S.Ct. 1970, 1974, 29 L.Ed.2d 554 (1971). Therefore we have given careful consideration to the framework of the public financing provisions. We do not find them, on their face, to be invidiously discriminatory. At the same time, we recognize the necessity for all concerned to maintain a careful scrutiny as the provisions are implemented.
 
 
 174
 The statutory scheme[148] gives evidence that here Congress has made a serious and conscientious attempt to implement a system that recognizes appropriate differences among parties but permits flexibility and change. It allows for new parties to grow and for old ones to wither and die; within reasonable bounds, the funding levels will follow these patterns of popular support. Moreover, Congress has chosen to have funding levels depend upon objectively measurable indicators of support voting levels, past or current, in the case of the general election;[149] contribution levels, within limits, in the case of the funding of primary campaigns.[150]
 
 
 175
 The plaintiffs argue that minor parties and new parties[151] are harmed by the provisions for funding of candidates in primaries and in the general election and certain nominating conventions. We examine general election funding first.
 
 General Election Provisions
 
 176
 We start with the recognition that Congress, in order to provide public funds for some candidates for President, is surely not required to provide equal funds to all who declare themselves Presidential candidates. Such a system would not only make it easy to raid the United States Treasury, it would also artificially foster the proliferation of splinter parties. "(A) State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." Bullock v. Carter, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972). So too does the federal government. And the Supreme Court has said expressly that a state has a "compelling" interest in protecting the stability of its political system by refraining from encouraging "splintered parties and unrestrained factionalism." Storer v. Brown, 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).
 
 
 177
 In Jenness v. Fortson, supra, the Court recognized that "(s)ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . . ." Id. 403 U.S. at 442, 91 S.Ct. at 1976. Congress was therefore entitled to take into account the obvious fact that there are differences in support among political movements. And to reflect those differences, Congress placed reliance, for the funding of general elections, on a system quite similar to the one Georgia has used to regulate access to its ballot, a system upheld without dissent in Jenness.
 
 
 178
 In the general election, major party candidates (candidates of parties which received at least 25 percent of the electoral vote at the preceding general election) are entitled to an equal level of funding up to the statutory maximum, $20 million plus adjustments for inflation. 26 U.S.C. § 9004(a). Minor party candidates (candidates of parties which received between 5 percent and 25 percent of the vote in the last election) receive pre-election funding at a level proportionate to their showing in the previous election. Id. § 9004(a)(2)(A). New party candidates (parties which did not achieve a 5 percent showing) are not entitled to pre-election funding, but they are entitled to post-election funding if they achieve 5 percent or more of the vote; the amount will be in proportion to their vote total relative to that of the major party candidates. Id. § 9004(a)(3). A similar provision allows minor party candidates to receive additional post-election monies if they improve their vote percentage over the last election. Id.
 
 
 179
 We recognize that under this scheme pre-election funding will depend on figures almost four years old. But other devices which might have been chosen to make the figures more current have their own potential deficiencies. Reliance, for example, on opinion polls or on more subjective determinations of current support by the Commission has obvious drawbacks, and could only lead to controversy that would divert energies and resources from the campaigns themselves. Moreover, support for a candidate at an early stage is often shallow. The differences that develop between candidates as they take to the stump often changes their appeal, for better or worse. So early prophecies are chancy and later may seem foolish. On the other hand, funding candidates on indications of early strength creates the danger of a self-fulfilling prophecy. Evidencing support by petition signatures may provide an objective and more current measure, but again it would siphon off considerable campaign energies into a petition drive. A system of matching grants, based on the private contributions a candidate or party was receiving, similar to the system for public funding of primary campaigns,[152] is a more eligible alternative. But it too yields a more cumbersome system, and Congress was acting within proper bounds when it chose to relieve serious candidates of at least some of the burdens of fund raising once they had achieved nomination, and to make it clear to all candidates from the beginning what level of funding would be available to each and to each of his or her competitors.[153] Whatever alternative system might have been possible, the legislative history indicates that Congress had in mind the Supreme Court's specific approval in Jenness of a system which bases differential treatment on "demonstrated relative strength" in prior elections. S.Rep.No.93-689, 93d Cong., 2d Sess. 9 (1974). In light of Congress's adherence to Jenness, we cannot say it acted improperly.
 
 
 180
 It was noted by the court in Jenness that even if a candidate failed to garner enough petition support to win a place on the printed ballot, he still had an alternative path open toward eventual election. He could be elected on the strength of write-in votes. Jenness v. Fortson, supra, at 434, 91 S.Ct. 1970. There was, of course, no suggestion that a write-in candidacy was as attractive as appearing on the ballot. Similarly, under the general election funding established by the challenged statutes, a third party or independent candidate retains alternative means of getting his message across to the voters through private funding. No one asserts that this option is as attractive as full public financing, but it should be borne in mind that smaller parties are likely to be the major beneficiaries of another part of the statutory scheme, the expenditure ceilings. Those ceilings have been set at a level significantly below major party spending in the 1972 election.[154] Even relying on private funding, then, third party and independent candidates are now in a better position to approach the spending levels of the major parties. Chapter 95 makes it clear that the expenditure limits are an integral part of the overall public financing scheme. See 26 U.S.C. §§ 9003(b)(1), 9004(a)(1). Viewed in this context we are not prepared to say that the provisions for general election funding invidiously discriminate against third parties and independents.[155]Convention Funding
 
 
 181
 The major parties are entitled to receive full public funding for their conventions (up to $2 million plus inflation adjustments), id. § 9008(b)(1), and minor parties are entitled to a percentage of that amount using the same formula that applies for general election candidates. Id. § 9008(b)(2). For the same reasons that we found persuasive in upholding the general election financing provisions, we find no constitutional infirmity here. The provisions are a reasonable way of recognizing differences in strength among parties, and once again minor and new parties are not barred from putting on just as elaborate a convention as major parties, although they would have to fund all or part of it with private funds. The ceiling on convention expenditures puts equivalent convention spending more within their grasp, if they choose to apply their funds in this fashion. Id. § 9008(d). Unlike the general election provisions, the convention financing sections allow for no post-election reimbursement of convention expenses, no matter how well a new or minor party fares in the election. But this is not fatal to the statute. The fact that Congress has chosen to adopt an adjustment provision in one part of the scheme does not mean that it is required to do so as to all portions.[156]
 
 
 182
 Whatever doubts there might otherwise be about these provisions are put to rest by the Supreme Court's decision in American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). White held that a state could fund the expenses major parties incurred in selecting their candidates for the general election, without being required to "finance the efforts of every nascent political group seeking to organize itself . . . to win a place on the general election ballot." Id. at 794, 94 S.Ct. 1312.
 
 Primaries
 
 183
 The challenged statutes also provide for public financing of the primary election campaigns of candidates who meet the threshold requirements of the act. Plaintiffs do not contend that a primary funding plan is invalid unless it provides funds to all persons who declare themselves candidates; indeed, such a contention could not be sustained. See American Party of Texas v. White, supra, at 793-794, 94 S.Ct. 1296. Rather, they level their attack at the particulars of the requirements a primary candidate must meet before qualifying for public funds. To be eligible, a candidate must certify that he is seeking the nomination of a political party for the office of President and that he has received $5000 in contributions in each of 20 states. 26 U.S.C. § 9033(b)(3). Only the first $250 of the contribution of any individual may be counted toward the $5000 total. Id. § 9033(b)(4). Once a candidate qualifies, he or she is eligible for public funding on a matching basis: each dollar contributed privately will be matched by a dollar from the Presidential Election Campaign Fund. Again, only $250 of any one individual's contribution will be matched. Id. § 9034.
 
 
 184
 We find nothing invidiously discriminatory about these provisions. They simply require that a candidate demonstrate a "significant modicum of support," Jenness v. Fortson, supra, 403 U.S. at 442, 91 S.Ct. 1970, before becoming entitled to public funding. Since many primary candidates (unlike major and minor parties) would not have a track record of voting support in the previous election, Congress had to choose a different measure to assure that funding went only to serious national contenders. The device it chose the level of small contributions is workable, and obtaining small contributions is certainly an avenue open to all contenders. Nor is there anything unusual in the provision for matching payments; matching federal payments have become familiar in programs of federal aid to states and localities.[157] We note, moreover, that the primary funding provisions do not discriminate between candidates of major, minor, and new parties; once the threshold level is achieved, contributions to a candidate who seeks the nomination of a small party will be matched on exactly the same ratio as that available to major party candidates: one public dollar for one private dollar, up to $250 per contributor. Nor do we think that Congress has set the threshold amount, in absolute dollar terms, at an unreasonably high level. The statute requires that a total of $100,000 be raised (with appropriate geographic distribution a factor we consider below) before matching federal funds start to flow. That figure is a mere one percent of the expenditure ceiling for primary campaigns, $10 million. 18 U.S.C. § 608(c)(1)(A). In light of the history of high costs of Presidential campaigns,[158] Congress was certainly permitted to conclude that a candidate had not demonstrated a "significant modicum" of support until he or she achieved the $100,000 level.
 
 
 185
 It is not enough under the statute, however, to gather $100,000 in contributions of $250 or less. That amount must be collected in amounts of at least $5000 in each of at least 20 states. 26 U.S.C. § 9033(b)(3). As plaintiffs point out, this is a significant qualification; because of it a candidate with substantial support concentrated primarily in a few, but heavily populated, states might be unable to qualify for public funding. Plaintiffs argue strenuously that Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), requires that we invalidate this provision of the primary financing scheme. We disagree.
 
 
 186
 In Moore, the Supreme Court invalidated a provision of Illinois's ballot access law which required a wide geographic dispersal of voters who signed nominating petitions for candidates for statewide office. It was not sufficient for candidates to present petitions with the requisite total of signatures; they had to obtain signatures from at least 200 voters in each of at least 50 counties.[159]
 
 
 187
 The Illinois provision required a demonstration of support from nearly 50% of the state's geographic subdivisions; the primary financing scheme here requires a superficially similar showing from 40% of the jurisdictions. But we cannot mechanically apply the Moore holding, which dealt with a race for statewide office, to a scheme which operates for the election of a President.[160] "Presidential elections differ from state elections and in a sense are sui generis." Irish v. Democratic-Farmer-Labor Party of Minnesota, 287 F.Supp. 794, 803 (D.Minn.), aff'd, 399 F.2d 119 (8th Cir. 1968). The major difference, as the Irish court noted, lies in the fact that Presidents are chosen by the electoral college.
 
 
 188
 A successful Presidential candidate is not necessarily the one who gains a majority of the popular vote; he must win a majority in the electoral college. Since a state's electoral votes traditionally go in a block to the candidate who wins the popular vote in that state, whether the margin of victory is one vote or 100,000, a serious national candidate cannot avoid the need for broadening his base of support beyond a few states. Campaign strategy must be aimed at carrying states, not simply at increasing popular vote totals.
 
 
 189
 Moore was decided against a background of cases which have been uniformly hostile to state election schemes which give unequal weight to the votes of citizens, depending upon what section of the state they live in. See, e. g., Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Moore simply extended the equal protection principle of those cases to a ballot access scheme which gave unequal weight to the signatures of voters, depending upon their county of residence. But this equal protection principle cannot apply with the same force to Presidential elections, since it is the Constitution itself which provides for the electoral college, and the electoral college is not based upon strict adherence to an equal population formula. The Supreme Court has been sensitive to this difference, and to the unique historical circumstances which gave rise to the electoral college system. It has not allowed the states to use the electoral college analogy as a justification for schemes which give unequal weight to the votes of people in various subdivisions of a state. See Gray v. Sanders, supra, 372 U.S. at 378-379, 83 S.Ct. 801. See also Wesberry v. Sanders, 376 U.S. 1, 9-14, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The reverse is also true: one must be extremely careful in applying cases which strike down state voting (or ballot access) disparities to federal schemes where the electoral college is properly a factor.
 
 
 190
 We have held that it is permissible for national parties, in apportioning convention delegates among states, to depart from strict adherence to a population principle and to rely, in part at least, on an allocation scheme which reflects a state's strength in the electoral college. Bode v. National Democratic Party, 146 U.S.App.D.C. 373, 379-380, 452 F.2d 1302, 1308-09, cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). We based our holding on the fact that the convention delegates convene "to nominate candidates, not for state or county offices, but for President and Vice-President, whose very elections are to be made by the electoral college." Id. If the national parties may take the electoral college into consideration in allocating delegates among states, then surely Congress may take the same factor into account in allocating public funds to candidates in Presidential primaries. The 20-state requirement simply reflects the realities of Presidential campaigning. It looks to geographic dispersal of support among "sovereign States," which are represented as such in the electoral college, not among "non-autonomous creatures of the State,"[161] like the Illinois counties involved in Moore. Since the requirement provides a means for limiting public funding to serious national candidates, we do not find it to be invidiously discriminatory.[162]
 
 
 191
 Alleged Discrimination Against Independents
 
 
 192
 To this point we have been concerned primarily with impact of the public financing provisions on minor or new parties. The plaintiffs also challenge the public financing provisions on the grounds that they discriminate against independent candidates with respect to convention and primary funding. Obviously, an independent candidate who by definition participates in no primaries and is not nominated at a convention is ineligible for convention and primary funding. It is true that party candidates may obtain some lingering benefit from the public funds that were expended during the primary campaign which carries over to the general election race, a benefit unavailable to independents. But we do not think that an incidental difference of this sort constitutes invidious discrimination. It is simply a byproduct of the fact that party nomination and independent candidacy constitute alternative routes to the November ballot, each with its distinctive advantages and disadvantages.[163] Congress may reasonably choose to apply public financing only to the more common route, leaving to another day consideration of financing alternative routes. American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) provides solid authority for this proposition. Texas law required that major parties (defined as those which received more than 200,000 votes in the last election) nominate their candidates by primary election. All other parties and independent candidates had to seek access to the ballot by other means either by precinct, county, and state conventions or by petition; they were not permitted to hold primaries.[164] The law provided that the state would pay the costs which parties incurred in primaries, but not the costs of conventions or petition drives; the legislature appropriated over $3,000,000 to the two major parties to pay their expenses in connection with the 1972 primary election. Id. at 792, 94 S.Ct. 1296. The Supreme Court upheld the law:
 
 
 193
 They (the minority parties) must undergo expense, to be sure, in holding their conventions and accumulating the necessary signatures to qualify for the ballot, but we are not persuaded that the State's refusal to reimburse for these expenses is any discrimination at all against the smaller parties and if it is, that it is also a denial of the equal protection of the laws . . . .
 
 
 194
 . . . (W)e cannot agree that the State, simply because it defrays the expenses of party primary elections, must also finance the efforts of every nascent political group seeking to organize itself and unsuccessfully attempting to win a place on the general election ballot.
 
 Id. at 793-794, 94 S.Ct. at 1312.[165]
 
 195
 A more serious potential problem relative to independent candidates inheres in the provisions for general election funding. On their face, they provide funding only to candidates of "parties" major, minor, or new. This is also true of the crucial provision (so far as independents are concerned) providing post-election funding for minor and new parties based on receiving 5 percent or more of the votes cast in the current election. 26 U.S.C. § 9004(a)(3). If these provisions would in fact operate to prevent independents from obtaining public funding, no matter what their showing, or if they would require that independents go to the trouble of creating elaborate party machinery in order to obtain public funding, then they would raise serious constitutional questions. See Storer v. Brown, supra, 415 U.S. at 745-746, 94 S.Ct. 1274. But the statute does not command that interpretation. The term " political party" is not defined in the public financing provisions. There is thus ample room for the Commission or the officials in charge of disbursing funds to find that even informal committees formed to support independent candidates for President constitute political parties for the purposes of Chapter 95.[166] Until it is shown that a narrower definition is being applied, to the detriment of independent candidates who would otherwise qualify, we are in no position to invalidate the public financing provisions of the statute.
 
 VII. Federal Election Commission
 
 196
 In the initial section of this opinion, we drew attention to a distinctive feature of this effort by Congress to deal with the evils of uncontrolled campaign financing, namely, the multipronged nature of the attack. To the expanded and tightened requirements of disclosure an approach which has heretofore failed to do the job there have been added measures designed to shrink the sheer volume of dollars going into the election process by limitations upon both giving and spending, and by substituting public for private money. One would be bold to assert that this greatly broadened strategy is certain to be successful, but we, in common with most observers, have credited Congress with legitimate objectives and a visible degree of rationality in its choice of means to achieve them. We have, in consequence, conceived the circumstances to be such that a court should be slow to stop the experiment in its tracks by findings of facial unconstitutionality.
 
 
 197
 We now address an equally distinctive element and conceivably one of the most hopeful aspects of that experiment. That is the creation, for the first time in the history of federal legislation relating to campaign financing, of a fulltime agency authorized and empowered to make it work. As might be expected in an area as novel and complex as this, which implicates all segments of the federal establishment, the manner of constituting that agency, the tasks assigned to it, and the authority conferred upon it are in many respects unique. It may eventually prove to be true that some of that authority may be found, when and if exercised in a concrete context, in conflict with the Constitution. But so essential to the effective functioning of the overall legislative scheme is the existence of the new agency contrived to monitor and administer it that a court should be alert to the relationship of the agency to that scheme. The one without the other risks the frustrations and failures of the past. Unless it can clearly find that the agency is wholly without legitimacy in the very terms by which it is brought into being, the court's hand should be stayed.
 
 
 198
 Montesquieu, in formulating his great concept of the separation of powers, had no prevision of the problem of money in popular elections. Indeed, the Framers when they embraced that concept did not even envision the advent of political parties. It would be unfortunate if a judicial preoccupation with the deceptive neatness of the dividing lines assumed by the doctrine were permitted to obscure the common interest of all branches in the purity of the process by which political power is achieved and transferred.
 
 
 199
 eve
 
 
 200
 The FECA Amendments of 1974 established an eight member Federal Election Commission to administer, obtain compliance with, and formulate policy with respect to FECA and certain election law crimes codified in title 18 of the United States Code.[167] 2 U.S.C. § 437c(a)(1), (b). The Secretary of the Senate and the Clerk of the House are ex officio nonvoting members of the Commission.[168] Id. § 437c(a)(1). Of the six remaining members, two are appointed by the Senate, two by the House, and two by the President,[169] with a safeguard against the members in each "group" being affiliated with the same political party. Id.
 
 
 201
 Congress has delegated to the Commission a broad range of powers to enable it to accomplish its statutory responsibilities. See id. §§ 437d-h, 438, 456. Included among its major powers are rulemaking,[170] subpoena, a power to require submission of written reports, a power to conduct investigations and hearings, a power to initiate civil actions to enforce FECA,[171] a power to request the Attorney General to institute civil actions to obtain compliance with FECA and certain election law criminal provisions,[172] and a power to issue advisory opinions.[173] Congress has also given the Commission the power to impose a temporary disqualification on any candidate for election to federal office if the Commission finds that the individual, while a candidate, failed to file a report required by title III of FECA. Id. § 456.
 
 
 202
 The District Court has certified six separate questions concerning the powers and method of appointment of the Commission.[174] We reach only the questions concerning the method of appointment of the Commission, its power to issue advisory opinions, and its power to authorize convention expenditures in excess of the limits established by §§ 9008(d)(1), (2) of Subtitle H. We conclude that the other questions concerning specific powers of the Commission are not presently ripe for adjudication.
 
 
 203
 Question 8(a) asks us to determine whether the method of appointment of the Commission is constitutional.[175] Plaintiffs argue strenuously that the method of appointment violates article II, section 2 of the Constitution. Their argument is strikingly syllogistic: Under article II, section 2 the power of appointment of civil officers of the United States is a Presidential power; the members of the Commission are civil officers; therefore, the appointment of four members of the Commission by the legislative branch of government violates article II, section 2. So construed, article II, section 2 would deprive Congress of all power to appoint its own inferior officers to carry out appropriate legislative functions. We believe that the records of the Constitutional Convention fail to support that construction.
 
 
 204
 We begin our inquiry into the constitutional history of the appointment power with the Articles of Confederation. Under Article IX of that charter, Congress alone had the power to appoint "such other committees and civil officers as may be necessary for managing the general affairs of the United States . . . ." The merits of that allocation of power were raised and considered at the Constitutional Convention, and the Framers of the Constitution eventually substituted the method of appointment embodied in article II, section 2:(The President) shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.
 
 
 205
 The debates of the Convention evidence two competing concerns that led the Framers to substitute the present appointment process for Article IX a fear that the appointment power could not be effectively and responsibly managed by a group as numerous and diverse as the legislature,[176] and a fear that centralization of the appointment power in the executive could lead to despotism.[177] The compromise that emerged appointment of civil officers by the President with the advice and consent of the Senate reflects both a desire to provide the executive with a role in the appointment process and a concern that the legislature retain some control over executive appointments. Read against the background of these competing concerns, we are not convinced that the Framers intended article II, section 2 to deprive the legislative branch of all power to appoint inferior officers to perform appropriate legislative functions.
 
 
 206
 Although article II, section 2 is not in terms a bar to the appointment of inferior civil officers by the legislative branch, neither is it an affirmative grant of power to appoint the Federal Election Commission. We conclude, however, that Congress draws sufficient authority from the necessary and proper clause of the Constitution to establish such a Commission to aid in the execution of its power "to provide a complete code for congressional elections, not only as to times and places, but in relation to . . . prevention of fraud and corrupt practices . . . ." Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932) (interpreting article I, section 4, clause 1). See Burroughs and Cannon v. United States, 290 U.S. 534, 544-45, 54 S.Ct. 287, 78 L.Ed. 484 (Congress possesses the power to safeguard Presidential elections from the "improper use of money"); United States v. Classic, 313 U.S. 299, 317-320, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1941) (Congress has the power to regulate primary elections "where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice . . . .").
 
 
 207
 We thus conclude that Congress has the constitutional authority to establish and appoint the Federal Election Commission to carry out appropriate legislative functions.[178] As to this part of our holding, Judges Tamm, MacKinnon, and Wilkey are apparently in agreement.[179] Judge MacKinnon expressly notes in his dissent that the members of the Commission need not be appointed in conformity with article II, section 2 to the extent that the Commission is performing a "legislative function."[180] And Judge Tamm's characterization of the Commission's powers as "executive," "quasi-judicial," and "outside the ambit of Congress' basic constitutional role in the conduct of the federal electoral process"[181] implies that his concern is not that Congress has chosen to appoint members of a commission but rather that Congress has chosen to appoint members of a commission that performs other than appropriate "legislative functions."
 
 
 208
 Whether the Commission is actually empowered to perform other than appropriate legislative functions is the basic issue raised by Questions 8(b) through 8(e). Question 8(b)[182] focuses on the broad grant of administrative and enforcement powers in 2 U.S.C. §§ 437d, 437g, while Questions 8(c) through 8(e)[183] deal with specific grants of power to the Commission. Plaintiffs have asked us to answer these questions by in effect holding that a statutory grant of other than legislative functions to the Commission is invalid on its face. We believe that the grant of quasi-judicial and quasi-executive functions to a "legislative agency" does not justify a holding that the statute is invalid on its face, and we postpone actually testing certain specific powers of the Commission against the appropriate constitutional standard until such time as those issues are ripe for determination.
 
 
 209
 At the outset, we emphasize that Congress cannot constitutionally appoint the members of a commission or agency that performs primarily executive or judicial functions. Springer v. Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928). Any other conclusion would be contrary to article II, section 2 of the Constitution. But the Federal Election Commission performs at least some primarily legislative functions. Several of the Commission's major responsibilities include gathering and auditing information concerning the financing of federal election campaigns.[184] It is certainly within the sphere of appropriate legislative activity for Congress to gather and audit information to aid it in the process of "preventing fraud and corruption" in federal elections and in formulating legislation to accomplish that goal. See Barenblatt v. United States, 360 U.S. 109, 111, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115 (1959) ("(t)he scope of the power of inquiry is . . . as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."); McGrain v. Daugherty, 273 U.S. 125, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927) ("(a) legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."). The Commission is also responsible for certifying eligibility for public campaign finance funds and for overseeing the repayment of overpayments or improperly spent funds.[185] These certification and audit functions are quite similar to those exercised by the Comptroller General, a recognized legislative officer.[186] See Reorganization Act of 1949, § 7, 63 Stat. 205; 31 U.S.C. § 65(d); United States v. Stewart, 234 F.Supp. 94, 99 (D.D.C.), aff'd, 119 U.S.App.D.C. 254, 339 F.2d 753 (1964).
 
 
 210
 The problem in this case is that the Commission has also been delegated various quasi-judicial and quasi-executive powers, and the question thus becomes whether Congress can establish and appoint a commission that performs quasi-judicial and quasi-executive functions in addition to the exercise of its primary legislative functions. The Supreme Court answered that question in Springer v. Philippine Islands, supra, concluding that the issue was not whether a function was judicial or executive but rather whether the particular function was sufficiently related to the exercise of an appropriate legislative function. "It may be stated then, as a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the legislature cannot exercise either executive or judicial power . . . ." 277 U.S. at 201, 48 S.Ct. at 482 (emphasis added). See 1 Sutherland, Statutory Construction § 3.06 (4th ed. Sands 1972).
 
 
 211
 We therefore find ourselves unable to invalidate on its face a statutory provision that confers quasi-executive or quasi-judicial power upon a legislative agency. Whether particular powers are predominantly executive or judicial, or insufficiently related to the exercise of appropriate legislative power is an abstract question that would be better decided in the context of a particular factual controversy.
 
 
 212
 This is not to say that the specific powers at issue in Questions 8(b) through 8(e) are presumptively incidental (in a constitutional sense) to the exercise of legislative power. Indeed, some of the provisions for example, those conferring civil enforcement and candidate disqualification powers on the Commission raise very serious constitutional questions.[187] But those questions can only be addressed and answered when the issues are ripe for adjudication. In its present stance, this litigation does not present the court with the concrete facts that are necessary to an informed decision. No party has been joined in a civil enforcement action initiated by the Commission (Question 8(c)),[188] no one has been disqualified from running for office (Question 8(e));[189] the Commission has enacted no rules (Question 8(d));[190] nor has any party been adversely affected by the exercise of most of the Commission's broad powers under 2 U.S.C. §§ 437d, 437g (Question 8(b)). In fact, some of the issues presented to us in the certified questions may never reach a stage at which they would be ripe for adjudication. The Commission suggested at oral argument, for example, that it would not utilize in its civil enforcement power but would instead refer appropriate cases to the Department of Justice under 2 U.S.C. § 437g(a)(7).[191]
 
 
 213
 There is, however, one aspect of Question 8(b) that we find ripe for adjudication the issue of the power of the Commission to issue advisory opinions pursuant to 2 U.S.C. § 437f. Upon written request by an individual holding federal office, a candidate for federal office, or a political committee, the Commission is required to issue an advisory opinion with respect to whether the requesting party would violate FECA, Subtitle H, or the election law crimes codified in title 18, by engaging in a "specific transaction or activity." Id. § 437f(a). Moreover, a person who requests an advisory opinion is "presumed to be in compliance" with the statutory provisions that are the subject of the advisory opinion if he acts "in good faith in accordance with the provisions and findings" of the opinion. Id. § 437f(b).
 
 
 214
 Our initial problem with this issue is that on reading the certified questions it is not at all clear to what extent the issue is before this court. Question 8(b) asks, in part, whether section 437d is unconstitutional in that it entrusts administration and enforcement of FECA to the Commission.[192] And one of the powers delegated to the Commission in section 437d is the power "to render advisory opinions under section 437f."[193] Unlike the situation with respect to the rulemaking and enforcement powers, however, no separate question has been certified to this court concerning section 437f.[194] Nevertheless, we have read Question 8(b) broadly and conclude that this issue is before us.
 
 
 215
 Although none of these plaintiffs has as yet been adversely affected by the grant of other powers to the Commission, the fact that the Commission is already exercising its power to issue advisory opinions[195] leads us to a different conclusion with respect to that issue. These plaintiffs are no longer completely free to forego the opportunity for an advisory opinion, since they may well conclude that a court will look unfavorably on someone who engages in questionable transactions or activities without first pursuing the clarification device provided by Congress. They may thus be placed in the position of either seeking an advisory opinion when they would prefer not to (perhaps because they believe there is a tendency toward an adverse Commission determination that may be given considerable weight by the courts), or foregoing an activity or transaction that they would prefer to pursue. Consequently, there is a ripe controversy over whether the grant of the advisory opinion power to this legislative agency places plaintiffs in the position of being brought within the ambit of an agency appointed in violation of the doctrine of separation of powers.
 
 
 216
 Plaintiffs have offered this court little reason, if any, to conclude that the advisory opinion power is unconstitutional. In their brief to this court, plaintiffs asserted that the power to issue advisory opinions is an executive function and consequently requires appointment of the Commission by the President.[196] In oral argument, on the other hand, plaintiffs suggested that the power to issue advisory opinions was a quasi-judicial function, thus also requiring Presidential appointment.[197]
 
 
 217
 But as we noted above, labelling particular functions as "executive" or "judicial" is the beginning rather than the end of the inquiry into whether the function is an appropriate one for a legislative agency. We discern no general constitutional barrier that would prevent a legislative agency from informing the public as to its interpretation of the statutory provision it must administer. In general, indeed, disclosure to the public of how a statute pertaining to election campaigns will be administered is viewed as wholesome, and in any event naturally related to the function of administration. The fact that advisory opinions are usually issued in connection with executive functions, or quasi-judicial functions, does not assign this technique exclusively to the executive or judicial branch.
 
 
 218
 Judge MacKinnon raises a more substantial separation of powers issue concerning the advisory opinion power when he argues that the power to issue advisory opinions is on its face an "impermissible intrusion into the constitutionally conferred powers and duties of the executive branch," for the reason that the presumption of compliance provision creates a situation in which the opinions of the Commission "effectively override the decisions of Government prosecutors interpreting the criminal statutes." --- U.S.App.D.C. page ---, 519 F.2d page 931 infra. The thrust of this argument seems to be that giving a "presumed to be in compliance" effect to advisory opinions forecloses the exercise of executive functions by immunizing certain transactions and activities from criminal prosecution.
 
 
 219
 A court faced with the question of what effect to give to an advisory opinion would no doubt turn to the legislative history for guidance in interpreting the rather ambiguous language in 2 U.S.C. § 437f(b). It would seem that Judge MacKinnon's construction is contrary to a statement in the House Report on the final House bill: "The presumption of compliance for those who rely in good faith on an advisory opinion stops short of outright immunization against civil or criminal penalties. Instead, the bill provides for a presumption of compliance; this presumption would be rebuttable, and, therefore, legal action would not be foreclosed." H.R.Rep.93-1239, 93d Cong., 2d Sess. 9 (1974).
 
 
 220
 We do not pursue this point to a ruling, for we are not convinced that this particular aspect of the advisory opinion issue is ripe for adjudication. When a person who relied in good faith on an advisory opinion seeks to assert that good faith reliance as a defense to a civil suit or a criminal prosecution, the issue of the effect to be given to an advisory opinion can be raised and fully considered by the courts.
 
 
 221
 We therefore conclude that the Commission has the power as a legislative agency to issue advisory opinions. We find unripe for adjudication the remainder of Question 8(b) (challenging the administrative and enforcement provisions of 2 U.S.C. §§ 437d, 437g); Question 8(c) (challenging the Commission's power under id. § 437g(a) to institute civil actions to obtain compliance with FECA); Question 8(d) (challenging the Commission's rulemaking power under id. § 438(c)); and Question 8(e) (challenging the Commission's power to impose temporary candidate disqualification under id. § 456).
 
 
 222
 We do, however, find it necessary to reach the issues raised by Question 8(f),[198] which deals with the power of the Commission under § 9008(d)(3) of Subtitle H[199] to authorize Presidential nominating convention expenditures in excess of the $2 million limit established by §§ 9008(b)(1), (d)(1), (2). Plaintiffs challenge § 9008(d)(3) not on the ground that it is an executive or judicial function that cannot be exercised by a legislative agency, but rather that it vests excessive discretion in the Commission. Our reason for finding Questions 8(c) through 8(e) and most of Question 8(b) unripe the failure of the plaintiffs to present a concrete set of facts in which the court could analyze the nexus between each specific power and the exercise of legislative functions is therefore inapplicable to Question 8(f).
 
 
 223
 In light of our earlier analysis concerning the constitutionality of the statutory limitation on total Presidential nominating convention expenditures,[200] we think Congress could only have intended § 9008(d)(3) to enable the Commission to authorize additional convention expenditure where, due to extraordinary and unforeseen circumstances (for example, emergency conditions that warrant the use of special equipment, conditions that require special measures to protect convention participants, strikes, etc.), the national committee is unable to provide the services actually needed to run the convention without exceeding the statutory limit. So construed, we find that § 9008(d)(3) provides the Commission with sufficient guidelines to withstand a constitutional challenge of vagueness. We therefore answer Question 8(f) in the negative.
 
 VIII. Remaining Questions
 
 224
 Certified Question 9[201] seeks this court's determination whether nearly thirty named provisions of the challenged Acts are void for vagueness. We have already held, in Part V-B of this opinion, that2 U.S.C. § 437a is unconstitutional for overbreadth and vagueness. With respect to many other of the provisions discussed in our foregoing opinion, we answer Question 9 in the negative.[202] We deem unripe for resolution at this time all remaining provisions challenged in Question 9,[203] and commend the parties to the Commission, calling their attention to 2 U.S.C. § 437f,[204] which delegates to the Commission the power to render advisory opinions with respect to whether a "specific transaction or activity by (an) individual, candidate, or political committee" would constitute a violation of FECA, Subtitle H, or the criminal sections.[205]
 
 Conclusion
 
 225
 Our democracy has moved a long way from the town hall, one man, one vote conception of the Framers. Politics has become a growth industry and a way of life for millions of Americans. The corrosive influence of money blights our democratic processes. We have not been sufficiently vigilant; we have failed to remind ourselves, as we moved from the town halls to today's quadrennial Romanesque political extravagances, that politics is neither an end in itself nor a means for subverting the will of the people. The excesses revealed by this record the campaign spending, the use to which the money is put in some instances, the campaign funding, the quid pro quo for the contributions support the legislative judgment that the situation not only must not be allowed to deteriorate further, but that the present situation cannot be tolerated by a government that professes to be a democracy. The legislative branch, with the concurrence of the executive, has decided in this legislation that the time for corrective action, effective action, is now. What the Congress has prescribed, and the President has approved, may well be not enough. Lesser measures, taken since 1910, have failed. But these latest efforts on the part of our government to cleanse its democratic processes should at least be given a chance to prove themselves. Certainly they should not be rejected because they might have some incidental, not clearly defined, effect on First Amendment freedoms. To do so might be Aesopian in the sense of the dog losing his bone going after its deceptively larger reflection in the water.
 
 APPENDIX A
 
 226
 (THE ORDER OF THIS COURT)
 
 
 227
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges.
 
 ORDER
 
 228
 Pursuant to 2 U.S.C. § 437h(a), constitutional questions have been certified to this Court with respect to the Federal Election Campaign Act, as amended, and with respect to the criminal sections of Title 18 enumerated within the review provision. This case came before the Court sitting en banc to consider those questions certified by the District Court. After studying the record and the briefs of the parties and of amicus curiae, and after considering the arguments presented to the Court by learned counsel, it is hereby
 
 
 229
 Ordered by the Court, for the reasons stated in the accompanying opinion, that the certified constitutional questions be answered as follows:
 
 CONSTITUTIONAL QUESTIONS
 
 230
 1. Does the first sentence of § 315(a) of the Federal Election Campaign Act, as amended, 2 U.S.C. § 437h(a), in the context of this action, require courts of the United States to render advisory opinions in violation of the "case or controversy" requirement of Article III, § 2, of the Constitution of the United States?
 
 Answer: NO
 
 231
 2. Has each of the plaintiffs alleged sufficient injury to his constitutional rights enumerated in the following questions to create a constitutional "case or controversy" within the judicial power under Article III?
 
 
 232
 Answer: YES, SUBJECT TO CONSIDERATIONS OF RIPENESS
 
 
 233
 3. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that individuals or organizations may contribute or expend in connection with elections for federal office violate the rights of one or more of the plaintiffs under the First, Fifth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment of the Constitution of the United States?
 
 
 234
 (a) Does 18 U.S.C. § 608(a) violate such rights, in that it forbids a candidate or the members of his immediate family from expending personal funds in excess of the amounts specified in 18 U.S.C. § 608(a)(1)? (First Amended Complaint (FAC)* PP 56, 59, 60, 61, 62, 86, 87, 88.)
 
 Answer: NO
 
 235
 (b) Does 18 U.S.C. § 608(b) violate such rights, in that it forbids the solicitation, receipt or making of contributions on behalf of political candidates in excess of the amounts specified in 18 U.S.C. § 608(b)? (FAC PP 55, 59, 60, 61, 62, 86, 87, 88.)
 
 Answer: NO
 
 236
 (c) Do 18 U.S.C. §§ 591(e) and 608(b) violate such rights, in that they limit the incidental expenses which volunteers working on behalf of political candidates may incur to the amounts specified in 18 U.S.C. §§ 591(e) and 608(b)? (FAC PP 57, 59, 60, 61, 62, 86, 87, 88.)
 
 Answer: NO
 
 237
 (d) Does 18 U.S.C. § 608(e) violate such rights, in that it limits to $1,000 the independent (not on behalf of a candidate) expenditures of any person relative to an identified candidate? (FAC PP 59, 60, 61, 62, 76, 86, 87, 88.)
 
 Answer: NO
 
 238
 (e) Does 18 U.S.C. § 608(f) violate such rights, in that it limits the expenditures of national or state committees of political parties in connection with general election campaigns for federal office? (FAC PP 59, 60, 61, 62, 63, 64, 65, 86, 87, 88.)
 
 Answer: NO
 
 239
 (f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it limits the expenditures of the national committee of a party with respect to presidential nominating conventions? (FAC PP 59, 60, 61, 62, 63, 64, 65, 86.)
 
 Answer: NO
 
 240
 (g) Do 2 U.S.C. § 431(e) and (f) and 18 U.S.C. § 591(e) and (f) violate such rights, in that they exempt news stories, commentaries, and editorials from the statutory definitions of "expenditure" but not from the statutory definitions of "contribution?" (FAC PP 84, 86, 87, 88.)
 
 Answer: NO
 
 241
 (h) Does 18 U.S.C. § 608(b)(2) violate such rights, in that it excludes from the definition of "political committee" committees registered for less than the period of time prescribed in the statute? (FAC PP 59, 60, 61, 62, 77, 86, 87, 88.)
 
 Answer: NO
 
 242
 (i) Do 18 U.S.C. § 608 and § 9012 of the Internal Revenue Code of 1954 violate such rights, in that they provide that the government may bring criminal prosecutions against anyone who violates or is about to violate the provisions recited in those sections? (FAC PP 78, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 243
 4. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that candidates for elected federal office may expend in their campaigns violate the rights of one or more of the plaintiffs under the First or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
 
 
 244
 (a) Does 18 U.S.C. § 608(c) violate such rights, in that it forbids expenditures by candidates for federal office in excess of the amounts specified in 18 U.S.C. § 608(c)? (FAC PP 58, 59, 60, 61, 62, 86, 87, 88.)
 
 Answer: NO
 
 245
 (b) Do 18 U.S.C. § 608 and § 9012 of the Internal Revenue Code of 1954 violate such rights, in that they provide that the government may bring criminal prosecutions against anyone who violates or is about to violate the provisions recited in those sections? (FAC PP 78, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 246
 5. Does any statutory provision for the public financing of political conventions or campaigns for nomination or election to the Presidency or Vice Presidency violate the rights of one or more of the plaintiffs under the First or Ninth Amendment, the Due Process Clause of the Fifth Amendment, or Article I, Section 8, Clause 1, of the Constitution of the United States? (FAC PP 79, 80, 81, 82, 86, 87, 88.)
 
 Answer: NO
 
 247
 6. Do the particular provisions of Subtitle H and § 6096 of the Internal Revenue Code of 1954 deprive one or more of the plaintiffs of such rights under the First or Ninth Amendment or Article I, Section 8, Clause 1, in that they provide federal tax money to support certain political candidates, parties, movements, and organizations or in the manner that they so provide such federal tax money? (FAC PP 79, 80, 81, 82, 86, 87, 88.)
 
 Answer: NO
 
 248
 7. Do the particular requirements in the challenged statutes that persons disclose the amounts that they contribute or expend in connection with elections for federal office or that candidates for such office disclose the amounts that they expend in their campaigns violate the rights of one or more of the plaintiffs under the First, Fourth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
 
 
 249
 (a) Do 2 U.S.C. §§ 432(b), (c), and (d) and 438(a)(8) violate such rights, in that they provide, through auditing procedures, for the Federal Election Commission to inspect lists and records required to be kept by political committees of individuals who contribute more than $10? (FAC PP 70, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 250
 (b) Does 2 U.S.C. § 434(b)(1)-(8) violate such rights, in that it requires political committees to register and disclose the names, occupations, and principal places of business (if any) of those of their contributors who contribute in excess of $100? (FAC PP 71, 86, 87, 88.)
 
 Answer: NO
 
 251
 (c) Does 2 U.S.C. § 434(d) violate such rights in that it neither requires disclosure of nor treats as contribution to or expenditure by incumbent officeholders the resources enumerated in 2 U.S.C. § 434(d)? (FAC PP 72, 86, 87, 88.)
 
 Answer: NO
 
 252
 (d) Does 2 U.S.C. § 434(e) violate such rights, in that it provides that every person contributing or expending more than $100 other than by contribution to a political committee or candidate (including volunteers with incidental expenses in excess of $600) must make disclosure to the Federal Election Commission? (FAC PP 73, 86, 87, 88.)
 
 Answer: NO
 
 253
 (e) Does 2 U.S.C. § 437a violate such rights, in that it requires any person who expends funds or commits any act for the purpose of influencing the outcome of an election or who publishes or broadcasts to the public any material advocating the election or defeat of a candidate, setting forth a candidate's position on any public issue, his voting record, or any official acts to file reports with the Commission as if such person were a political committee? (FAC PP 74, 86, 87, 88.)
 
 Answer: YES
 
 254
 (f) Does 2 U.S.C. § 441 violate such rights, in that it provides criminal penalties for violations of Chapter 14 of Title 2 U.S.C.? (FAC PP 75, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 255
 8. Do the provisions in the challenged statutes concerning the powers and method of appointment of the Federal Election Commission violate the rights of one or more of the plaintiffs under the constitutional separation of powers, the First, Fourth, Fifth, Sixth, or Ninth Amendment, Article I, Section 2, Clause 6, Article I, Section 5, Clause 1, or Article III?
 
 
 256
 (a) Does 2 U.S.C. § 437c(a) violate such rights by the method of appointment of the Federal Election Commission? (FAC PP 66, 86, 87, 88.)
 
 Answer: NO
 
 257
 (b) Do 2 U.S.C. §§ 437d and 437g violate such rights, in that they entrust administration and enforcement of the FECA to the Federal Election Commission? (FAC PP 67, 86, 87, 88.)
 
 
 258
 Answer: NO as to the power to issue advisory opinions; UNRIPE as to all else.
 
 
 259
 (c) Does 2 U.S.C. § 437g(a) violate such rights, in that it empowers the Federal Election Commission and the Attorney General to bring civil actions (including proceedings for injunctions) against any person who has engaged or who may engage in acts or practices which violate the Federal Election Campaign Act, as amended, or §§ 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18? (FAC PP 83, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 260
 (d) Does 2 U.S.C. § 438(c) violate such rights, in that it empowers the Federal Election Commission to make rules under the FECA in the manner specified therein? (FAC PP 68, 86, 87, 88.)
 
 
 261
 Answer: UNRIPE FOR RESOLUTION(e) Does 2 U.S.C. § 456 violate such rights, in that it imposes a temporary disqualification on any candidate for election to federal office who is found by the Federal Election Commission to have failed to file a report required by Title III of the Federal Election Campaign Act, as amended ? (FAC PP 69, 86, 87, 88.)
 
 Answer: UNRIPE FOR RESOLUTION
 
 262
 (f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it empowers the Federal Election Commission to authorize expenditures of the national committee of a party with respect to presidential nominating conventions in excess of the limits enumerated therein? (FAC PP 59, 60, 61, 62, 63, 64, 65, 86.)
 
 Answer: NO
 
 263
 9. Do 2 U.S.C. §§ 431(b), (d), (e) and (f); 434(e); 437a, 437d, 437g(a)(5)-(7), and 456; 18 U.S.C. §§ 591(b), (d), (e) and (f); 608(b)(6), (c)(4), (e); Internal Revenue Code of 1954 §§ 9002(2), (9); 9006(d); 9008(d)(3); 9032(2), (4), (8), and (9), and 9037 violate the constitutional rights of one or more of the plaintiffs in that they are excessively vague? (FAC PP 85, 87, 88.)
 
 Answer: YES as to 2 U.S.C. § 437a
 
 264
 NO as to 2 U.S.C. §§ 431(b), (d), (e) and (f); 434(e); 437d(a)(7); 18 U.S.C. §§ 591(b), (d), (e) and (f), 608(b)(6), (c)(4), (e); 26 U.S.C. §§ 9002(2), 9008(d)(3), 9032(2) and (4)
 
 
 265
 UNRIPE FOR RESOLUTION as to 2 U.S.C. §§ 437d(a)(1)-(6), (8)-(11), and (b)-(d), 437g(a)(5)-(7), 456; 26 U.S.C. §§ 9002(9), 9006(d), 9032(8) and (9), 9037.
 
 APPENDIX B
 History Of This Litigation
 
 266
 This lawsuit was filed in the District Court on January 2, 1975, the first business day after the FECA Amendments of 1974 went into effect. The case was assigned to District Judge Corcoran. Plaintiffs sought declaratory and injunctive relief, bottoming jurisdiction upon 28 U.S.C. §§ 1331, 2201, 2202 and section 315(a) of FECA, codified as 2 U.S.C. § 437h, added by section 208 of the Amendments of 1974.
 
 
 267
 The plaintiffs requested convocation of a three-judge District Court as to all matters pursuant to 28 U.S.C. §§ 2282, 2284, and also requested certification to this Court under § 437h. Plaintiffs moved the District Court to reduce defendants' answering time from 60 to 30 days. On January 16th the defendants opposed the motion for a three-judge court, and mooted the request for reduction in answering time by moving to dismiss the complaint on grounds of lack of subject matter jurisdiction because of premature and nonjusticiable issues and the absence of an indispensable and necessary party, the Federal Election Commission (Commission or FEC). On January 24th, Judge Corcoran entered an order denying the plaintiffs' application for a three-judge court, and directing the Clerk of the District Court to transmit the entire file to the Clerk of this Court. He bottomed his transmittal action upon a reading together of § 437h and 26 U.S.C. § 9011(b),[1] (the review provision contained within Chapter 95 of Subtitle H). On that same date, all of the papers in the case were entered upon this Court's regular docket as our No. 75-1061. Plaintiffs filed their opposition to the motion to dismiss in this Court along with an explanation of their actions. Subsequent thereto, federal defendants joined with applicants for intervention (now the intervening defendants) to move remand of the instant case to the District Court.
 
 
 268
 On February 19, 1975, this Court entered an order preliminarily deeming the case to be properly certified here under § 437h and declaring that it would be considered en banc.[2] Further, the Clerk was ordered to inquire of the parties by letter as to their needs and intentions regarding submission of evidence and establishment of procedures to evaluate it, and the parties were ordered to file within a court-determined schedule additional briefs or memoranda on the jurisdictional questions.
 
 
 269
 While this matter was on our docket we granted a motion for leave to intervene on behalf of the Center for Public Financing of Elections, Common Cause, The League of Women Voters of the United States, and eight individuals in leadership positions with those organizations. Other motions for leave to intervene and to appear amicus curiae were held in abeyance.
 
 
 270
 At the urging of the parties in response to our Clerk's letters that this Court establish fact-finding procedures without waiting for the decision upon the motions to remand and to dismiss, it was ordered en banc on March 14th that the parties file proposed findings of fact and in conjunction with each proposed finding a documented offer of proof to consist of evidence in tangible form. This first round of material was due on April 3rd, with a responsive filing admitting or denying by similar documented offer due on April 18th. The March 14th order also set oral argument on the motions for April 2nd.
 
 
 271
 Defendants and intervening defendants then served plaintiffs with notices to take deposition upon oral examination, interrogatories, requests for admission, and for production of documents. The plaintiffs indicated to the Court, first by informal letter which was not accepted for filing, and then later as a Preliminary Response to defendants' discovery filings, that they thought discovery procedures were outside the intendment of this Court's March 14 evidentiary order, and not compelled by the Federal Rules of Civil Procedure, since by their terms the Rules apply to the District Court. On the day prior to argument the plaintiffs moved this Court for a procedural order setting forth a schedule for filing of summary judgment motions. Defendants moved to compel discovery. At the April 2nd oral argument upon the motions, all parties discussed whether such discovery was within or without the scope of this Court's March 14th order. The first round of evidentiary filings was completed on April 4th, and it was extensive. Defendants and intervening defendants continued to attempt discovery and filed copies of their demands in this Court.
 
 
 272
 On April 14th this Court entered an en banc order (Chief Judge Bazelon dissenting), granting the motion to remand to the extent of remanding the record to Judge Corcoran to do the following:
 
 
 273
 1. Identify constitutional issues in the complaint.
 
 
 274
 2. Take whatever may be necessary in the form of evidence over and above submissions that may be suitably handled through judicial notice, as of legislative facts, supported by legislative history or works reasonably available, to the extent not controverted in material and substantial degree.
 
 
 275
 3. Make findings of fact with reference to those issues.
 
 
 276
 4. Certify to this Court constitutional questions arising from steps 1, 2, and 3. Memorandum at 1 (April 14, 1975).
 
 
 277
 The remand order also provided that the second round of evidentiary filings, due April 18th, would be referred to Judge Corcoran. The District Court was ordered to return the augmented record to this Court no later than May 19, 1975.
 
 
 278
 On April 15th, Judge Corcoran, pursuant to the suggestion of the en banc order notified the Chief Judge of the request for convening of a three-judge court to deal with the Subtitle H issues.[3] On the same day, Chief Judge Bazelon designated himself, Judge Robinson and Judge Corcoran to constitute that court. At an April 16th status call, Judge Corcoran postponed the second round of evidentiary findings from April 18th to April 21, and granted the motion of James C. Calaway to intervene as a party plaintiff (Calaway's motion made to this Court was then still pending). The District Court endorsed discovery proceedings but ordered them expedited. On April 21, the parties filed their second round of proposed findings of fact in this Court and they were referred to Judge Corcoran. The District Court also granted leave to Senator Lee Metcalf to file a brief amicus curiae and to participate in oral argument (Metcalf's motion made to this Court was then still pending). On April 23rd, the parties filed proposed constitutional questions, and intervening plaintiff Calaway's complaint was filed. On April 28, papers responsive to the first round of proposed constitutional questions were filed. Additional discovery filings occurred during the first week of May. On May 14th the General Counsel for the Federal Elections Commission was served with the First Amended Complaint by plaintiffs. On that same day Judge Corcoran granted the motion for substitution of Louise D. Wides as intervening defendant for Susan B. King.
 
 
 279
 On May 19th, Judge Corcoran entered a memorandum and order transmitting the augmented record back to this Court, and adopting extensive findings of fact. That document is in four parts: Part I: Findings of Fact Agreed to by the Parties; Part II: Statistical Findings of Fact: Part III: Court Findings of Fact; Part IV: The Constitutional Questions, certified by the District Court.
 
 
 280
 While this case was on remand of the record, this Court sua sponte entered an order setting a briefing schedule to be triggered by the return of remand. It provided that opening briefs were due fourteen days after return of the record (in fact, June 2) and reply briefs to be due ten days thereafter (June 12).
 
 
 281
 On May 23rd, after return of the record, the United States filed a motion for leave to file a brief amicus curiae in excess of the page limits. That motion was later withdrawn. On May 28th a per curiam order was entered sua sponte setting a joint sitting with the three-judge district court for June 13th at 9:30 a. m. On May 29th the Court entered an order to grant the pending motions of James C. Calaway for leave to intervene, and of Senator Lee Metcalf for leave to file a brief amicus curiae and to participate in oral argument, and for the Clerk to modify the docket to reflect those changes. Intervening plaintiff Calaway's complaint was then filed.
 
 
 282
 On June 13th, a per curiam order was entered granting amicus curiae ten minutes time at oral argument not be be subtracted from the time of the other parties, after parties could not agree on a division of time. The case was then argued to both courts sitting jointly for purposes of argument only, consideration of the three-judge district court being limited to the Subchapter H issues.
 
 APPENDIX C
 
 283
 Brief History of Federal Election Regulation
 
 
 284
 The primary source of Congressional authority to regulate Federal elections is found in article 1, section 4 of the Constitution, which provides:
 
 
 285
 The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing Senators.
 
 
 286
 This grant of authority does not refer in terms to regulation of Presidential elections. In fact, it has been held that in the absence of direct election, a Presidential elector is a state officer, not a federal one. In re Green, 134 U.S. 377, 379, 10 S.Ct. 586, 33 L.Ed. 951 (1890). More recently, in the case of Burroughs and Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934), it was held that the federal interest in the existence of the Presidency is such that, because the states could theoretically refuse to provide for selection of electors, the federal government must have regulatory powers implicit in article II. In United States v. Manning, 215 F.Supp. 272, 284 (D.C.La.1963), the court held that the phrase "manner of holding elections" refers to the entire electoral process, from the first step of registering to the last step of promulgating honest returns.
 
 
 287
 The modern era of federal campaign regulation may be reckoned from 1907, when President Roosevelt urged adoption of a system of public financing. Although Congress did not adopt that proposal, it did enact in that same year the Tillman Act, ch. 420, 34 Stat. 864, which is the predecessor of present day 18 U.S.C. § 610. That statute prohibited national banks and corporations chartered by Congress from making political contributions in any election, and prohibited all corporations from making political contributions in connection with elections for federal office. "As the historical background of this statute indicates, its aim was not merely to prevent the subversion of the integrity of the electoral process. Its underlying philosophy was to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." United States v. UAW, 352 U.S. 567, 575, 77 S.Ct. 529, 533, 1 L.Ed.2d 563 (1957).
 
 
 288
 In 1909, Congress attempted but failed to broaden the Act's coverage to include contributions of all items of value (in-kind contributions) and state legislative races. 1910 saw the first federal disclosure law, Act of June 25, 1910, ch. 392, §§ 5-6, 36 Stat. 823, which required political committees (as defined therein) operating in Congressional elections in two or more states, to disclose all transactions above $100. Similarly, expenditures of greater than $50, made independently of a political committee, had to be reported. Id. § 7, 36 Stat. 824. The 1910 Act was amended in 1911 to include, for the first time, overall expenditure ceilings on campaigns for the House ($5,000) and for the Senate ($10,000), and detailed reporting requirements. Act of Aug. 19, 1911, ch. 33, § 2, 37 Stat. 26. That revision also broadened disclosure to include primary, convention and other pre-nomination periods. Id. In 1918, Congress added criminal penalties for offering money to influence voting. Act of Oct. 16, 1918, ch. 187, 40 Stat. 1013. In 1921, in the only instance of a criminal prosecution under this act and its successor statute, Truman Newberry was convicted of violating the expenditure ceiling in his 1918 Michigan Senate primary race. His conviction was reversed and the primary provisions of the Act were overturned as unconstitutional by the Supreme Court because primaries were intra-party affairs, and Congress could not limit expenses therein under article 1, section 4. Newberry v. United States, 256 U.S. 232, 41 S.Ct. 469, 65 L.Ed. 913 (1921).
 
 
 289
 After Newberry, the Congress acted to draw together in 1925 the surviving provisions of federal election law, generally broadening disclosure. Federal Corrupt Practices Act of 1925, ch. 368, tit. III, 43 Stat. 1070. In 1934, in Burroughs and Cannon, supra, the Supreme Court upheld the Federal Corrupt Practices Act of 1925 in very broad language:
 
 
 290
 If it can be seen that the means are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone. . . . Congress reached the conclusion that public disclosure of political contributions, together with the names of contributors and other details, would tend to prevent corrupt use of money to affect elections. The verity of this conclusion reasonably cannot be denied. . . . (I)t seems plain that the statute as a whole is calculated to discourage the making and use of contributions for purposes of corruption.
 
 
 291
 290 U.S. at 547-548, 54 S.Ct. at 291.
 
 
 292
 As indicated above, Burroughs and Cannon also stands for the proposition that the power of Congress to regulate elections extends to the selection of Presidential electors:
 
 
 293
 The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated. To say that Congress is without power to pass appropriate legislation to safeguard such an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection. Congress, undoubtedly, possesses that power, as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption.
 
 
 294
 290 U.S. at 545, 54 S.Ct. at 290.
 
 
 295
 In 1939-1940, Congress enacted the Hatch Act, the restrictions of which are far more stringent as applied to federal employees than are those of the challenged Acts as applied to the citizenry at large. Ch. 410, 53 Stat. 1147. That statute, which banned overt political activities by all federal employees save Presidential appointees, was upheld in United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). In 1940, Congress also limited the total expenses of political committees to $3,000,000 and limited gifts to candidates or political committees to $5,000 in any calendar year. Act of July 19, 1940, ch. 640, 54 Stat. 767.[1]
 
 
 296
 In 1941, in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), the Supreme Court held that the regulatory powers of Congress did extend to the pre-election period. That case involved the Louisiana Democratic primary for House of Representatives, which custom and long history showed was, de facto, the determinant of who would occupy House seats. Without so stating, the Classic court overruled Newberry :
 
 
 297
 (T)he authority of Congress, given by (article I,) § 4, includes the authority to regulate primary elections when, as in this case, they are a step in the exercise by the people of their choice of representatives in Congress.
 
 
 298
 313 U.S. at 317, 61 S.Ct. at 1038.
 
 
 299
 Labor unions were first brought within the Federal Corrupt Practices Act prohibition on contributions in 1943. War Labor Disputes Act (Smith-Connally Act), ch. 144, § 9, 57 Stat. 167. But since the War Labor Disputes Act contained an explicit termination clause, Congress found it necessary in the 1947 Taft-Hartley Act to enact another provision including labor unions within the ban on contributions. Labor Management Relations Act (Taft-Hartley Act) ch. 120, § 304, 61 Stat. 159. The Taft-Hartley Act also prohibited corporations and unions from making campaign expenditures, id., thus closing the loophole which might have permitted both groups to influence the outcome of federal elections within the law merely by making purchases themselves (expenditures), rather than by contribution (the putting of resources within the control of a candidate or his agents). That Act also implemented Classic by broadening the federal statutes to include primary elections.
 
 
 300
 From the late 1940's through the end of the 1950's, various legislative bodies recommended changes in the Federal Corrupt Practices Act and the Hatch Act, including amendment of the dollar expenditure limits to reflect more realistic costs, but no action was taken. In 1960, the Senate approved a bill to toughen reporting requirements for both political committees and candidates, to adopt an individual contribution limit, to rationalize Congressional expenditure ceilings, and to place ceilings on Presidential campaigns. 106 Cong.Rec. 1193 (1960). The bill died for lack of a House companion.
 
 
 301
 President Kennedy's Presidential Commission on Campaign Costs recommended reform in 1962, favoring tax incentives and credits for small political contributions, realistic ceilings, and suspension of the equal time provision as to media debates. President's Commission on Campaign Costs, Financing Presidential Campaigns (1962). In 1966, Congress first enacted a one dollar tax checkoff plan to provide public financing for Presidential general elections, but the following year that plan was effectively repealed.
 
 
 302
 Late in 1971, Congress passed the annual Revenue Act which contained a revivified one dollar tax checkoff to finance Presidential general elections. The following year the FECA of 1971, Pub.L.No.92-225, 86 Stat. 3, was signed into law, requiring disclosure of all contributions in excess of $100, disclosure of expenditures by all candidates and by political committees spending more than $1000 per year.
 
 
 303
 In 1973, the Supreme Court again examined the Hatch Act's restrictions upon the freedom of expression of federal employees, and again upheld it, in United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796. Vagueness and overbreadth attacks on the Hatch Act were rejected:
 
 
 304
 (T)he judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences. . . .
 
 
 305
 . . . (That judgment) is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act.
 
 
 306
 413 U.S. at 564, 93 S.Ct. at 2890.
 
 
 307
 On October 15, 1974, President Ford signed into law the FECA Amendments of 1974, which enactment forms the majority of the statutes under challenge in this action.
 
 
 308
 This history of federal election law as accretion is included for two chief reasons: First, it indicates that the seeming ambiguities of the challenged statutes (such as the use of "contribution" and "expenditure" almost identically defined) are not the result of poor draftsmanship,[2] but in part the culmination of a loophole-closing process. Second, and more importantly, this history shows that most of the elements of regulation present in the existing, challenged Acts have been tried alone or in different combinations before, which bears upon the question whether Congress has regulated in as narrow a manner as possible. The statutes of 1910-1911 relied upon some disclosure, candidate expenditure ceilings and corporate donation prohibitions for primaries and general elections. The Federal Corrupt Practices Act of 1925 relied upon similar regulatory strategies but applied them to general elections only. The Taft-Hartley Act tightened labor donation bans and broadened the prohibition on corporate and labor contributions to include expenditures. The FECA of 1971 reacted to the regulatory failures of its predecessor Acts by repealing candidate expenditure ceilings, mandating fuller disclosure, and putting expenditure ceilings upon media advertising only, which was seen as the most unequal application of money. By separate Act, public financing of Presidential general elections was adopted (though delayed until 1976). In the 1974 Amendments, Congress abandoned media limits in favor of returning to candidate expenditure ceilings, added tight contribution limits, buttressed them with limitations on individual spending to endorse or oppose candidates, retained disclosure as a means of enforcing these other limits, and extended public financing to national party Presidential nominating conventions and to Presidential primaries.
 
 
 309
 Thus we have arrived at the comprehensiveness of the present Acts through the failure of piecemeal regulation to preserve the integrity of federal elections.
 
 
 310
 BAZELON, Chief Judge (concurring in part and dissenting in part):
 
 
 311
 This case involves the agonizing process of weighing competing values of the most fundamental importance in a democratic society: a statute designed to effectuate the one person one vote principle and to safeguard the integrity of elections against first amendment guarantees for candidates and voters. In general, I agree with the necessarily difficult accommodations reached by the court on all issues except for its holding that the disclosure requirements of § 434, when applied to minor parties,[1] are constitutional.[2]
 
 
 312
 It is common ground that the First Amendment protects the privacy of one's associations and beliefs.[3] Privacy is safeguarded first for its own sake, as a fundamental value of any society that respects the dignity of the individual.[4] But privacy is also protected as a means of achieving the "uninhibited, robust and wide-open" debate to which the First Amendment commits us.[5] The First Amendment, after all, rests on the principle "that the best test of truth is the power of the thought to get itself accepted in the competition of the market."[6] And privacy is essential to the proper functioning of that market because dissidents and heretics, fearing harassment, may decline to speak if they must first publicly identify themselves.[7] As the Supreme Court has observed, "Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all."[8]
 
 
 313
 Associational privacy is of particular importance to minor parties. Members of mainstream organizations such as the major parties have little to fear from being so identified.[9] But to be publicly labeled e. g., Socialist, Communist, or Nazi is to invite social ostracism, loss of business or employment, verbal or physical abuse, or worse. Fearing these consequences, many minor party adherents likely will be deterred from acting on their convictions. And given the fragile nature of many minor parties,[10] the loss of even a small portion of their support may well be fatal.[11]
 
 
 314
 The death of a significant number of minor parties would threaten the effective functioning of the two-party system. At an irreducible minimum, minor parties ensure a multitude of tongues in what should be the most democratic of all forums, the election. As the Supreme Court declared in Williams v. Rhodes, "There . . . is no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms."[12] The American experience with minor parties has confirmed the value of that competition. In the oft-quoted words of Chief Justice Warren, "History has amply proved the virtue of political activity by minority, dissident groups who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted."[13]
 
 
 315
 When law intrudes on contributors' right to the privacy of their beliefs, and threatens to drastically affect dissident speakers, the command of the Constitution is clear: absent compelling governmental interests that can be furthered in no less restrictive manner, the law cannot stand.[14] The court today agrees in principle, and it purports to find such interests to sustain the disclosure requirements of § 434.[15] But the court concedes that these interests might not be deemed "compelling" were proof of harassment of contributors offered.[16] Implicitly, then, because of the state of the record the court applies less than the exacting scrutiny the Constitution demands.
 
 
 316
 Admittedly, the record of harassment and chill in this case is insubstantial, although representatives of the Committee for a Constitutional Presidency McCarthy '76,[17] New York Conservative Party,[18] New York Libertarian Party,[19] National Libertarian Party,[20] and Mississippi Republican Party[21] all testified to knowing of at least one or two persons who refused to contribute because of disclosure requirements. But the weakness of the record did not prevent the court from invalidating the requirement that "issue-discussion groups" which play much the same role as minor parties identify their contributors.[22] Similarly, the absence of strong evidence with respect to minor parties should not vitiate the force of the compelling interest test.
 
 
 317
 One evil of disclosure the invasion of the privacy of belief requires no proof. The other evils chill and harassment are largely incapable of formal proof. Pre-existing minor parties might be able to link disclosure with a chill by demonstrating a sudden drop in contributions, but only if they could negate all other possible causes. New parties would not even have this option available, and would have to find a group of most unlikely witnesses: persons unwilling to publicize their contributions but nevertheless willing to publicize the reasons for their fears. Similarly, disclosure can be shown to produce reprisals only if (1) minor party members are willing to publicly announce their contributions; (2) those members suffer palpable injury; and (3) no other explanation for such injury is plausible. Even assuming that the causal links could eventually be established, many minor parties would wither and die on the vine awaiting the evidence required. The spectre of reputations blotted and lives ruined by the release of membership lists is still too vivid to claim ignorance of the danger disclosure poses. "All others can see and understand this. How can we properly shut our minds to it? "[23]
 
 
 318
 Nothing in the Supreme Court precedents supports the majority's "wait-and-see" approach.[24] The Court has never varied the rigor of its scrutiny depending on the presence or absence of a record of harassment and chill.[25] Rather, whenever a disclosure requirement[26] or any other law[27] has posed a reasonable danger of chilling the exercise of First Amendment rights, the Court has applied its most exacting review.
 
 
 319
 When measured against the rigors of the compelling interest test, the application of § 434 to minor parties cannot be sustained. The court concludes that requiring disclosure is justified by the interests in "informing the electorate and preventing the corruption of the political process."[28] This interest assumes that the press will invest their scarce investigative resources and paper space (or air time) on the generally small lists of small contributors to minor parties. In truth, most minor parties probably are too small to attract press scrutiny in the heat of a campaign.[29] Furthermore, minor parties generally receive too little money[30] and too few large contributions[31] for their contributor lists to provide significant information. Finally, unlike the major parties, the views of minor party candidates are clearly defined, and their supporters share a basic ideological commitment.[32] Thus, information about the sources of support of minor parties is of minimal importance to those voters who would seriously consider voting for them.
 
 
 320
 The primary information the court suggests might be uncovered by requiring disclosure of minor party contributors and the primary evil it suggests thereby might be deterred is "stalking horses."[33] Although major party adherents may have always had an interest in diverting support from their principal rival, not a scintilla of evidence is offered to demonstrate that the stalking horse threat is a substantial one. Moreover, the stalking horse danger is only real if one assumes either that minor parties will accept large contributions without inquiring about the donors[34] or that they will knowingly allow themselves to be used to further the ends of a conspiracy of major party members.[35] To the extent the threat is serious and a proper concern of Congress, a less restrictive remedy for the objectionable acts would be to impose criminal sanctions.
 
 
 321
 In the end, the court requires minor parties to prove what is obvious but unprovable, while permitting the government to hypothesize interests which are little more than plausible. This approach stands First Amendment jurisprudence on its head. To justify infringing freedom of speech, a danger must be "present" or "imminent," not hypothetical.[36] The crucial issues at stake in this case call for strengthening, not relaxing, that requirement.
 
 
 322
 I respectfully dissent.
 
 
 323
 TAMM, Circuit Judge (concurring in part and dissenting in part):
 
 
 324
 I take this opportunity to set out my views briefly on the constitutionality of this statute, which, in the name of reform and in furtherance of legitimate governmental interests, cuts deeply into our most highly prized freedoms. In light of the compelling need for expedition of this matter to facilitate the earliest Supreme Court review, this is not the occasion for an exhaustive exposition, and I shall be content merely to highlight the difficulties I perceive in this comprehensive attempt to reform and purify our electoral process.
 
 I. Standards and Interests
 
 325
 To approach the question of the statute's constitutionality properly, the initial step must be to identify the rights plaintiffs seek to protect in attacking the statute and the interests the Government seeks to effectuate by its enactment. Only after such an inquiry can an identification of the type of interest the Government must advance to justify the statute be made and an analysis of whether the means chosen in the statute are appropriate to further those interests be undertaken.
 
 
 326
 Plaintiffs assert that the Federal Election Campaign Act (FECA) violates their first amendment rights. In order to accept that claim, the contribution or expenditure of money for political purposes must be considered protected speech or political association. Plaintiffs claim that "(t)he contribution of money to a candidate" is "precisely the sort of (first amendment) associational freedom protected in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)." Pl. Br. at 101. Expenditures, plaintiffs opine, is the basis of every political communication protected by the first amendment and thus must be considered "pure speech", Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), whose protection "is a major purpose of the amendment." Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). Defendants and intervenors, while conceding that campaign contributions can affect first amendment interests, in part respond that money is not equivalent to speech and is, at best, speech plus action. As such, the Government's interest in regulation is stronger and thus the case does not present the clash of constitutional interests that plaintiffs contend. See United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
 
 
 327
 I am inclined to conclude that campaign expenditures, at least, are so intertwined with direct political communication to be indistinguishable for first amendment purposes; for example, political advertising, through the media, bumper stickers, mailings, or pamphlets, clearly must be considered "pure speech." See Bigelow v. Virginia, --- U.S. ---, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Political contributions, also in my mind, are connected with important speech and associational interests, although admittedly containing other, less constitutionally-valued components. However, as can be seen infra, I need not go beyond these conclusions and establish at this time a hierarchy of political speech to resolve the issues before us. It is sufficient to conclude that the Government must advance a compelling interest to justify the intrusions into plaintiff's first amendment rights.
 
 
 328
 Defendants, at argument, conceded that they must demonstrate a "compelling need" for the legislation and that it must represent the "least restrictive" intrusion into "protected rights." Defendants advance multiple governmental interests which they assert that Congress found compelling and justifying the legislation. Those interests, include: (1) the skyrocketing increase in campaign costs with the accompanying effects of unnecessary spending and freezing out candidates for office; (2) the increasing dependence of candidates on large contributors, who thus had a disproportionate ability to affect the process, and whose influence increased the possibility or appearance of corruption; (3) the so-called "Watergate problem" and (4) the alienation from and disillusionment in the electoral process by this country's citizens. Defendants assert that prior campaign legislation has proven inadequate to curb campaign finance abuses, which contributed to the "compelling need for comprehensive prophylactic measures that would restore public faith in the electoral process." Int. Def.'s Br. at 60. In addition, FECA, defendants argue, promotes other governmental interests, including: (1) increasing the flow of information to the public; (2) opening politics to candidates; and (3) equalizing the ability of all citizens to affect electoral outcomes.
 
 
 329
 I am prepared to accept the validity of these legislative facts as found by Congress to be legitimate interests. No one disputes that there have been abuses and inequities in our electoral process; each of us applauds any effort to enhance the impact of each citizen on the process and to cleanse the system of the taint or appearance of corruption and undue influence. However, sympathy, no matter how heartfelt, for the aims of the legislation before us must not override our obligation to protect the liberties, which are the bedrock of the republic, from infringement even for the noblest of purposes.
 
 
 330
 Thus, we must scrutinize the entire package of regulation and limitation on individual choice carefully to ensure that they are all indispensable to effectuate the delineated legislative ends. We must also examine FECA to determine whether those purposes justifying particular regulation are undercut by other portions of the statute. We are not substituting our judgment for that of the legislative branch when we are called upon to perform this type of review.
 
 II. Disclosure
 
 331
 I must agree that, in general, the disclosure provisions of the statute most directly effectuate the congressional goals of preventing corruption and undue influence. See Stoner v. Fortson, 379 F.Supp. 304 (N.D.Ga.1974). As Justice Brandeis has written:
 
 
 332
 Sunlight is said to be the best of disinfectants. Electric light the most efficient policeman.
 
 
 333
 L. Brandeis, Other People's Money 92 (1914). The Supreme Court has noted that "informed public opinion is the most potent of all restraints upon misgovernment." Grosjean v. American Press, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). In a similar vein, disclosure increases the quantity of information reaching the body politic and furthers the first amendment goal of "producing an informed public capable of conducting its own affairs." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 392, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969).
 
 
 334
 Plaintiffs contend that disclosure impermissibly "chills" the exercise of first amendment rights, especially in respect to contributions to unpopular or controversial groups; that the threshold level triggering disclosure is impermissibly low; and that the Government has demonstrated no need to require disclosure for contributions to minority or new parties. However, the record before us does not contain any evidence of individuals chilled by disclosure provisions which have previously been in force, nor any indication of harassment of contributors to unpopular groups; there appears to me to be no evidence to sustain such a claim at this time. Cf. United States v. Finance Comm. to Re-Elect the President, 165 U.S.App.D.C. ---, 507 F.2d 1194 (1974). There also does not appear to be anything unreasonable about the triggering mechanism. It is high enough to exempt a significant number of contributions and "high enough for a political campaign to enjoy substantial support from secret gifts alone," United States v. Finance Comm. to Re-Elect the President, supra, 507 F.2d at 1200, yet low enough effectively to prevent evasion through pooling of lower contributions and to allow the voting public to discern a pattern of support.
 
 
 335
 Finally, I find unconvincing plaintiff's challenge to requiring disclosure of contributors to minor or new parties. Disclosure eliminates the so-called "stalking horse" problem, where minor parties are secretly funded to dissipate potential support from more serious opposition. Disclosure also furthers the public interest of knowing the source of significant financial support of all those who enter the political marketplace to compete for votes. Hence, with one exception, I would uphold on this record the FECA disclosure requirements.
 
 
 336
 That exception is 2 U.S.C. § 437a, "Reports by certain persons." Section 437a requires the disclosure of contributions and expenditures of any non-individual
 
 
 337
 who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal Office), or otherwise designed to influence individuals to cast their votes for or against such candidates or to withhold their votes from such candidate(s).
 
 
 338
 Under this section, therefore, plaintiff American Civil Liberties Union must disclose its contributors and expenditures since it publishes a membership newsletter with voting records on civil liberties issues. Under this section, a similar requirement would be placed on a Right-to-Life group who places a newspaper advertisement calling for the election of all candidates who support an anti-abortion constitutional amendment.
 
 
 339
 I can hardly imagine a more sweeping abridgement of first amendment associational rights. Section 437a creates a situation whereby a group contributes to the political dialog in this country only at the severest cost to their associational liberties. I can conceive of no governmental interest that requires such sweeping disclosure of all groups who take a stand on a public issue or report voting records, even only to its own membership. This is a far harsher statute than the one condemned in ACLU v. Jennings, 366 F.Supp. 1041 (D.D.C.1973), vacated as moot, sub nom. Staats v. ACLU, --- U.S. ---, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975). It represents a greater intrusion than any found in the line of cases commencing with NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).
 
 
 340
 Of course, the statute could be narrowly construed, perhaps restricted to groups specifically endorsing candidates or groups whose endorsements were not based on a long-standing issue orientation. However, that would involve us in judgments best left to Congress. We have held that if Congress clearly intended the unconstitutional interpretation, we may not avoid striking the statute down. United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333, 1341 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972). From reference to the legislative history, it is abundantly clear that that is the case here. See e. g., 120 Cong.Rec. H 10332-33 (daily ed. Oct. 10, 1974) (remarks of Rep. Frenzel); id., at H 10327 (daily ed. Oct. 10, 1974) (remarks of Rep. Hays). I would strike down section 437a as violative of the first amendment.
 
 III. Contributions
 
 341
 The limit on individual contributions, codified in 18 U.S.C. § 608(b), represents an attempt by Congress to reduce the perceived influence large contributors have on the electoral process. However, while the issue has posed some difficulty for me, I must conclude that section 608(b) cannot stand. Alternative lines of analysis lead me to the identical conclusion.
 
 
 342
 I start from the proposition that contributions, as defined in 18 U.S.C. § 591(e), contain substantial components of speech and associational activities protected by the first amendment. This statute directly attempts to regulate and limit these activities.
 
 
 343
 Congress took this action in furtherance of one-man, one-vote principles and to equalize the effects individuals and groups can have on the political process. However, that interest was only partially carried out, and the classification created only regulates certain types of disproportional influences. Under section 591(e)(5), services are excluded from contributions. This allows the housewife to volunteer time that might cost well over $1000 to hire on the open market, while limiting her neighbor who works full-time to a regulated contribution. It enhances the disproportional influence of groups who command large quantities of these volunteer services and will continue to magnify this inequity by not allowing for an inflation adjustment to the contribution limit. It leads to the absurd result that a lawyer's contribution of services to aid a candidate in complying with FECA is exempt, but his first amendment activity is regulated if he falls ill and hires a replacement. Hence, section 608(b) creates for me fatal equal protection problems.
 
 
 344
 In classifying the contributions of money or services to a political campaign as first amendment activity, I, of course, do not include the donation of money or services in exchange for the promise or expectation of political favoritism after an election. Such activity, donated in expectation of a quid pro quo, is clearly outside the ambit of the first amendment and may be regulated or prohibited by the Government. However, with that exception, I am inclined to the conclusion that the fundamental spirit of the first amendment prohibits the regulation of any individual's contribution to the political dialog and electoral process, whether that individual's major resource is time or money. I entertain grave doubts whether the Constitution permits the type of line-drawing Congress has attempted here, even for the most benevolent of motives.
 
 
 345
 I do not believe that the "Hatch Act" cases present any barrier to this conclusion. The bars on active, partisan political activity by present governmental employees, most recently upheld in United States Civil Service Comm. v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), is grounded on the most compelling of governmental interests the need to preserve the effective and fair operation of Government, without bias or favoritism for all citizens, no matter the party presently holding power. Id. at 564-65, 93 S.Ct. 2880. That mechanism to protect the very integrity of Government is not at issue here. Finally, the constitutional validity of Congress' attempt to regulate union and corporate political activities has never been resolved and is thus not dispositive. See Pipefitters Union v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); United States v. UAW, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); United States v. CIO, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948).
 
 
 346
 Third, section 608(b) is constitutionally infirm because it is overbroad and regulates activities protected by the first amendment unnecessary to interests behind the statute, as evidenced by Congress' own actions. Section 608(b) limits "contributions to any candidate with respect to any election for Federal Office. . . . " The ceiling is imposed "to do away with the corresponding undue influence of large campaign donors on those who win elections." Int. Def.'s Br. at 83. This limit covers all candidates and all parties, whether major or minor. However, Congress, in the public financing section of FECA, refused to fund fully non-major party candidates because of the unlikelihood of their election. In other words, these groups or individuals cannot accept large contributions because they might be unduly influenced if they win, but are ineligible for full funding because Congress believes they have little chance of winning. Congress cannot have it both ways and still justify abridgement of protected rights. Moreover, Congress has advanced, in my opinion, no compelling interest to justify eliminating the often salutary effect of a candidate or contributor heavily financing a candidacy which brings a dissident viewpoint or proposal into our political dialog. As the Supreme Court has noted: "History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted." Sweezy v. New Hampshire, 354 U.S. 234, 250-51, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). Under this analysis, section 608(b) must be stricken on overbreadth grounds.
 
 
 347
 Another part of section 608, subsection (e), deserves independent scrutiny and should be declared unconstitutional, regardless of one's view on contribution limits. Section 608(e) is a "loophole closer" and limits to $1,000 any individual expenditure made relative to a clearly identified candidate. This section, like expenditure ceilings discussed infra, is a direct limitation on political communication. Its limit is set below the present cost of a full-page advertisement in the Washington Post, Agreed Fact 65, and is not subject to adjustment. As such, it would appear to prohibit the publication of independent speech, such as a paid letter stating why an individual, who may have some influence, endorses a candidate. This type of prior restraint on independent speech is the problem which was avoided regarding Title I of 1971 FECA by construing such conduct outside its reach. See United States v. National Comm. for Impeachment, 469 F.2d 1135 (2d Cir. 1972); cf. ACLU v. Jennings, supra. I can sympathize with similar efforts to construe section 608(e), since, if one accepts the validity of the contribution limits, some mechanism to prevent easy circumvention of the ceiling is necessary. However, since I would invalidate section 608(b) itself, I am prepared to strike down section 608(e) completely.
 
 IV. Expenditures
 
 348
 I also believe that the limitation on campaign expenditures must fall as a per se abridgement of the right to free expression. It appears to me axiomatic that in our modern society, campaign contributions are inexorably intertwined with political communication, so that the regulation of either is the regulation of both. Never before in our history has the Government attempted to regulate the quantity of debate in the political arena. No one, not even Congress, can ascertain the proper quantum of public discussion of issues; this type of paternalism in the area of ideas and political communication is, or should be, completely alien to our democratic system of government.
 
 
 349
 The interests advanced to justify this aspect of FECA appear to be woefully inadequate. Federal defendants contend that expenditure limits are required to reduce the soaring increases in the costs of seeking office. Fed. Def.'s Br. at 83-84. This argument requires the heroic assumption that some of these costs are superfluous and that unnecessary discussion of public issues have occurred; in fact, some believe that there has been a paucity of real discussion of public issues. Intervening defendants assert that ceilings will equalize all candidates. Intervening Def.'s Br. at 127. Equalizing one characteristic between candidates only accents the other advantages a candidate may possess name recognition, incumbency, or identification with popular issues, and eliminates the one real equalizing factor a candidate may have, the unfettered ability to promote one's cause or ideas. In sum, while I do not believe any governmental need justifies this restriction, none has been advanced which is even remotely convincing.
 
 
 350
 Further, I do not find any support for expenditure restrictions in Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), the oft-cited sound truck case. Dollars are not merely the functional equivalent of decibels. By regulating sound trucks through a noise ordinance, the Government was not regulating the quantity of speech; Mr. Kovacs could broadcast as much and as often as he desired. That is not the case here. Congress is attempting to limit quantity and frequency of speech, a wholly different situation for which Kovacs offers no support.
 
 
 351
 Thus, I find myself in agreement with the view expressed by the unanimous Oregon Supreme Court when recently striking down a state expenditure limitation statute. Deras v. Myers, Or., 535 P.2d 541 (1975). The court concluded that there was no evidence "that our system of government is imperiled by the free expenditure of funds in political campaigns." Id. at 545. It rejected the corruption or "Watergate" rationale with the observation:
 
 
 352
 We fail to see how these evils are relevant to the need for controlling campaign expenditures. The "break-in," the bribery, the "wire tap," the use of government servants for private political ends, the "cover up," the various "dirty tricks," and the other moral and legal deviations characterizing "Watergate" had little or nothing to do with the fact that large sums of money were available to a political party.
 
 
 353
 Id. at 546. Finally, the Oregon court invoked what the United States Supreme Court has termed the "classic formulation" of the fundamental nature of the right of free expression, particularly applicable here, Justice Brandeis writing in Whitney v. California, 274 U.S. 357, 375-76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring):
 
 
 354
 Those who won our independence believed that . . . freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.
 
 
 355
 Even if my brethren are inclined to uphold both the disclosure and contribution provisions, I cannot understand what government need requires them to go further and approve this startling restriction on free expression. The interests in preventing corruption and undue influence are fully effectuated by the former two provisions, and what is then accomplished through expenditure ceilings escapes me. If a senatorial candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communication? I know of none.
 
 
 356
 The majority adopts defendants' argument that the ineffectiveness of piecemeal reform justified the passage of this comprehensive package. However, comprehensiveness does not authorize unnecessary curtailment of fundamental freedoms when a less restrictive alternative effectuates the same interests and has yet to be proven ineffective. The majority suggests that expenditure limits serve as a protection against violation of the disclosure and contribution limits. However, every restriction on freedom lessens the opportunity for violation of the law, but our democratic principles do not condone governmental action taken on that rationale. Finally, stripped of its plumage, the majority's position is that the expenditure limits pass constitutional scrutiny because political expenditures have substantial non-speech elements; after Bigelow v. Virginia, supra, which the majority nowhere discusses, that is no longer the law.
 
 
 357
 I would therefore invalidate 18 U.S.C. § 608(e).
 
 V. Public Financing
 
 358
 Assuming that we have jurisdiction under 2 U.S.C. § 437h to review the Subtitle H provisions, I would conclude that while Congress has the power to commit public resources to fund electoral campaigns, the method embodied in this statute is not the least restrictive available to preserve first amendment values and should be set aside. I would also hold that the present scheme violates the fifth amendment by impermissibly depriving minor and new party presidential candidates their justifiable share of the public monies at a meaningful time.
 
 
 359
 Initially, I agree that Congress' constitutional power to raise and spend money to "provide for the . . . general Welfare of the United States," U.S., Const. art. I, § 8, cl. 1, encompasses the authority to publically finance presidential campaigns. The Supreme Court has held that this power is not limited by the direct constitutional grants of legislative power. See United States v. Butler, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936). Plaintiffs offer no persuasive reason to overrule Congress' general legislative judgment that public financing is in the public interest. However, the method with which Congress implements its authority must be in a manner that does not infringe upon individual liberties. Under this standard, the present statute fails.
 
 
 360
 26 U.S.C. § 6096 permits a taxpayer to earmark, by checking a box on his tax return, $1 of his tax liability for financing presidential election campaigns. However, the taxpayer has no control over what candidate or party receives this contribution. Under this scheme, the American taxpayer forfeits the opportunity to engage in first amendment activity to support or withhold support from candidates on the basis of those candidates' beliefs. To permit a taxpayer to support the worthy goal of public financing only through a non-designation method places him in a coercive dilemma. Thus, I am inclined to agree with Thomas Jefferson who wrote,
 
 
 361
 to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical . . ..
 
 
 362
 Padover, The Complete Jefferson 946 (1942).
 
 
 363
 The question, therefore, is whether the beneficial aspects of public financing could be obtained in a manner which intrudes less severely or coercively on individual choice to exercise first amendment rights. In making that inquiry, we are not substituting our judgment for that of Congress' by reexamining its selection among alternative schemes, but are ensuring that when making that selection, Congress protected, to the maximum extent possible, basic constitutional rights.
 
 
 364
 Apparently, Congress rejected several alternative schemes which appear to offer individuals greater political choice. One such plan was offered by plaintiff-intervenor Metcalf. Senator Metcalf's voucher system would allow taxpayers to send authorizations to the candidate of one's choice, redeemable for public monies. Another proposal, made by Senator Mathias, would have allowed taxpayers to designate their choice of candidates or parties on the tax return itself.
 
 
 365
 The issue then becomes whether the rejection of these less restrictive alternatives was required to preserve the basic interests behind public financing. Unfortunately, the legislative history reveals that was not the case at all. Senator Long, who offered the non-designation amendment, stated that its effect would be to "quit confusing people. Rather than saying both Democrats or Republicans are the party of one's choice, the taxpayer just makes a check on the tax return . . .." 119 Cong.Rec. S 12196 (daily ed. June 27, 1973). Another proponent, Senator Pastore, argued that allowing designation of candidates or parties "would not be fair. What we are trying to do is to give both sides the same amount of money . . .." Cong.Rec. S 18891 (daily ed. Nov. 17, 1971). Besides demonstrating a myopic two-party view of the political spectrum, this legislative history points to no interest underlying public financing which requires the existing plan. Consequently, I must vote to set aside the check-off provision, since it does not represent the least, or a lesser, intrusive method to effectuate legitimate interests and unnecessarily curtails first amendment choice. In doing so, I must admit my surprise that the majority, while conceding the validity of this limitation against legislative actions, see, e. g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), fails even to test section 6096 against these standards.
 
 
 366
 I also adhere to the view that the allocation of public funds contained in Chapter 95 violates the fifth amendment by unnecessarily discriminating against minor and new party candidacies. The Supreme Court has stated the applicable test to judge governmental attempts to effectuate its compelling interests regarding the electoral process:
 
 
 367
 legitimate (governmental) interest(s), . . . must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity.
 
 
 368
 Lubin v. Panish, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).
 
 
 369
 Chapter 95 fails to meet that test. The major difficulties arise from the facts that: (1) minor parties only get a proportion of funding based on their last electoral performance and, more importantly, new parties get no funding until after an election; and (2) while funding is provided for conventions and, on a matching basis, for primary campaigns, none is authorized for activities necessary to obtain a place on the ballot. First, that procedure will often over-compensate declining political movements and under-compensate movements with increasing support; for example, under this statute, American Party candidate George Wallace would have been entitled to no money before the 1968 election, but his strong performance would have qualified 1972 candidate Schmitz to substantial pre-election payments, even though Schmitz was a far less serious candidate.
 
 
 370
 More fundamentally, the system makes no attempt to provide aid to new parties before the election, when it is undoubtedly the most helpful. This is true no matter what indicia of support those parties' candidates can supply. Perhaps this is unsuprising in light of the bias toward the major parties we have seen in the legislative history. However, any candidate for the nomination of a party who runs in primaries is entitled to federal funds, no matter how marginal his candidacy or overwhelming his opposition, so long as he raises the requisite quantum of contributions. Once again to invoke the 1968 example, George Wallace or Eugene McCarthy (if he formed a fourth party after the Democratic convention) would have been ineligible for pre-election funding; Harold Stassen may have been able to receive monies. There has been no demonstration, aside from unconvincing explanations that the system "was the best we could do," why a similar threshold limit of support, albeit possibly different than the one presently in section 9033(b), could not be established for some increment of pre-election money for new parties. Without such a demonstration, and coupled with the additional restrictions on contributions which the majority upholds today, I am constrained to conclude that Congress has placed insurmountable burdens in the paths of any new parties entering our political system. Hence, Chapter 95 represents a means that unfairly or unnecessarily burdens non-major parties' interest in the continued availability of political opportunity. Lubin v. Panish, supra.
 
 
 371
 Nothing in American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) undermines that conclusion. Intervening defendants cite American Party for the proposition that a government "does not violate the First Amendment or deny equal protection by enacting regulations that recognize the inherent differences among types of political movements." Int. Def.'s Br. at 171. That is far too broad a reading of the case. The Supreme Court in American Party upheld a statute which reimbursed expenses for conducting primaries which major parties alone were statutorily required to hold. The Court did not think it unfair that minor parties were not compensated for petitioning and convention expenses, since the Court found that all political parties were required to hold conventions by statute and none of those expenses were reimbursed. Such funding of required expenses is not before us here. The Court also held that a government need not "finance the efforts of every nascent political group seeking to organize itself and unsuccessfully attempting to win a place on the general election ballot." Id. at 794, 94 S.Ct. at 1312 (emphasis supplied). That is far cry from refusing to support candidacies at a meaningful time even if the party has successfully placed its name on the ballot in every state, while funding any seeker of a major party nomination who demonstrates a modicum of support.
 
 
 372
 I dissent from the upholding of the public financing provisions.
 
 VI. The Commission
 
 373
 Plaintiffs launch a multi-pronged attack against the enforcement provisions of FECA. The Attorney General, while arguing that the issue is not ripe for consideration, argues that the Federal Election Commission, as presently established, violates the principle of separation of powers. I concur in the proposition that many of the questions concerning the powers of the Commission, particularly the authority under 2 U.S.C. § 456 to disqualify individuals from seeking office for failing to file reports, can be deferred. However, I believe that the challenge to the composition of the Commission can be disposed of now and that the present appointment provision violates article II, section 2 of the Constitution.
 
 
 374
 2 U.S.C. § 437c(b) empowers the commission to
 
 
 375
 administer, seek to obtain compliance with, and formulate policy with respect to this Act . . . (and to possess) primary jurisdiction with respect to the civil enforcement of such provisions.
 
 
 376
 The Commission has rulemaking authority, investigative and subpoena powers and may issue advisory opinions; it has already instituted rulemaking proceedings. All of these duties have direct effects on the political operations of most of the plaintiffs before us, and the Commission stands ready to enforce the Act which prohibits the activities in which plaintiffs wish to engage. See Civil Service Comm. v. Letter Carriers, supra, 413 U.S. at 551, 93 S.Ct. 2880. It is clear that all planning in this political season must be made with FECA and the Commission in mind. See e. g., Witcover, New Campaign Fund Law Already Making Critical Impact, Washington Post, Mar. 15, 1975, at § A, p. 3, col. 3. In sum, the question of whether the agency established to administer FECA, which is now actively engaged in that administration, may constitutionally perform such tasks appears ripe for resolution.
 
 
 377
 The Commission argues strenuously in its separate brief that all of its functions are encompassed in Congress' legislative authority and role in the conduct of the federal electoral process. I disagree with that characterization. FECA delegates to the Commission a multitude of duties some which require the execution of the statutory provisions are clearly executive; others which involve rulemaking and information gathering vis-a-vis the electoral process are quasi-legislative; still other duties, including the disqualification power and the rendering of the interpretative opinions, are quasi-judicial. As such, the Commission is most like the independent agencies such as the Federal Trade Commission or Interstate Commerce Commission. Moreover, as are the members of the latter two commissions, the members of the Federal Election Commission are "officers of the United States" as the term is used in article II, section 2.
 
 
 378
 Thus, section 437c(a)(1), the appointment provision for the Commission, appears to violate article II by placing the appointment power for four of six members of the Commission in the hands of members of Congress. To find otherwise would lead to the equally devastating conclusion that the Commission is a legislative delegate exercising powers in violation of the constitutional principle of separation of powers. See, e. g., Springer v. Government of the Philippine Islands, 277 U.S. 189, 201-02, 48 S.Ct. 480, 72 L.Ed. 845 (1928); Ponzi v. Fessenden, 258 U.S. 254, 262, 42 S.Ct. 309, 66 L.Ed. 607 (1922).
 
 
 379
 The Commission's and intervening defendants' arguments to the contrary are unpersuasive. Neither the Officers of the Houses of Congress, nor the members of the quasi-public associations or corporations, for example the Washington National Monument Society and the American National Red Cross, nor the members of study or fact-finding commissions, for example the National Commission on Consumer Finance and the Commission on Political Activity of Government Personnel, exercise anywhere the degree of executive or quasi-judicial authority with which the Federal Elections Commission is empowered. Moreover, to the contrary of the Commission's argument, much of this authority falls well outside the ambit of Congress' basic constitutional role in the conduct of the federal electoral process, especially in regards to Presidential elections. Further, Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) is of no help to defendants here. Humphrey's dealt with the scope of the President's removal power over officers of independent agencies; the President's constitutional authority over the appointment of such officers was assumed. Finally, the long-standing congressional practice of establishing qualifications for federal officers is not the equivalent of the exercise of appointment power. See Supplemental Reply Br. of Int. Def. at 44-45.
 
 
 380
 I would invalidate the appointment provision of FECA.
 
 VII. Conclusion
 
 381
 I concede that upholding the statute is an appealing result. Congress, for the most part, acted out of the best of motives, and any measure which attempts to reduce the abuses and inequities that have plagued our electoral system and have sapped public confidence in governmental institutions could easily induce a predisposition for approval. I am afraid that this phenomenon, coupled with the recognition that we serve here primarily as the jurisdictional prerequisite to ultimate Supreme Court disposition, may have partially contributed to the result reached today. Moreover, in the face of plaintiff's all-inclusive attack on the statute, it becomes somewhat difficult to focus upon the need and justification for each increment of government regulation and prohibition of first amendment rights contained in the various parts of FECA. Quite frankly, that is the only explanation I have for the majority's affirmance of the FECA expenditure limits. In fact, the majority's voluminous opinion boils down to the simple argument that the statute's purpose is benevolent and that restrictions on freedoms can be summarily dismissed as incidental.
 
 
 382
 For my part, I adhere to the firm belief that even the most noble of intentions cannot supplant our traditional liberties, nor justify the establishment of government ceilings on first amendment activities and the unnecessary implantation of rigidity into our political system. Defendants argue that if FECA is declared unconstitutional, the Constitution contains the seeds of its own destruction. I respond that the Constitution prevents us from sowing the seeds of our own destruction by placing limits on political communication the foundation of all our freedoms.
 
 
 383
 Circuit Judge WILKEY joins in this opinion.
 
 
 384
 MacKINNON, Circuit Judge (concurring in part and dissenting in part):
 
 
 385
 I concur generally in the court's responses to the first seven and the ninth certified constitutional questions. Plaintiffs clearly have made sufficient assertions of interests which are affected by the election statutes under review to give them standing, and the impact on their interests is sufficiently immediate to make most of the issues raised ripe for review. The reporting and disclosure requirements and the limitations on contributions and expenditures are valid exercises of Congress' power to regulate federal elections. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Burroughs & Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). While the $1000 limits on individual contributions and independent expenditures may be low, this is a matter best left to determination by Congress, and the limits it chose cannot be said to be arbitrary or unreasonable. The public financing provisions are within the congressional authority to make expenditures for the "general Welfare of the United States" under Article I, section 8, of the Constitution. While plaintiffs have raised serious questions concerning the impact of these election laws on their first amendment interests, I do not believe that there is any grounds for this court to overturn on a wholesale basis the congressional determinations embodied in the substantive provisions of the Act.
 
 
 386
 * I do question the constitutionality of section 437a which requires that:
 
 
 387
 Any person (other than an individual) who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office), or otherwise designed to influence individuals to cast their votes for or against such candidates or to withhold their votes from such candidates shall file reports with the Commission as if such person were a political committee. The reports filed by such person shall set forth the source of the funds used in carrying out any activity described in the preceding sentence in the same detail as if the funds were contributions within the meaning of section 431(e) of this title, and payments of such funds in the same detail as if they were expenditures within the meaning of section 431(f) of this title. The provisions of this section do not apply to any publication or broadcast of the United States Government or to any news story, commentary, or editorial distributed through the facilities of a broadcasting station or a bona fide newspaper, magazine, or other periodical publication. A news story, commentary, or editorial is not considered to be distributed through a bona fide newspaper, magazine, or other periodical publication if
 
 
 388
 (1) such publication is primarily for distribution to individuals affiliated by membership or stock ownership with the person (other than an individual) distributing it or causing it to be distributed, and not primarily for purchase by the public at newsstands or by paid subscription; or
 
 
 389
 (2) the news story, commentary, or editorial is distributed by a person (other than an individual) who devotes a substantial part of his activities to attempting to influence the outcome of elections, or to influence public opinion with respect to matters of national or State policy or concern.
 
 
 390
 At first glance, this section appears to be a substantial duplication of section 434(e) which requires reports by every person who makes contributions or expenditures (other than to a political committee or a candidate) in excess of $100. There seems to be only two possible reasons for the enactment of section 437a: (1) to force certain persons who expend less than $100 to file reports; or (2) to require the reporting of certain fund outlays which are excluded from the definition of "expenditure" in section 431(f)(4). As the former situation is certainly too trivial to have merited this much congressional attention, only the latter appears to be the real basis for section 437a. Thus the issue is whether Congress has any legitimate interest in requiring disclosure by persons who are not required to report "expenditures" under section 434(e).
 
 
 391
 The conclusion seems inescapable that section 437a is directed to disclosure of exactly the type of activities carried on by plaintiffs New York Civil Liberties Union and the American Conservative Union, among others. See Remarks of Congressmen Hays and Frenzel, 120 Cong. Rec. H 10327, 10332-33 (Daily ed. Oct. 10, 1974) which specifically disavow earlier statements by Senate sponsors that tended to limit the reach of this section. A restrictive construction of the statute might have certain attractions, but it is simply not supported by the specific language or the legislative history. Since section 437a is explicitly directed to compelling disclosure of activities protected by the First Amendment, ACLU v. Jennings, 366 F.Supp. 1041 (D.D.C.1973) (three-judge court), prob. juris. noted sub nom. Staats v. ACLU, 417 U.S. 944, 94 S.Ct. 3066, 41 L.Ed.2d 664 (1974), vacated as moot, --- U.S. ---, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975), in my view this section is unconstitutional. Section 434(e) is by itself sufficient to assure the disclosure of those expenditures which Congress has a legitimate interest in regulating. If in fact what prompted Congress to enact section 437a was a concern that "non-bona fide" publications would appear prior to elections and claim to be exempt from reporting due to the definition of "expenditure," that concern can be allayed simply by construing section 431(f)(4)(A) as referring only to legitimate "publications."
 
 II
 
 392
 I do not join in the court's responses to the issues presented by Question 8 and its subparts. After considering the composition of and the powers vested in the Federal Election Commission, it is my conclusion that as its membership is presently constituted, it violates the separation of powers of the three branches of government as prescribed by the Constitution.
 
 
 393
 As a threshold matter, it is necessary to determine whether the challenges to the composition and powers of the Election Commission are appropriate for judicial review at this time and in this particular action. With respect to 2 U.S.C. § 456, which temporarily disqualifies from candidacy for federal office any person who is found by the Commission to have failed to file a required report, Question 8(e) relating to its validity might best be left to challenge in a concrete case brought by someone who has been subjected to disqualification. However, I believe that the remaining challenges are presently ripe for review.
 
 
 394
 Plaintiffs assert that they are now pursuing or are about to engage in various political activities which will fall within the provisions of the Act and could possibly result in violations. The Commission's deep involvement in the regulation of political activities is shown by section 437c(b) which provides:
 
 
 395
 The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to this Act and sections 608, 610, 611, 613, 614, 615, 616, and 617 of Title 18, United States Code. The Commission has primary jurisdiction with respect to the civil enforcement of such provisions.
 
 
 396
 In addition, section 437d confers broad investigative and subpoena powers on the Commission, and section 437f authorizes it to issue advisory opinions with respect to potential violations. In light of the deep and pervasive involvement of the Commission in the present and anticipated political affairs of the plaintiffs, I would hold that Questions 8(a), 8(b) and 8(d) are ripe for review.
 
 
 397
 Furthermore, I do not believe that the Commission's enforcement powers are sufficiently separate from its other duties that review of them should be postponed. Under section 437g(a)(5), the Commission is empowered to commence civil enforcement proceedings whenever it determines "that there is reason to believe that any person has engaged, or is about to engage in any acts or practices which constitute or will constitute a violation of this Act . . . ." (Emphasis added.) This power to anticipate violations and seek injunctions against persons suspected of planning activity which may be unlawful certainly gives the enforcement role of the Commission a much more immediate impact on plaintiffs' affairs than does the normal statutory enforcement procedure which is brought into play only after a violation has occurred (as is the case with disqualification under section 456). In light of the "inhibitory effect" which these enforcement powers can have on plaintiffs' political activities, I would hold that Question 8(c) is also ripe for review at this time.
 
 
 398
 I find the Commission's argument that only the President has standing to contest an encroachment on executive powers unconvincing. The plaintiffs have a sufficient interest in having their political affairs regulated by a validly constituted commission to maintain this action.
 
 
 399
 In an attempt to avoid immediate review, the Commission and the Attorney General argue that all civil enforcement matters might be turned over to the Attorney General under section 437g(a)(7). If this happens, it is asserted, no concrete case will ever arise which presents the issue of whether civil enforcement by the Commission violates the constitutional separation of powers. However, section 437g(a)(7) provides that "upon request by the Commission the Attorney General on behalf of the United States shall institute a civil action for relief . . . ." (Emphasis added.) The use of the mandatory "shall" quite clearly indicates Congress intended that the Attorney General would have no discretion to determine whether to initiate civil enforcement proceedings when he receives a referral from the Commission. Even if the Commission chooses to refer all cases under this section, it still retains effective control of the civil enforcement powers. The fact that the enforcement authority may be exercised through the Attorney General as a passive intermediary should therefore be irrelevant to determining the ripeness of challenges to the Commission's enforcement powers.
 
 III
 
 400
 Turning to the merits of the various parts of Question 8, the issue before us is whether the Election Commission, as presently appointed, violates the constitutional principle of separation of powers. The Constitution, without explicitly so stating, provides for a separation of the powers of government into legislative, executive and judicial departments. This "object is basic and vital . . . namely, to preclude a commingling of these essentially different powers of government in the same hands." O'Donoghue v. United States, 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933). This method of political organization and operation seeks to safeguard liberty by preventing the concentration of excessive power in any one branch of the government. However, it is not a complete and absolute separation of powers. As Justice Story wrote:
 
 
 401
 When we speak of a separation of the three great departments of the government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution. This has been shown with great clearness and accuracy by the author of the Federalist. It was obviously the view taken of the subject by Montesquieu and Blackstone in their commentaries; for they were each speaking with approbation of a constitution of government which embraced this division of powers in a general view; but which at the same time established an occasional mixture of each with the others, and a mutual dependency of each upon the others. The slightest examination of the British Constitution will at once convince us that the legislative, executive and judiciary departments are by no means totally distinct and separate from each other.
 
 
 402
 Story, Commentaries on the Constitution § 525, quoted in 1 Sutherland, Statutory Construction § 3.03 (4th ed. Sands 1972). In more recent times, the general view as to the separation of powers was expressed by Chief Justice Taft as follows:
 
 
 403
 The Federal Constitution and State Constitutions of this country divide the governmental power into three branches. . . . (T)he rule is . . . in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.
 
 
 404
 J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928). Under this interpretation, one department may exercise some powers belonging to other departments when essential to the exercise of its primary functions and when it does not amount to an assumption of the whole power of another department. See Sutherland, supra, at § 3.06.
 
 
 405
 The degree to which the powers must be kept separate or may overlap depends in the final analysis upon applicable constitutional provisions. In this case, we are concerned with determining whether Congress has overstepped the limitations imposed by the Constitution in setting up the Election Commission. Those who defend the Commission and the powers vested in it by the statute contend that it is a branch of the legislature and that Congress is authorized to establish a body which is in many respects responsible to Congress, or to the separate houses of Congress, because the Constitution gives Congress certain powers with respect to elections.
 
 
 406
 The Commission refers to several provisions of the Constitution as relevant to the congressional power over federal elections. Article I, section 5, provides:
 
 
 407
 Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . .
 
 
 408
 The Twelfth Amendment provides that the certificates of the votes of the electoral college shall be transmitted to the President of the Senate who "shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." If no person receives a majority, the House chooses the President by ballot. The powers conferred by these provisions are quite limited insofar as the present case is concerned since they focus on the results of elections rather than on their conduct.
 
 
 409
 The congressional power over the conduct of elections to Congress is directly specified in Article I, section 4, which provides:
 
 
 410
 The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing Senators.
 
 
 411
 Although the Constitution gives the states authority over the manner of appointing electors in presidential elections, see Article II, section 1, Burroughs & Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934), holds that the congressional power to protect the sanctity of elections extends to the selection of presidential electors.[1] Finally, a general grant of power may be inferred from the "necessary and proper" clause of Article I, section 8:
 
 
 412
 The Congress shall have Power . . .
 
 
 413
 To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.
 
 
 414
 To the extent that the statutes under review regulate and supervise the conduct of federal elections, Congress is within its power in so legislating. However, the method chosen by Congress to accomplish this regulation (i. e. creation of the Federal Election Commission) raises substantial questions as to whether it has appropriated to itself functions constitutionally entrusted to the executive and judicial branches.
 
 
 415
 Balanced against the congressional powers with respect to elections are other provisions of the Constitution which allocate functions to the executive branch. Article II, section 1, provides:
 
 
 416
 The executive Power shall be vested in a President of the United States of America.
 
 
 417
 By way of elaborating upon the intent as to a portion of the power conferred by this provision, section 3 provides that the President "shall take Care that the Laws be faithfully executed . . . ." Thus the Constitution clearly places the responsibility for executing the laws in the executive branch rather than in Congress. Article III similarly vests the judicial power in the Courts of the United States:
 
 
 418
 The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.
 
 
 419
 The Constitution is also specific with respect to the method of appointing federal officers. Article II, section 2, provides that the Presidentshall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.
 
 
 420
 The specific provisions of the statute in question must be evaluated against this constitutional framework.
 
 IV
 
 421
 Section 437c(a)(1) establishes the Federal Election Commission which
 
 
 422
 is composed of the Secretary of the Senate and the Clerk of the House of Representatives, ex officio and without the right to vote, and 6 (six) members appointed as follows:
 
 
 423
 (A) 2 (two) shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the President pro tempore of the Senate upon the recommendations of the majority leader of the Senate and the minority leader of the Senate;
 
 
 424
 (B) 2 (two) shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the Speaker of the House of Representatives, upon the recommendations of the majority leader of the House and the minority leader of the House; and
 
 
 425
 (C) 2 (two) shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the President of the United States.
 
 
 426
 The method of appointment of this Commission clearly violates Article II, section 2, in that four members are nominated by congressional officers rather than the President and the two members who are Presidential appointees are subject to confirmation by "a majority of both Houses of the Congress" rather than "by and with the Advice and Consent of the Senate."
 
 
 427
 It is argued that the inherent right of both Houses of Congress to appoint their own officers, such as clerks, doorkeepers and other housekeeping personnel, is precedent to justify their appointing the members of this Commission in the manner specified. This comparison is somewhat inapposite since the powers and duties of the Commission are quite different from those related to the day-to-day internal functioning of Congress, over which it unquestionably has complete control.
 
 
 428
 It is also contended that precedent for the appointment of this Commission in the manner prescribed exists in the act creating the General Accounting Office with a Comptroller General of the United States at its head, accountable in some respects to Congress and subject to impeachment and removal by Congress. 31 U.S.C. § 41 et seq., (42 Stat. 23, June 10, 1921). However, that act provides that the "Comptroller General of the United States and an Assistant Comptroller General of the United States . . . shall be appointed by the President with the advice and consent of the Senate." 31 U.S.C. § 42, 42 Stat. 23, c. 18, Title III, § 302, June 10, 1921. Thus the Comptroller General is no precedent for the unique methods chosen for appointing the Election Commission.[2]
 
 
 429
 This is not to say that Congress has no role to play in the appointment of officials to regulate federal elections. Under the 1971 Act, the Secretary of the Senate and the Clerk of the House of Representatives, both legislative officers not appointed under Article II, section 2, were assigned certain duties in connection with the reporting of campaign finances. To the extent that the Commission is performing a similar legislative function, it should not be necessary that its members be appointed in conformity with Article II, section 2.[3] Thus we must determine if the powers vested in the Commission exceed the limits of the powers which may be exercised by the legislative branch under the Constitution.[4] To properly answer this question requires an analysis of the specific provisions of the statute and a determination as to whether any of the powers so granted separately or in the aggregate trespass impermissibly into the executive or judicial fields.
 
 V
 
 430
 The powers of the Election Commission with respect to reporting of contributions and expenditures are specified in section 437d. To the extent that the Commission is empowered to require that candidates for election make reports concerning their financing, to require contributors and political committees to disclose their contributions and expenditures, and to gather and compile this data, the validity of conferring such powers on an appropriate legislative commission is not subject to serious question. Similarly, the power to develop reporting forms and the powers associated with conducting legislative investigations into the implementation of the statute would appear to be proper adjuncts to the congressional power over federal elections. In these areas, the Commission is performing functions analogous to those entrusted to the General Accounting Office. However, the Act confers other duties and responsibilities on the Commission which are not solely related to constitutional powers conferred upon Congress.
 
 
 431
 Congress has made numerous attempts to vest the Commission with authority to enforce both the reporting and disclosure provisions and the sections of the Criminal Code which limit contributions and expenditures. Section 437d(a)(6) empowers the Commission
 
 
 432
 to initiate (through civil proceedings for injunctive, declaratory, or other appropriate relief), defend, or appeal any civil action in the name of the Commission for the purpose of enforcing the provisions of this Act, through its general counsel;
 
 
 433
 (Emphasis added.) Section 437c(b) is even more specific regarding the Commission's enforcement authority:
 
 
 434
 The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to this Act and sections 608, 610, 611, 613, 614, 615, 616, and 617 of Title 18, United States Code. The Commission has primary jurisdiction with respect to the civil enforcement of such provisions.
 
 
 435
 These two provisions must be read together. The power to "administer, seek to obtain compliance with, and formulate policy," especially with respect to the enumerated sections of the Criminal Code, trespasses directly into the powers conferred by the Constitution upon the executive branch. The same is true of the attempt to give the Commission "primary jurisdiction" to initiate, defend or appeal actions for civil enforcement of the statute. A legislative agency formulating policy on an ad hoc basis with respect to the criminal law and enforcing provisions of the criminal law through civil proceedings would be more than a novel development in American law it would be an unheard of merger of legislative and prosecutorial powers, which is the precise evil the separation of powers was designed to avoid. The grant of authority to compel compliance with the reporting and disclosure sections similarly intrudes directly into executive functions. The Constitution explicitly allocates to the executive branch the duty to "take care that the laws be faithfully executed." Since the earliest days, the enforcement of the laws in general and the criminal laws in particular has been a primary responsibility of the Executive Department acting through its Attorney General.[5] Whether laws are enforced by civil or criminal action, a delegation of the enforcement power to a legislative agency amounts to an infringement on the power vested in the executive.
 
 
 436
 Section 437d(a)(9) authorizes the Commission
 
 
 437
 to formulate general policy with respect to the administration of this Act and sections 608, 610, 611, 613, 614, 615, 616, and 617 of Title 18 (United States Code). . . .
 
 
 438
 It is not at all clear what is meant by the formulation of "general policy" with respect to the administration of a statute, and especially as related to the administration of the criminal provisions. However, insofar as this section authorizes the formulation of policies relating to enforcement of the statute, it clearly constitutes a further infringement of powers vested in the executive branch.[6]
 
 
 439
 Section 437d(a)(11) empowers the Commission
 
 
 440
 to conduct investigations and hearings expeditiously, to encourage voluntary compliance, and to report apparent violations to the appropriate law enforcement authorities.
 
 
 441
 While investigations and hearings in connection with legislation are certainly proper functions for a congressional organ, an investigation as a preliminary to civil or criminal enforcement of the criminal laws relating to federal elections is not normally a legislative act. Congress' power to investigate "is justified solely as an adjunct to the legislative (power)." Watkins v. United States, 354 U.S. 178, 197, 77 S.Ct. 1173, 1184, 1 L.Ed.2d 1273 (1957). Thus to the extent that the Act seeks to confer power to investigate preliminary to civil or criminal enforcement of the criminal laws, the broad power to conduct such investigations vested in the Commission exceeds the scope of Congress' constitutional powers over elections. An exception to this would be those relatively rare instances where an investigation relates to a contested election which is to be decided by either or both Houses.
 
 
 442
 Section 437g, entitled "Enforcement," spells out the details of the Commission's power to enforce the election laws and is perhaps the most extensive intrusion on executive powers. It provides that any person who believes a violation of the reporting and disclosure laws or of the designated criminal statutes has occurred may file a complaint with the Commission. The Commission then has the option of reporting the matter to the Attorney General or making its own investigation. Commission investigations are kept secret unless the object of the investigation consents in writing to disclosure (section 437g(a)(3)). After a hearing is held and the Commission determines there is reason to believe a present or potential violation of the reporting statutes exists, section 437g(a)(5) gives it the following enforcement options:
 
 
 443
 (I)t may endeavor to correct such violation by informal methods of conference, conciliation, and persuasion. If the Commission fails to correct the violation through informal methods, it may institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business. Upon a proper showing that such person has engaged or is about to engage in such acts or practices, the court shall grant a permanent or temporary injunction, restraining order, or other order.
 
 
 444
 If it discovers violations of the criminal statutes, or if it is unable to correct other violations under paragraph (5), section 437g(a)(6) states that the Commission "shall refer apparent violations to the appropriate law enforcement authorities. . . ."
 
 
 445
 This statutory scheme infringes upon the constitutional functions of coordinate branches of government in two ways. As previously discussed, the responsibility for enforcing the laws is an executive function. Empowering an organ of the legislative branch to perform such duties, whether done through civil or criminal action, clearly infringes upon the specific powers conferred by the Constitution on the executive branch. Second, with respect to the Commission's investigation of potential criminal violations, it has been empowered to act in the manner of a grand jury, including the use of broad subpoena and investigative powers and secret proceedings. While it does not hand down formal indictments, a congressional unit, absent an election contest, is not performing a constitutional congressional function when it engages in the business of gathering evidence through preliminary investigations and formally recommending prosecution of criminal offenses. See --- U.S.App.D.C. p. ---, 519 F.2d p. 929, supra.
 
 
 446
 One of the most serious intrusions on the powers of the executive branch is section 437g(a)(7) which provides in mandatory language that the Attorney General "shall " institute civil actions upon request of the Commission:
 
 
 447
 Whenever in the judgment of the Commission, after affording due notice and an opportunity for a hearing, any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 (United States Code), upon request by the Commission the Attorney General on behalf of the United States shall institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which the person is found, resides, or transacts business. Upon a proper showing that such person has engaged or is about to engage in such acts or practices, a permanent or temporary injunction, restraining order, or other order shall be granted without bond by such court.
 
 
 448
 (Emphasis added.) The suggestion made at oral argument that "shall" really means "may" is simply not consistent with the explicit language or congressional intent as indicated by the tone of the entire Act. Congress quite clearly intended to deprive the Attorney General of his normal discretion in bringing actions to enforce the laws and reduce him to a mere functionary acting under the control of the Commission. This immediate congressional supervision and control of the exercise of powers constitutionally committed to the executive branch certainly contravenes the constitutional separation of powers.[7]
 
 
 449
 Under section 437f, the Commission is required to render advisory opinions
 
 
 450
 with respect to whether any specific transaction or activity by such individual, candidate, or political committee would constitute a violation of this Act, of chapter 95 or chapter 96 of Title 26 (of the U.S.Code), or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 (United States Code).
 
 
 451
 Any person who relies on such opinions is presumed to be in compliance with the election laws:
 
 
 452
 (b) Notwithstanding any other provision of law, any person with respect to whom an advisory opinion is rendered under subsection (a) who acts in good faith in accordance with the provisions and findings of such advisory opinion shall be presumed to be in compliance with the provision of this Act, of chapter 95 or chapter 96 of Title 26 (of the U.S.Code), or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 (United States Code), with respect to which such advisory opinion is rendered.
 
 
 453
 2 U.S.C. § 437f(b). Thus the decisions of the Commission will effectively override the decisions of Government prosecutors interpreting the criminal statutes. While advisory opinions by a properly constituted agency would be highly desirable in light of the complexity of the statute, giving such status to advisory opinions issued by a congressional commission is, in my opinion, another impermissible intrusion into the constitutionally conferred powers and duties of the executive branch, i. e. to execute the laws.
 
 
 454
 The majority opinion cites a portion of the House Report on section 437f(b) which states that "the bill provides for a presumption of compliance; this presumption would be rebuttable, and, therefore, legal action would not be foreclosed." H.Rep. 93-1239, 93d Cong., 2d Sess. 9 (1974). The purpose of section 437f(b) is quite clearly to prevent the Government from obtaining the conviction of someone who can prove he has acted "in good faith and in accordance with the provisions of such advisory opinion" by arguing that the advisory opinion is not a proper interpretation of the statute. Assuming that the statute is to be construed as providing for only a "rebuttable" presumption of compliance with the statute, however, the Government would "rebut" the presumption by showing that the accused's actions were in fact not "in compliance with" the statute he is accused of violating.[8] But this is exactly the showing the Government must make to establish its case against the accused in the absence of any presumption. Thus, unless the presumption of compliance with the Act is a conclusive presumption, arising once the accused establishes his good faith compliance with the advisory opinion, section 437f(b) is simply a nullity. Despite the language in the legislative history, I do not believe this court can so easily assume that the full Congress intended to pass meaningless legislation.
 
 
 455
 I also believe section 438(c) is invalid. That section prohibits the Commission from issuing rules and regulations without first submitting the proposed language to the affected house, or to both houses in the case of rules applying to presidential candidates, and affording an opportunity for the exercise of a "congressional veto." This provision, applying as it does to the broad policy-making functions of the Commission, implicates Congress itself as well as the Commission in the exercise of those powers discussed above which violate the separation of powers. In addition, to the extent that the regulations may be substantive, as opposed to procedural or mere housekeeping matters, the exercise of a legislative veto by either or both houses arguably violates Article I, section 4, to the extent that it requires congressional regulation of elections to be accomplished "by Law."
 
 
 456
 Finally, section 456, entitled "Additional enforcement authority," provides:
 
 
 457
 (a) In any case in which the Commission, after notice and opportunity for a hearing on the record in accordance with section 554 of title 5, United States Code, makes a finding that a person who, while a candidate for Federal office, failed to file a report required by title III of this Act, and such finding is made before the expiration of the time within which the failure to file such report may be prosecuted as a violation of such title III, such person shall be disqualified from becoming a candidate in any future election for Federal office for a period of time beginning on the date of such finding and ending one year after the expiration of the term of the Federal office for which such person was a candidate.
 
 
 458
 (b) Any finding by the Commission under subsection (a) shall be subject to judicial review in accordance with the provisions of chapter 7 of title 5, United States Code.
 
 
 459
 While this section may not be ripe for review until someone is actually disqualified and appeals, I have no doubt that it must be ultimately held that the disqualification of a candidate from future elections by a legislatively-appointed body like the Commission is improper. Such action, based upon a finding of the Commission that the candidate failed to file a required report, constitutes in effect a trial and the (automatic) imposition of sentence. This is judicial action with a vengeance and infringes upon the judicial power vested in the courts by Article III, section 1.[9]
 
 
 460
 In light of the various provisions of the statute discussed above, it is my conclusion that the Election Commission has been vested by the statute with duties which under the Constitution are not solely or primarily conferred on the Congress. Nor can it be said that these are powers necessarily exercised by the legislative branch in order to assure the proper performance of its role with respect to federal elections. There has been no showing that vesting the Commission with these broad rule-making, interpretive, policy making, investigatory and enforcement powers is essential to the accomplishment of constitutional congressional objectives. Finally, this intrusion into the powers of the executive and judiciary can in no way be described as minimal. I therefore must conclude that the powers vested in the Election Commission, when considered in light of the manner provided by the statute for the appointment of its members, impermissibly infringes upon the powers constitutionally allocated to other branches of government, and thus the Act violates the separation of powers required by the Constitution. See Springer v. Government of the Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928).
 
 
 461
 The majority describes the Commission's powers as "quasi-executive" or "quasi-judicial." It should be apparent from the foregoing discussion, however, that many of these powers are in fact "executive" or "judicial." The majority itself acknowledges that "some of the provisions for example, those conferring civil enforcement and candidate disqualification powers on the Commission raise very serious constitutional questions." --- U.S.App.D.C. at ---, 519 F.2d at 892. I agree wholeheartedly. In political campaigning, even the suggestion of wrongdoing can prove fatal, and this is especially so when the accusation is made by an official organ of the Government. Under such circumstances, I cannot agree with the majority that consideration of "serious constitutional questions" which challenge the Commission's power to even begin to perform various activities should be postponed until these actions are actually taken, at which point a substantial portion of the harm is likely to have already occurred.
 
 VI
 
 462
 The obvious solution to this problem would be for Congress to amend the statute to provide that all members of the Commission shall be appointed in conformity with Article II, section 2. Both the Commission and the Intervening Defendants argue that this procedure would be inconsistent with the purposes of the Act since the members of the Commission would then be obligated to a President who is also the head of his party and who himself may be a candidate for reelection. By the same token, members of Congress are also members of parties and candidates for reelection. However, it is the Constitution that provides the answer to this argument by its requirement that officers appointed by the President under Article II, section 2, be confirmed by the Senate. This provision defines the manner and extent of congressional participation the Framers thought necessary to avoid undue presidential or congressional control over federal officers and preserves the system of checks and balances between the branches of government. In contrast, the present Election Commission is the result of an attempt to evade the constitutional role of the executive as a check on congressional power. Since this court is not empowered to rewrite the statute, however, we are limited to striking down those portions of the Commission's duties and responsibilities which infringe upon the powers of the executive and judicial branches.[10]
 
 
 463
 As previously indicated, I believe that the powers vested in the Commission, other than its authority to collect and compile reports of contributions and expenditures and its duties incidental thereto, involve the exercise of powers beyond those allocated to the legislative branch by the Constitution. Thus I would answer Questions 8, 8(a) and 8(c) in the affirmative, and Questions 8(b) and 8(d) in the affirmative to the extent the powers involved relate to functions other than the collection of reports. In my opinion, Question 8(e) must also ultimately be answered in the affirmative although it may not presently be ripe for review.
 
 
 464
 Subject to the exceptions discussed above, I otherwise join in the responses to the certified constitutional questions contained in the court's order entered today.
 
 
 
 [1]
 Plaintiffs are: Senator James L. Buckley, Eugene J. McCarthy, Representative William A. Steiger, Stewart Rawlings Mott, Committee For A Constitutional Presidency McCarthy '76, Conservative Party of the State of New York, Mississippi Republican Party, Libertarian Party, New York Civil Liberties Union, Inc., American Conservative Union, Conservative Victory Fund, and Human Events, Inc. James C. Calaway is an intervening plaintiff
 
 
 [2]
 Federal Election Campaign Act of 1971, Pub.L.No.92-225, 86 Stat. 3 (1972) (codified in sections of 2, 18, 47 U.S.C.) (hereinafter cited as FECA of 1971), as amended, Federal Election Campaign Act Amendments of 1974, Pub.L.No.93-443, 88 Stat. 1263 (1975) (codified in sections of 2, 5, 18, 26, 47 U.S.C.) (hereinafter cited as FECAA of 1974). Title I, governing Campaign Communications, has been repealed. FECAA of 1974, supra, § 205(b). Title II consists of Criminal Code Amendments respecting the election law crimes enacted in prior federal election laws, including the Corrupt Practices Act of 1925, ch. 368, Title III, 43 Stat. 1070 (codified in scattered sections of 2, 18 U.S.C.). Title III requires Disclosure of Federal Campaign Funds. Title IV contains General Provisions
 
 
 [3]
 FECAA of 1974, supra note 2. FECA of 1971, as amended by FECAA of 1974, is hereinafter cited as FECA
 
 
 [4]
 Federal defendants are: Hon. Francis R. Valeo, Secretary of the U. S. Senate, Hon. W. Pat Jennings, Clerk of the U. S. House of Representatives, Hon. Elmer B. Staats, Comptroller General of the U. S., Hon. Edward H. Levi, Attorney General of the U. S., and the Federal Election Commission (created by the legislation under review). Defendants Valeo and Jennings are sued both in their capacities as officials of their respective bodies, and as ex officio members of the Commission. The Commission is represented by both the Department of Justice and its own counsel
 Although the Commission was not organized and functioning on January 2, 1975, the date on which this lawsuit was filed, it has completed the transition of powers and duties from the former supervisory officers to itself, under section 208(b) of the FECA Amendments of 1974, and has participated in this litigation by brief and argument.
 
 
 [5]
 Intervening defendants are: Center For Public Financing of Elections, Common Cause, The League of Women Voters of the United States, Chellis O'Neal Gregory, Norman F. Jacknis, Louise D. Wides, Daniel R. Noyes, Mrs. Edgar B. Stern, Charles F. Taft, John W. Gardner, and Ruth Clusen
 
 
 [6]
 The Revenue Act of 1971, Pub.L.No.92-178, 85 Stat. 562, as amended, Pub.L.No.93-53, 87 Stat. 138, as amended, FECAA of 1974, supra note 2, §§ 403-06, 408 (codified in 26 U.S.C. §§ 9001-13, 9031-42) (also referred to as Subtitle H). This Subtitle consists of two parts, Chapter 95 dealing with conventions and general elections for President, and Chapter 96 dealing with matching funds for Presidential primaries. These provisions are loosely termed the "public financing provisions." Parallel proceedings with respect to Subtitle H and constitutional questions pertaining thereto are presently pending before a three-judge district court of this Circuit, Buckley v. Valeo, D.C., 387 F.Supp. 135. That court heard oral argument jointly with this court sitting en banc. This procedure will facilitate presentation to the Supreme Court without the risk of a wrong fork in the road that would lead to a jurisdictional dead end
 
 
 [7]
 § 437h. Judicial review
 (a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, United States Code. The district court immediately shall certify all questions of constitutionality of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, United States Code, to United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.
 (b) Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) shall be reviewable by appeal directly to the Supreme Court of the United States. Such appeal shall be brought no later than 20 days after the decision of the court of appeals.
 (c) It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a).
 
 
 [8]
 Buckley v. Valeo, 387 F.Supp. 135 (D.D.C.1975)
 
 
 [9]
 Buckley v. Valeo, --- U.S.App.D.C. ---, 519 F.2d 817 (1975)
 
 
 [10]
 For a summary history of this litigation see Appendix B
 
 
 [11]
 United States v. UAW, 352 U.S. 567, 570, 77 S.Ct. 529, 530, 1 L.Ed.2d 563 (1957)
 
 
 [12]
 See Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964): "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."
 
 
 [13]
 United States v. UAW, 352 U.S. 567, 570, 77 S.Ct. 529, 531, 1 L.Ed.2d 563 (1957)
 
 
 [14]
 Id. at 571, 77 S.Ct. 529
 
 
 [15]
 Id. at 571, 77 S.Ct. at 531 citing Hearings before House Committee on Elections, 59th Cong., 1st Sess., referring to E. Root, Addresses on Government & Citizenship 143 (Bacon & Scott ed. 1916)
 
 
 [16]
 352 U.S. at 572, 77 S.Ct. at 531
 
 
 [17]
 Id. at 575, 77 S.Ct. at 533
 
 
 [18]
 H.R.Doc.No.1, 60th Cong., 1st Sess., pt. 1 at XLVII (1910)
 
 
 [19]
 At oral argument, counsel for plaintiffs noted (Tr. 18) that in the past the law was without restrictions, on contributions and expenditures, in any "effective sense whatever" because of the "infinite ability to multiply" committees
 
 
 [20]
 H.R.Rep.No.93-1239, 93d Cong., 2d Sess. 3 (1974), U.S.Code Cong. & Admin.News 1974, p. 5587. See also S.Rep.No.93-170, 93d Cong., 1st Sess. 1-2 (1973); S.Rep.No.93-689, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 5587; Findings I, P 88
 
 
 [21]
 H.R.Rep.No.93-1239, supra note 20, at 3
 
 
 [22]
 Findings I, P 100
 
 
 [23]
 120 Cong.Rec. H 7919 (daily ed. Aug. 8, 1974) (remarks of Cong. Udall)
 
 
 [24]
 Findings I, P 101-03; II A, 77-90, 96-99
 
 
 [25]
 Findings II A, P 100-03
 
 
 [26]
 Hearings on S. 382 Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Administration, 92d Cong., 1st Sess. 78 (1971). See also Findings I, P 170
 
 
 [27]
 Hearings on H.R. 7612 and S. 372 Before the Subcomm. on Elections of the House Comm. on House Administration, 93d Cong., 1st Sess. 138 (1973)
 
 
 [28]
 119 Cong.Rec. 25984-95 (1973). During the Senate debate, Senator Humphrey similarly stated:
 Those of us who run for office can profess that the campaign contributions we receive do not in any way control our votes, but I venture to say that not many believe it.
 
 
 [120]
 Cong.Rec. S 4553 (daily ed. March 27, 1974)
 
 
 [29]
 Hearings on S. 3496, Amendment No. 732, S. 2006, S. 2965, and S. 3014 Before the Senate Comm. on Finance, 89th Cong., 2d Sess. 78 (1966)
 
 
 [30]
 Findings II A, P 104
 
 
 [31]
 Findings I, PP 156, 158, 165
 
 
 [32]
 Congress found and the District Court confirmed that such contributions were often made for the purpose of furthering business or private interests by facilitating access to government officials or influencing governmental decisions, and that, conversely, elected officials have tended to afford special treatment to large contributors. See S.Rep.No.93-689, 93d Cong., 2d Sess. 4-5; Findings I, PP 108, 110, 118, 170
 
 
 [33]
 Findings I, P 170-71
 
 
 [34]
 Center for Political Studies (U. of Michigan) 1964-1972, Market Opinion Research prepared for the Republican National Committee, 1974, included in Findings I, P 155
 1964 1966 1968 1970 1972 1974
 ------ ------ ------ ------ ------ ------
For benefit of all 64.0% 53.0% 51.8% 40.6% 43.4% 21.3%
Few big interests 29.0 34.0 39.2 49.6 48.4 69.9
Other/Depends/Both
 Checked 4.0 6.0 4.6 5.0 2.5 ----
Don't Know 3.0 7.0 4.3 4.8 5.8 8.8
 ------ ------ ------ ------ ------ ------
TOTAL 100.0% 100.0% 100.0% 100.0% 100.0% 100.0%
 
 
 [35]
 A review of the perception of Congress, and particularly the public, must emphasize the investigation, hearings, and 1974 Report of the Senate Select Committee on Presidential Campaign Activities, chaired by Senator Sam Ervin. Final Report of the Select Comm. on Presidential Campaign Activities, S.Rep.No.93-981, 93d Cong., 2d Sess. (1974) (hereinafter cited as Final Report)
 
 
 [36]
 Findings I, PP 117b, 158, 165. Looming large in the perception of the public and Congressmen was the revelation concerning the extensive contributions by dairy organizations to Nixon fund raisers, in order to gain a meeting with White House officials on price supports. Final Report, supra note 35 at 581, 592-3. The industry pledged $2,000,000 to the 1972 campaign, a pledge known to various White House officials, with President Nixon informed directly by Charles Colson in September 1970, as acknowledged by the 1974 White House paper. Id. at 612-14, 616
 Since the milk producers, on legal advice, worked on a $2500 limit per committee, they evolved a procedure, after consultation in November 1970 with Nixon fund raisers, to break down the $2 million into numerous smaller contributions to hundreds of committees in various states which could then hold the money for the President's reelection campaign, so as to permit the producers to meet independent reporting requirements without disclosure. Id. at 615.
 On March 23, 1971, after a meeting with dairy organization representatives, President Nixon decided to overrule the decision of the Secretary of Agriculture and to increase price supports. In the meetings and calls that immediately followed the internal White House discussion and preceded the public announcement two days later, culminating in a meeting held by Herbert Kalmbach at the direction of John Ehrlichman, the dairymen were informed of the likelihood of an imminent increase and of the desire that they reaffirm their $2 million pledge. Id. at 648 ff., N.B. 664.
 It is not material, for present purposes, to review the extended discussion in the Final Report on the controverted issue of whether the President's decision was in fact, or was represented to be, conditioned upon or "linked" to the reaffirmation of the pledge.
 
 
 [37]
 The findings document lavish contributions by groups or individuals with special interests to legislators from both parties, e. g., by the American Dental Association to incumbent Congressmen in California, Findings IIA, P 111; by H. Ross Perot, whose company supplies data processing for medicare and medicaid programs, to members of the House Ways and Means and Senate Finance Committees, and the House Appropriations Subcommittee for HEW. Findings IIA, PP 93-95
 The disclosures of illegal corporate contributions in 1972 included the testimony of executives that they were motivated by the perception that this was necessary as a "calling card, something that would get us in the door and make our point of view heard," Hearings before the Senate Select Comm. on Presidential Campaign Activities, 93d Cong., 1st Sess. 5442 (1973) (Ashland Oil Co. Orin Atkins, Chairman) or "in response to pressure for fear of a competitive disadvantage that might result," id. at 5495, 5514 (American Airlines George Spater, former chairman); see Findings I, P 105.
 The record before Congress was replete with specific examples of improper attempts to obtain governmental favor in return for large campaign contributions. See Findings I, PP 159-64.
 
 
 [38]
 As for ambassadorships, while the appointment of large contributors is not novel, the Committee's Report exposed scale and volume, and the widespread understanding that such contributions were a means of obtaining the recognition needed to be actively considered. Findings I, P 124. The Final Report identified over.$1.8 million in Presidential campaign contributions as ascribable, in whole or in part, to 31 persons holding ambassadorial appointments from President Nixon, and stated that six other large contributors, accounting for $3 million, appear to have been actively seeking such appointment at the time of their contributions. Final Report, supra note 35, at 493-94. The fund raisers routinely advised that only the President could guarantee nomination. Id. at 495
 On February 25, 1974, Herbert Kalmbach, a principal fund raiser, pleaded guilty to a charge of violation of 18 U.S.C. § 600, in having promised, in 1971, a more prestigious post to Ambassador (to Trinidad) J. Fife Symington, in return for a $100,000 contribution to be split between 1970 senatorial candidates designated by the White House and Mr. Nixon's 1972 campaign. Id. at 492.
 
 
 [39]
 H.R.Rep.No.93-1239, supra note 20, at 4; S.Rep.No.93-689, supra note 20, at 4
 
 
 [40]
 NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960)
 
 
 [41]
 Burroughs and Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934); Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); United States v. UAW, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957). See also Civil Serv. Comm'n. v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). The starting point for Congressional authority to regulate federal elections is, of course, Article I, Section 4 of the Constitution, which says in full: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."
 
 
 [42]
 Civil Serv. Comm'n. v. Letter Carriers, supra note 41, 413 U.S. at 564, 93 S.Ct. at 2890
 
 
 [43]
 Cf. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In that case, an Arkansas statute required teachers to divulge all of their associational ties. The Court there said: "(E)ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." 364 U.S. at 488, 81 S.Ct. at 252 (footnotes omitted). See also Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed.2d 1213 (1940)
 
 
 [44]
 See Jenness v. Fortson, 403 U.S. 431, 441-42, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Cf. Steward Machine Co. v. Davis, 301 U.S. 548, 584, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Carmichael v. Southern Coal Co., 301 U.S. 495, 510-12, 57 S.Ct. 868, 81 L.Ed. 1245 (1937)
 
 
 [45]
 See text and note at note 49 infra
 
 
 [46]
 Traditionally, commentators and political reformers have suggested four methods of regulation to insure that "big money" does not wield undue influence in political campaigns or upon elected officials: (1) limits on individual contributions, (2) limits on overall spending in a campaign, (3) disclosure, and (4) public financing of elections. The present body of law (previous law, the surviving portions of the 1971 Act, the 1974 Amendments and Subtitle H, supra at notes 2 and 6) provides a blend of all four approaches in the belief that the elements will buttress each other. The total package may trench less upon fundamental rights than sole reliance upon a single reform strategy, or upon a different mix of them
 
 
 [47]
 United States v. UAW, 352 U.S. 567, 572, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)
 
 
 [48]
 See text at notes 15-18 supra
 
 
 [49]
 E. g., Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (candidates excluded by filing fees); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (third parties discouraged by ballot access requirements); Gould v. Grubb, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337 (1975) (incumbents improperly advantaged by first place on ballot; strict judicial scrutiny appropriate because the classification imposes a " 'real and appreciable impact' on the equality, fairness and integrity of the electoral process.")
 
 
 [50]
 We use the term "inhibitory effect" throughout to indicate the impact of a particular provision upon those planning and conducting campaigns for federal office. A finding of such inhibitory effect confers ripeness upon a constitutional question certified to us under § 437h, we believe, because there are practical and equitable reasons not to require these plaintiffs to violate the criminal law or to await further developments in order to obtain constitutional review. Cf. Dombrowski v. Pfister, 380 U.S. 479, 491, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965): "We believe that those affected by a statute are entitled to be free of the burdens of defending prosecutions, however expeditious, aimed at hammering out the structure of the statute piecemeal, with no likelihood of obviating similar uncertainty for others." Here, the provisions as to which we find inhibitory effect operate closely in conjunction with each other to provide a broad regulatory scheme. To deny ripeness because any or all had not
 been specifically violated, or to rule only upon those which had been directly violated, would be to break the circle of regulation. Further, in light of the events of Watergate, and the arguably low repute in which the political profession may now be held by the public, it is unreasonable for this court to require a candidate for public office to begin his campaign by having himself criminally charged with violation of FECA. It is more likely that if that were the threshold for "case or controversy," a wary politician would absorb any "chilling effect" of the new regulatory scheme sooner than come to public attention as merely another campaign law violator (the delicacies of test cases perhaps not being well reported or understood). Whereas "chilling effect" is a legal conclusion, "inhibitory effect" is rather a finding that there is a sufficient nexus between a plaintiff with statutory standing and the provision being attacked to constitute a "case or controversy."
 
 
 [51]
 18 U.S.C. § 591(g) defines a "person" and "whoever" to mean "an individual, partnership, committee, association, corporation, or any other organization or group of persons."
 
 
 [52]
 Id. § 591(e) provides:
 (e) "contribution"
 (1) means a gift, subscription, loan, advance, or deposit of money or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business, which shall be considered a loan by each endorser or guarantor, in that proportion of the unpaid balance thereof that each endorser or guarantor bears to the total number of endorsers or guarantors), made for the purpose of influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States;
 (2) means a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make a contribution for such purposes;
 (3) means funds received by a political committee which are transferred to such committee from another political committee or other source;
 (4) means the payment, by any person other than a candidate or a political committee, of compensation for the personal services of another person which are rendered to such candidate or political committee without charge for any such purpose; but
 (5) does not include
 (A) the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee;
 (B) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
 (C) the sale of any food or beverage by a vendor for use in a candidate's campaign at a charge less than the normal comparable charge, if such charge for use in a candidate's campaign is at least equal to the cost of such food or beverage to the vendor;
 (D) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate; or
 (E) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising;
 to the extent that the cumulative value of activities by any person on behalf of any candidate under each of clauses (B), (C), and (D) does not exceed $500 with respect to any election.
 
 
 [53]
 Id. § 591(b) provides:
 (b) "candidate" means an individual who seeks nomination for election, or election, to Federal office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal office, if he has (1) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or (2) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office.
 
 
 [54]
 Id. § 591(c) provides:
 (c) "Federal office" means the office of President or Vice President of the United States, or Senator or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States.
 
 
 [55]
 Id. § 608(b)(5) reads in full: "The limitations imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election."
 
 
 [56]
 Id. § 591(f) provides:
 (f) "expenditure"
 (1) means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business), made for the purpose of influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States;
 (2) means a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make any expenditure; and
 (3) means the transfer of funds by a political committee to another political committee; but
 (4) does not include
 (A) any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate;
 (B) nonpartisan activity designed to encourage individuals to register to vote or to vote;
 (C) any communication by any membership organization or corporation to its members or stockholders, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any person to Federal office;
 (D) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
 (E) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate;
 (F) any communication by any person which is not made for the purpose of influencing the nomination for election, or election, of any person to Federal office;
 (G) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising;
 (H) any costs incurred by a candidate in connection with the solicitation of contributions by such candidate, except that this clause shall not apply with respect to costs incurred by a candidate in excess of an amount equal to 20 percent of the expenditure limitation applicable to such candidate under section 608(c) of this title; or
 (I) any costs incurred by a political committee (as such term is defined by section 608(b)(2) of this title) with respect to the solicitation of contributions to such political committee or to any general political fund controlled by such political committee, except that this clause shall not apply to exempt costs incurred with respect to the solicitation of contributions to any such political committee made through broadcasting stations, newspapers, magazines, outdoor advertising facilities, and other similar types of general public political advertising;
 to the extent that the cumulative value of activities by any individual on behalf of any candidate under each of clauses (D) or (E) does not exceed $500 with respect to any election.
 Part of the comprehensional difficulty of this case arises from overlapping and slightly different definition and usage of terms. Generally, a "contribution" involves the donation of money, services or things to a campaign in such a way as to put them under the control of a candidate or his designated agent. When used in contradistinction to "contribution," "expenditure" means an application of money, services or things to influence the outcome of an election, without placing such money, services or things within the control of a candidate or his agent, and sometimes even without the candidate's tacit approval of the way in which the person allocates those expenditures. Confusion lies in the fact that federal election laws also use the term "expenditure" to mean an outlay by the candidate or his agent from within the fund of money, services or things contributed to the candidate and thus within his control. This explanation is offered to illuminate, but not to supplant, the definitions of
 "contribution" and "expenditure" found at 2 U.S.C. § 431(e), (f), and 18 U.S.C. § 591(e), (f).
 Under the present law, expenditures by individuals are regulated by id. § 608(e) and are termed "expenditures relative to a clearly identified candidate." In the now repealed Title 1 of FECA of 1971, see note 2 supra, the concept of expenditures by individuals in their own name to endorse a candidate for federal office was expressed by use of the ambiguous phrase "on behalf of a candidate," which was substantially criticized in ACLU v. Jennings, 366 F.Supp. 1041, 1052 (D.D.C.1973) (three judge court), vacated as moot sub nom. Staats v. ACLU, Inc., --- U.S. ---, 95 S.Ct. 2646, 45 L.Ed.2d 686, 43 U.S.L.W. 3673 (1975). Expenditures by a corporation or labor union (not from a segregated voluntary fund) are strictly forbidden under 18 U.S.C. § 610. Expenditures by a candidate for federal office (or by his agent) must be within the over-all campaign spending limits established in id. § 608(c)(1).
 
 
 [57]
 2 U.S.C. § 431(d) and 18 U.S.C. § 591(d) define a "political committee" as "any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000."
 
 
 [58]
 Except that the limit is $15,000 in primary and general elections for Delegate from Guam or the Virgin Islands. 18 U.S.C. § 608(c)(1)(F)
 
 
 [59]
 Id. § 608(d) provides:
 (d) Adjustment of limitations based on price index.
 (1) At the beginning of each calendar year (commencing in 1976), as there become available necessary data from the Bureau of Labor Statistics of the Department of Labor, the Secretary of Labor shall certify to the Commission and publish in the Federal Register the per centum difference between the price index for the 12 months preceding the beginning of such calendar year and the price index for the base period. Each limitation established by subsection (c) and subsection (f) shall be increased by such per centum difference. Each amount so increased shall be the amount in effect for such calendar year.
 (2) For purposes of paragraph (1)
 (A) the term "price index" means the average over a calendar year of the Consumer Price Index (all items United States city average) published monthly by the Bureau of Labor Statistics; and
 (B) the term "base period" means the calendar year 1974.
 
 
 [60]
 The full text of 2 U.S.C. § 437h is reprinted at note 7 supra
 
 
 [61]
 The first sentence provides:
 (a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of title 18, United States Code.
 
 
 [62]
 Article III, section 2 of the Constitution provides, in pertinent part: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution (and) the Laws of the United States . . . ."
 
 
 [63]
 Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937): "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (citations omitted)
 
 
 [64]
 1. Does the first sentence of § 315(a) of the Federal Election Campaign Act, as amended, 2 U.S.C. § 437h(a), in the context of this action, require courts of the United States to render advisory opinions in violation of the "case or controversy" requirement of Article III, § 2, of the Constitution of the United States?
 
 
 [65]
 See 120 Cong.Rec. S5707-08 (daily ed. April 10, 1974). (Remarks of Senator Buckley). Senator Buckley's expressed concerns dealt chiefly with the constitutionality of direct dollar limitations on overall campaign expenditures
 
 
 [66]
 See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)
 
 
 [67]
 2. Has each of the plaintiffs alleged sufficient injury to his constitutional rights enumerated in the following question to create a constitutional "case or controversy" within the judicial power under Article III?
 
 
 [68]
 See note 41 supra
 
 
 [69]
 3. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that individuals or organizations may contribute or expend in connection with elections for federal office violate the rights of one or more of the plaintiffs under the First, Fifth, or Ninth Amendments or the Due Process Clause of the Fifth Amendment of the Constitution of the United States?
 (b) Does 18 U.S.C. § 608(b) violate such rights, in that it forbids the solicitation, receipt or making of contributions on behalf of political candidates in excess of the amounts specified in 18 U.S.C. § 608(b)?
 
 
 [70]
 18 U.S.C. § 608(b) provides in part:
 (1) Except as otherwise provided by paragraphs (2) and (3), no person shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $1,000.
 (2) No political committee (other than a principal campaign committee) shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $5,000. Contributions by the national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States shall not exceed the limitation imposed by the preceding sentence with respect to any other candidate for Federal office. For purposes of this paragraph, the term "political committee" means an organization registered as a political committee under section 303 of the Federal Election Campaign Act of 1971 (2 U.S.C. § 433) for a period of not less than 6 months which has received contributions from more than 50 persons and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office.
 
 
 [71]
 Id. § 591(a) provides:
 (a) "election" means
 (1) a general, special, primary, or runoff election,
 (2) a convention or caucus of a political party held to nominate a candidate,
 (3) a primary election held for the selection of delegates to a national nominating convention of a political party, or
 (4) a primary election held for the expression of a preference for the nomination of persons for election to the office of President.
 
 
 [72]
 Id. § 608(b) provides in part:
 (3) No individual shall make contributions aggregating more than $25,000 in any calendar year. For purposes of this paragraph, any contribution made in a year other than the calendar year in which the election is held with respect to which such contribution was made, is considered to be made during the calendar year in which such election is held.
 (4) For purposes of this subsection
 (A) contributions to a named candidate made to any political committee authorized by such candidate, in writing, to accept contributions on his behalf shall be considered to be contributions made to such candidate; and
 (B) contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States.
 (5) The limitations imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.
 (6) For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.
 
 
 [73]
 3(d) Does 18 U.S.C. § 608(e) violate such rights, in that it limits to $1,000 the independent (not on behalf of a candidate) expenditures of any person relative to an identified candidate?
 
 
 [74]
 Id. § 608(e) provides:
 (1) No person may make any expenditure (other than an expenditure made by or on behalf of a candidate within the meaning of subsection (c)(2)(B)) relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000.
 (2) For purposes of paragraph (1)
 (A) "clearly identified" means
 (i) the candidate's name appears;
 (ii) a photograph or drawing of the candidate appears; or
 (iii) the identity of the candidate is apparent by unambiguous reference; and
 (B) "expenditure" does not include any payment made or incurred by a corporation or a labor organization which, under the provisions of the last paragraph of section 610, would not constitute an expenditure by such corporation or labor organization.
 
 
 [75]
 We note here, in the event that our treatment above and in Part II of this opinion has not made it abundantly clear, that a person need not choose between making a maximum "contribution" of $1,000 to a candidate, and making a maximum "expenditure" of $1,000 "relative to (that same) clearly identified candidate." A person can make a $1,000 contribution to a candidate (assuming he does not exceed the $25,000 ceiling) even if he has already made a $1,000 expenditure "relative to (that) clearly identified candidate."
 
 
 [76]
 See United States v. UAW, 352 U.S. 567, 581, 583, 585, 77 S.Ct. 519, 1 L.Ed.2d 563 (1957) (considering Congressional attempt to close loopholes in the ban on corporate and union campaign contributions); United States v. CIO, 335 U.S. 106, 115, 122, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) (same)
 
 
 [77]
 3(a) Does 18 U.S.C. § 608(a) violate such rights, in that it forbids a candidate or the members of his immediate family from expending personal funds in excess of the amounts specified in 18 U.S.C. § 608(a)(1)?
 
 
 [78]
 18 U.S.C. § 608(a) provides:
 (1) No candidate may make expenditures from his personal funds, or the personal funds of his immediate family, in connection with his campaigns during any calendar year for nomination for election, or for election, to Federal office in excess of, in the aggregate
 (A) $50,000, in the case of a candidate for the office of President or Vice President of the United States;
 (B) $35,000, in the case of a candidate for the office of Senator or for the office of Representative from a State which is entitled to only one Representative; or
 (C) $25,000, in the case of a candidate for the office of Representative, or Delegate or Resident Commissioner, in any other State.
 For purposes of this paragraph, any expenditure made in a year other than the calendar year in which the election is held with respect to which such expenditure was made, is considered to be made during the calendar year in which such election is held.
 (2) For purposes of this subsection, "immediate family" means a candidate's spouse, and any child, parent, grandparent, brother, or sister of the candidate, and the spouses of such persons.
 (3) No candidate or his immediate family may make loans or advances from their personal funds in connection with his campaign for nomination for election, or for election, to Federal office unless such loan or advance is evidenced by a written instrument fully disclosing the terms and conditions of such loan or advance.
 (4) For purposes of this subsection, any such loan or advance shall be included in computing the total amount of such expenditures only to the extent of the balance of such loan or advance outstanding and unpaid.
 
 
 [79]
 Supra note 2, § 203
 
 
 [80]
 First Amended Complaint PP 24, 55, 56, 57, 58. Paragraph 56 reads: "The FECA and FECA Amendments violate the rights of one or more of the plaintiffs in that they restrict and inhibit political activity by preventing candidates or their immediate family from expending personal funds where available and necessary, in violation of their rights of freedom of speech and association guaranteed by the First Amendment to the Constitution."
 
 
 [81]
 Apparently, plaintiffs had difficulty settling on their position vis-a-vis these provisions, for unlike the seeming approval in the complaint of unlimited personal and family expenditures by the candidate, they say in brief: "By distinguishing between what wealthy candidates are permitted to do and what non-wealthy candidates are permitted to do (i. e., because the latter are barred from receiving contributions in excess of $1,000 from wealthy supporters), the interrelationship of 18 U.S.C. § 608(a) and § 608(b) creates a clear discrimination based on wealth." Brief at 185
 
 
 [82]
 18 U.S.C. § 608(c) is reprinted in full at note 100 infra
 
 
 [83]
 Id. § 608(e) is reprinted in full at note 74 supra
 
 
 [84]
 A private loan is a "contribution" subject to the $1,000 limitation imposed by 18 U.S.C. § 608(b)(1). For the definition of contribution, see note 52 supra
 
 
 [85]
 "Seed money," is the politician's and political scientist's term for a critical mass of money to be applied at the outset of a campaign to establish a "viable" candidacy. For a campaign that intends to rely upon small contributions solicited by direct mail, for example, the seed money would be the cost of an initial direct mailing and associated expenses. An end-of-campaign countercharge cushion is a sum of money or resources laid aside by a candidate and his campaign manager for use late in a campaign to deal with late blossoming accusations or other mud-slinging that could disbalance an election, if not promptly and firmly refuted
 
 
 [86]
 3(c) Do 18 U.S.C. §§ 591(e) and 608(b) violate such rights, in that they limit the incidental expenses which volunteers working on behalf of political candidates may incur to the amounts specified in 18 U.S.C. §§ 591(e) and 608(b)?
 
 
 [87]
 Section 591(e) provides that "contribution":
 (5) does not include
 (A) the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee;
 (B) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
 (C) the sale of any food or beverage by a vendor for use in a candidate's campaign at a charge less than the normal comparable charge, if such charge for use in a candidate's campaign is at least equal to the cost of such food or beverage to the vendor;
 (D) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate; or
 (E) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising;
 to the extent that the cumulative value of activities by any person on behalf of any candidate under each of clauses (B), (C), and (D) does not exceed $500 with respect to any election.
 (The full text of 18 U.S.C.A. § 591(e) is reprinted at note 52 supra.)
 
 
 [88]
 The full text of 18 U.S.C. § 608(b) is reprinted at notes 70, 72 supra
 
 
 [89]
 3(f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it limits the expenditures of the national committee of a party with respect to presidential nominating conventions?
 
 
 [90]
 26 U.S.C. § 9008(d) provides:
 (d) Limitation of expenditures.
 (1) Major parties. Except as provided by paragraph (3), the national committee of a major party may not make expenditures with respect to a presidential nominating convention which, in the aggregate, exceed the amount of payments to which such committee is entitled under subsection (b)(1).
 (2) Minor parties. Except as provided by paragraph (3), the national committee of a minor party may not make expenditures with respect to a presidential nominating convention which, in the aggregate, exceed the amount of the entitlement of the national committee of a major party under subsection (b)(1).
 (3) Exception. The Commission may authorize the national committee of a major party or minor party to make expenditures which, in the aggregate, exceed the limitation established by paragraph (1) or paragraph (2) of this subsection. Such authorization shall be based upon a determination by the Commission that, due to extraordinary and unforeseen circumstances, such expenditures are necessary to assure the effective operation of the presidential nominating convention by such committee.
 
 
 [91]
 For a definition of major and minor parties see note 151 infra. 26 U.S.C. § 9002(6), (7)
 
 
 [92]
 Our ruling that Congress has the power to provide public funds for national conventions appears in Part VI infra
 
 
 [93]
 Absent an overall ceiling on convention expenditures, political parties could attempt to achieve a substantial campaign effect through various campaign related activities, such as extending the length of the convention, rearranging the convention to enhance its wind-up, etc
 
 
 [94]
 3(h) Does 18 U.S.C. § 608(b)(2) violate such rights, in that it excludes from the definition of "political committee" committees registered for less than the period of time prescribed in the statute?
 
 
 [95]
 18 U.S.C. § 608(b)(2) provides:
 (2) No political committee (other than a principal campaign committee) shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $5,000 . . . . For purposes of this paragraph, the term "political committee" means an organization registered as a political committee under section 303 of the Federal Election Campaign Act of 1971 (2 U.S.C. § 433) for a period of not less than 6 months which has received contributions from more than 50 persons and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office.
 
 
 [96]
 3(g) Do 2 U.S.C. § 431(e) and (f) and 18 U.S.C. § 591(e) and (f) violate such rights, in that they exempt news stories, commentaries, and editorials from the statutory definitions of "expenditure" but not from the statutory definitions of "contribution?"
 
 
 [97]
 The full text of the definition of contribution, 18 U.S.C. § 591(e), is reprinted in full at note 52 supra
 
 
 [98]
 The full text of the definition of expenditure, id. § 591(f), is reprinted in full at note 56 supra
 
 
 [99]
 4. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that candidates for elected federal office may expend in their campaigns violate the rights of one or more of the plaintiffs under the First or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
 (a) Does 18 U.S.C. § 608(c) violate such rights, in that it forbids expenditures by candidates for federal office in excess of the amounts specified in 18 U.S.C. § 608(c)?
 
 
 [100]
 18 U.S.C. § 608(c) provides:
 (c) Limitations on expenditures.
 (1) No candidate shall make expenditures in excess of
 (A) $10,000,000, in the case of a candidate for nomination for election to the office of President of the United States, except that the aggregate of expenditures under this subparagraph in any one State shall not exceed twice the expenditure limitation applicable in such State to a candidate for nomination for election to the office of Senator, Delegate, or Resident Commissioner, as the case may be;
 (B) $20,000,000, in the case of a candidate for election to the office of President of the United States;
 (C) in the case of any campaign for nomination for election by a candidate for the office of Senator or by a candidate for the office of Representative from a State which is entitled to only one Representative, the greater of
 (i) eight cents multiplied by the voting age population of the State (as certified under subsection (g)); or
 (ii) $100,000;
 (D) in the case of any campaign for election by a candidate for the office of Senator or by a candidate for the office of Representative from a State which is entitled to only one Representative, the greater of
 (i) 12 cents multiplied by the voting age population of the State (as certified under subsection (g)); or
 (ii) $150,000;
 (E) $70,000, in the case of any campaign for nomination for election, or for election, by a candidate for the office of Representative in any other State, Delegate from the District of Columbia, or Resident Commissioner; or
 (F) $15,000, in the case of any campaign for nomination for election, or for election, by a candidate for the office of Delegate from Guam or the Virgin Islands.
 (2) For purposes of this subsection
 (A) expenditures made by or on behalf of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be expenditures made by or on behalf of the candidate of such party for election to the office of President of the United States; and
 (B) an expenditure is made on behalf of a candidate, including a Vice Presidential candidate, if it is made by
 (i) an authorized committee or any other agent of the candidate for the purposes of making any expenditure; or
 (ii) any person authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate, to make the expenditure.
 (3) The limitations imposed by subparagraphs (C), (D), (E), and (F) of paragraph (1) of this subsection shall apply separately with respect to each election.
 (4) The Commission shall prescribe rules under which any expenditure by a candidate for Presidential nomination for use in 2 or more States shall be attributed to such candidate's expenditure limitation in each such State, based on the voting age population in such State which can reasonably be expected to be influenced by such expenditure.
 
 
 [101]
 2 U.S.C. §§ 241-256 (1970), repealed by FECA of 1971, supra note 2, § 405
 
 
 [102]
 See note 2 supra, and Appendix C infra
 
 
 [103]
 2 U.S.C. § 439a provides:
 § 439a. Use of contributed amounts for certain purposes
 Amounts received by a candidate as contributions that are in excess of any amount necessary to defray his expenditures, and any other amounts contributed to an individual for the purpose of supporting his activities as a holder of Federal office, may be used by such candidate or individual, as the case may be, to defray any ordinary and necessary expenses incurred by him in connection with his duties as a holder of Federal office, may be contributed by him to any organization described in section 170(c) of Title 26, or may be used for any other lawful purpose. To the extent any such contribution, amount contributed, or expenditure thereof is not otherwise required to be disclosed under the provisions of this title, such contribution, amount contributed, or expenditure shall be fully disclosed in accordance with rules promulgated by the Commission. The Commission is authorized to prescribe such rules as may be necessary to carry out the provisions of this section.
 
 
 [104]
 Brief at 223: "Indeed, plaintiffs believe that narrowly drawn disclosure requirements would be the proper solution to virtually all of the evils Congress sought to remedy by passing the challenged statutes."
 
 
 [105]
 Findings II A, PP 18-50 give some indication of the possible impact of expenditure ceilings on the campaigns of challengers and incumbents. They compare actual expenditures in 1972 and 1974 races against the ceilings established by the FECAA of 1974
 The Findings assume that House candidates may make expenditures of $84,000 in the primary period (the $70,000 ceiling plus 20% or $14,000 for expenditures related to fundraising), and a similar amount for the general election, or $168,000 in total. Findings II A, P 17. The actual expenditures of 1974 House contenders are compared against that ceiling figure in id. PP 18-22. Only 22 of 810 or 2.7 percent of all House candidates exceeded that sum in 1974. Id. P 18. All 22 were running on a major party ticket, 10 as incumbents, three as challengers (to incumbents) and nine in races for open seats. Id. Of these, seven incumbents won, three lost. One challenger won and two lost, and eight of the heavy spenders won in open races and one lost. Id. No minor party or independent exceeded the ceiling figure. Id. P 19. Forty major party challengers defeated House incumbents in the November election. Only one of these successful challengers overspent the ceiling. Id. P 20. Eighteen of the forty spent
 less than half that sum, and of the forty winning challengers, 18 were outspent by the incumbents whom they defeated. Id. Major party challengers were outspent by incumbents in 78% of the races in which incumbents ran. Roughly 83% of the challengers spent less than half the ceiling, and 69% spent less than $50,000. Id. P 21.
 In Senate races, the Findings assume that a Senate candidate may spend eight cents times the voting age population of the state (VAP) for nomination, 12 cents times the VAP for the general election, or 20 cents times the VAP, plus 20% for fundraising, or 24 cents times the VAP in total. Id. P 27. Of the 65 major party candidates for Senate in 1974, 17 exceeded that level. Of that 17, nine were incumbents, four were challengers to incumbents (of whom three were outspent by the incumbents they opposed), and four were candidates in races for open seats. Of that 17, eight incumbents won, one was defeated, one challenger won, and three lost. The candidates for open seats split, 2-2. Id. P 28. No minor or independent candidate exceeded the putative ceiling. Id. P 29. Only two of 22 major party challengers to incumbents were elected. One exceeded both the limit and his opponent's spending. The other underspent both the limit and his incumbent opponent. Id. P 30. In 21 of the 22 races between
 incumbent and challenger, the incumbent outspent the challenger. Id. P 31.
 Turning to the 1972 House figures, 20 of 816 or 2.4 percent of all House candidates exceeded the $168,000 ceiling: six were incumbents, five were challengers, and nine ran in open races. Five incumbents won and one lost. One challenger won and four lost, and three running in open races won, to six losers. Id. P 40. Ten major party challengers defeated House incumbents; only one such challenger exceeded the limitation. Three spent less than $84,000, and two were outspent by the incumbents they defeated. Id. P 42. Major party challengers were outspent by incumbents in 78% of the 321 races involving incumbents and challengers. Approximately 89% of challengers spent less than $84,000, and 77% spent less than $50,000. Id. P 43.
 In 1972 Senate races, 18 of 66 candidates spent in excess of 24 cents times the VAP. Of these, 7 were incumbents, two were challengers (one of whom was outspent by the incumbent challenged) and nine were in open races. Of these 18, the seven incumbents won, both challengers lost, and the open races split five winners, four losers. Id. P 47. No independent or minor party candidate exceeded the ceiling. Id. P 48. Five of 24 major party challengers to incumbent Senators won, but none exceeded the limitation. Three of that five outspent their opponents; two were themselves outspent. Id. P 49. Nineteen of 25 major party challengers were outspent by incumbents. Of the six who outspent incumbents, three won and three lost. Id. P 50.
 
 
 [106]
 Findings II PP 55, 58, 63, 73, 83, 92
 
 
 [107]
 7. Do the particular requirements in the challenged statutes that persons disclose the amounts that they contribute or expend in connection with elections for federal office or that candidates for such office disclose the amounts that they expend in their campaigns violate the rights of one or more of the plaintiffs under the First, Fourth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
 
 
 [108]
 7(a) Do 2 U.S.C. §§ 432(b), (c), and (d) and 438(a)(8) violate such rights, in that they provide, through auditing procedures, for the Federal Election Commission to inspect lists and records required to be kept by political committees of individuals who contribute more than $10?
 
 
 [109]
 2 U.S.C. § 432 provides:
 (b) Account of contributions; segregated funds. Every person who receives a contribution in excess of $10 for a political committee shall, on demand of the treasurer, and in any event within five days after receipt of such contribution, render to the treasurer a detailed account thereof, including the amount of the contribution and the identification of the person making such contribution, and the date on which received. All funds of a political committee shall be segregated from, and may not be commingled with, any personal funds of officers, members, or associates of such committee.
 (c) Recordkeeping. It shall be the duty of the treasurer of a political committee to keep a detailed and exact account of
 (1) all contributions made to or for such committee;
 (2) the identification of every person making a contribution in excess of $10, and the date and amount thereof and, if a person's contributions aggregate more than $100, the account shall include occupation, and the principal place of business (if any);
 (3) all expenditures made by or on behalf of such committee; and
 (4) the identification of every person to whom any expenditure is made, the date and amount thereof and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made.
 (d) Receipts; preservation. It shall be the duty of the treasurer to obtain and keep a receipted bill, stating the particulars, for every expenditure made by or on behalf of a political committee in excess of $100 in amount, and for any such expenditure in a lesser amount, if the aggregate amount of such expenditures to the same person during a calendar year exceeds $100. The treasurer shall preserve all receipted bills and accounts required to be kept by this section for periods of time to be determined by the Commission.
 Id. § 438(a)(11) provides that it shall be the duty of the Commission:
 To make from time to time audits and field investigations with respect to reports and statements filed under the provisions of this subchapter, and with respect to alleged failures to file any report or statement required under the provisions of this subchapter . . . .
 
 
 [110]
 Id. § 434(b) provides:
 (b) Contents of reports. Each report under this section shall disclose
 (1) the amount of cash on hand at the beginning of the reporting period;
 (2) the full name and mailing address (occupation and the principal place of business, if any) of each person who has made one or more contributions to or for such committee or candidate (including the purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events) within the calendar year in an aggregate amount or value in excess of $100, together with the amount and date of such contributions;
 (3) the total sum of individual contributions made to or for such committee or candidate during the reporting period and not reported under paragraph (2);
 (4) the name and address of each political committee or candidate from which the reporting committee or the candidate received, or to which that committee or candidate made, any transfer of funds, together with the amounts and dates of all transfers;
 (5) each loan to or from any person within the calendar year in an aggregate amount or value in excess of $100, together with the full names and mailing addresses (occupations and the principal places of business, if any) of the lender, endorsers, and guarantors, if any, and the date and amount of such loans;
 (6) the total amount of proceeds from (A) the sale of tickets to each dinner, luncheon, rally, and other fundraising event; (B) mass collections made at such events; and (C) sales of items such as political campaign pins, buttons, badges, flags, emblems, hats, banners, literature, and similar materials;
 (7) each contribution, rebate, refund, or other receipt in excess of $100 not otherwise listed under paragraphs (2) through (6);
 (8) the total sum of all receipts by or for such committee or candidate during the reporting period, together with total receipts less transfers between political committees which support the same candidate and which do not support more than one candidate;
 (9) the identification of each person to whom expenditures have been made by such committee or on behalf of such committee or candidate within the calendar year in an aggregate amount or value in excess of $100, the amount, date, and purpose of each such expenditure and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made;
 (10) the identification of each person to whom an expenditure for personal services, salaries, and reimbursed expenses in excess of $100 has been made, and which is not otherwise reported, including the amount, date, and purpose of such expenditure;
 (11) the total sum of expenditures made by such committee or candidate during the calendar year, together with total expenditures less transfers between political committees which support the same candidate and which do not support more than one candidate;
 (12) the amount and nature of debts and obligations owed by or to the committee, in such form as the Commission may prescribe and a continuous reporting of their debts and obligations after the election at such periods as the Commission may require until such debts and obligations are extinguished, together with a statement as to the circumstances and conditions under which any such debt or obligation is extinguished and the consideration therefor; and
 (13) such other information as shall be required by the Commission.
 
 
 [111]
 7(b) Does 2 U.S.C. § 434(b)(1)-(8) violate such rights, in that it requires political committees to register and disclose the names, occupations, and principal places of business (if any) of those of their contributors who contribute in excess of $100?
 
 
 [112]
 We recognize that there are potential problems with the definitions in the Act which determine who is a political committee and therefore who must report under 2 U.S.C. § 434. Whether a group is a "political committee" (id. § 431(d)) depends upon whether its outlays amount to "contributions" or "expenditures," which in turn depends on whether the outlays are found to have been "made for the purpose of . . . influencing the nomination for election, or the election" of candidates for federal office. Id. §§ 431(e), (f). The latter phrase, without more, would be open to constitutional attack on the grounds of vagueness, since it potentially reaches, for example, the activities of nonpartisan issue groups which in a sense seek to "influence" an election, but only by influencing the public to demand of candidates that they take certain stands on the issues. See our discussion of similar language in 2 U.S.C. § 437a, --- U.S.App.D.C. pages --- - ---, 519 F.2d pages 873-876, infra. However, the languagein section 431 has been authoritatively construed and limited in reach by the Second Circuit in United States v. National Committee for Impeachment, 469 F.2d 1135, 1141 (2d Cir. 1972); the Second Circuit's interpretation was followed in ACLU v. Jennings, 366 F.Supp. 1041, 1056-57 (D.D.C.1973) (three-judge court), vacated as moot sub nom. Staats v. ACLU, --- U.S. ---, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975). Both decisions held that a group will be considered a political committee only if it makes its expenditures under the control or with the consent of a candidate, or if the major purpose of its expenditures is the nomination or election of candidates. Nonpartisan issue groups are therefore not covered
 We accept the construction of the section 431 definitions offered in National Committee for Impeachment and Jennings, supra, and we consider the reach of the major disclosure provisions, as thus construed, constitutional. We note, moreover, that Congress too apparently accepts the courts' construction; the FECA Amendments of 1974 do make some changes in 2 U.S.C. §§ 431(d), (e), and (f), but they leave unchanged the key language ("made for the purpose of influencing") which was narrowly construed in the two cases.
 
 
 [113]
 Advanced in the intervening defendants' brief is the thesis that disclosure promotes First Amendment values by assisting voters to make an informed choice among candidates because the voters know which individuals, groups, and causes are funding which candidates. Brief at 72-73. The District Court found that by improving the flow of information to the voter, disclosure laws facilitate the intelligent exercise of the franchise. Findings I, P 134
 
 
 [114]
 The short answer to this argument is set out in Stoner v. Fortson, supra. In upholding a disclosure statute remarkably similar to section 434 (disclosure began with $101 contributions rather than those in excess of $100), the court rejected the precise attack made here. Stoner, a candidate for Lieutenant Governor of Georgia in the Democratic primary (tantamount to election in Georgia, see United States v. Classic, supra, 313 U.S. at 313-14 & n.2, 61 S.Ct. 1031), alleged "that because he is a very controversial candidate, the Act's requirement of listing the name, amount, and address of contributors contributing $101 or more to his campaign would subject such contributors to harassment and persecution, thus depriving them of their first amendment right of free speech and association." 379 F.Supp. at 710-11. Following the usual two-step procedure, the court held first that the disclosure statute served a compelling state interest and second that there was a substantial nexus between this interest
 and the enforcement of the statute. Id. at 712-714. Therefore, the court held, incidental infringement of first amendment rights of speech and association was constitutionally permissible. Id. at 714.
 For reasons similar to those stated by the Stoner court, that same substantial nexus exists here between the government's compelling interest in clean elections, on the one hand, and disclosure by all candidates, including independents and candidates of minor and new parties, on the other. This record shows that non-major party candidates are often supported by "angels" who make large contributions. See Findings III, Buckley P 41 (at least 180 individuals gave $1000 or more to Senator Buckley's 1970 campaign on the Conservative Party ticket). There is no reason to believe that those angels are incapable of violating the contribution limitations or otherwise giving in devious ways. Compare Findings I, PP 112-117 (detailing 47 recent convictions for election law violations). Disclosure would tend to prevent or expose such violations of the statute by minor party contributors every bit as much as it deters or reveals violations by major party donors. Moreover, the voting population has an interest in
 knowing the composition of the angels' wings and what makes them fly. Opponents have an interest in enlightening the electorate on the subject. And Congress has a right, if not an obligation, to provide a means of informing the voting population so voters are not required to vote blind. On these two grounds, disclosure with respect to non-major parties serves exactly the same purposes as it does with respect to major parties. There can be no dispute that disclosure by minor parties has a substantial nexus to the compelling governmental interests in enforcing the election laws and informing the voters.
 There is, to be sure, a third interest to be served by disclosure laws: deterring corruption in the sense of favors dispensed by those in power to their large contributors. Cf. Stoner v. Fortson, supra, 379 F.Supp. at 713. And it is true that the connection is less substantial between this interest and disclosure by non-major parties, for it is indeed less likely that minor parties will win and find themselves in a position to dispense governmental favors. It is, however, not impossible and no election law should ever be premised on the notion that non-major parties cannot win an election. Those who argue that disclosure laws serve no compelling interest when applied to minor parties and independents focus too narrowly. They see only this third reason for disclosure laws and ignore the two compelling interests described earlier: disclosure laws serve as an enforcement tool and an informing agent. These interests apply with full force to minor parties, and they are sufficient to overcome any incidental infringement on first amendment rights worked by the disclosure provisions.
 
 
 [115]
 There was testimony by Laura Wertheimer that two persons solicited in 1974 for a contribution to the Libertarian Party in New York refused to contribute because they were unwilling to have their names disclosed, and the District Court so found. Findings III, Wertheimer P 6. The District Court further found, however, that Ms. Wertheimer could present no evidence of harassment or reprisal inflicted on persons whose names were reported as contributors to the Libertarian Party during the 1974 campaign. Id. at P 11
 The record evidence on harassment is particularly thin. For example, Daniel Joy, Treasurer of the American Conservative Union (ACU), testified that persons were harassed because they were in receipt of funds from ACU. Findings III, Joy P 9. No details were given as to the extent, nature, scope, or duration of the harassment. Certainly, Joy's testimony standing alone is not sufficient to warrant a decision by this court declining to apply an otherwise constitutional disclosure requirement to ACU or other minor parties.
 Similarly, J. Daniel Mahoney, State Chairman of the Conservative Party of the State of New York, testified that in 1962 individuals in various departments of the state government "talk(ed) to people in regulated businesses" who had signed a petition to establish the party as a legal entity. Findings III, Mahoney P 8. It does not appear that these particular incidents mark a substantial program of harassment, and apparently the incidents ceased after publication of two critical newspaper editorials. Id. Moreover, as with the testimony of Daniel Joy, there is no evidence as to the type of reprisals planned or practiced. And finally, Mahoney testified that he knew of no incident in which individuals whose names were disclosed to the federal government under the FECA of 1971 have been subject to harassment or reprisals as a result of the disclosure. Id. P 9.
 We are not called on to decide whether unpopular minor parties would have to produce evidence of "economic reprisal, loss of employment, threats of physical coercion, and other manifestations of public hostility" (such as were demonstrated in NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)) in order to be relieved of the duty to disclose. We do not hesitate to hold that the evidence in this record falls far short of that required to warrant a judicially imposed exemption from the FECA disclosure requirements.
 
 
 [116]
 Findings III, Mahoney P 9; Findings IIB, P 1; see Findings IIA, PP 3-4, 5-7. The District Court also found that a Washington State disclosure law produced no reduction in the total amount of funds collected by major candidates there. Finding I, P 195. For an analysis of a parallel Florida statute, see Roady, Ten Years of Florida's "Who Gave It Who Got It" Law, 27 Law & Contemp.Prob. 434, 440 (1962) (concluding that the statute did not reduce contributions)
 
 
 [117]
 In this country a person's right to vote secretly is inviolate. A person also has a right of personal privacy in political association, including a right to contribute to the candidate of his choice. But the right to contribute secretly is certainly of a lesser order of priority than the secret ballot. To the extent that a person goes past voting to contributing, his right of privacy in political association weighs less when balanced against other societal values
 
 
 [118]
 See, e. g., Findings III, Buckley P 4 (plaintiff Buckley was elected to the United States Senate in 1970 as the candidate of the Conservative Party of the State of New York)
 
 
 [119]
 The disclosure statute does not, however, make it impossible for minor parties to get underway, even if nearly all their contributors insist on remaining confidential. Gifts of $100 or less are not disclosed, and $100 is not an insubstantial sum. Since minor party contributions are generally smaller than those made to major parties, see Findings IIA, PP 56, 73, minor party contributions are less affected by the disclosure requirements. Moreover, even those who have already contributed $100 can still find ways to advance the cause without breaking confidentiality. They can make independent expenditures of $100 or less without being subject to disclosure, 2 U.S.C. § 434(e), and the Act puts no restriction on services volunteered by individuals. See id. § 431(e)(5)(A)
 
 
 [120]
 In Pollard v. Roberts, 283 F.Supp. 248 (E.D.Ark.), aff'd, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (mem.), a three-judge district court, which included then Circuit Judge Blackmun, saw no compelling state interest to justify a particularized inquiry by a prosecutor into the identity of contributors to the Republican Party in Arkansas, referred to as a long-time minority party, "a minority party as far as numbers of regular adherents are concerned." Id. at 258. The court expressly distinguished general corrupt practices legislation, and indeed referred to such statutes as having "much merit." Id. at 258-59
 
 
 [121]
 7(c) Does 2 U.S.C. § 434(d) violate such rights, in that it neither requires disclosure of nor treats as contribution to or expenditure by incumbent officeholders the resources enumerated in 2 U.S.C. § 434(d)?
 
 
 [122]
 2 U.S.C. § 434(d) provides:
 (d) Members of Congress, reporting exemption. This section does not require a Member of the Congress to report, as contributions received or as expenditures made, the value of photographic, matting, or recording services furnished to him by the Senate Recording Studio, the House Recording Studio, or by an individual whose pay is disbursed by the Secretary of the Senate or the Clerk of the House of Representatives and who furnishes such services as his primary duty as an employee of the Senate or House of Representatives, or if such services were paid for by the Republican or Democratic Senatorial Campaign Committee, the Democratic National Congressional Committee, or the National Republican Congressional Committee. This subsection does not apply to such recording services furnished during the calendar year before the year in which the Member's term expires.
 
 
 [123]
 7(d) Does 2 U.S.C. § 434(e) violate such rights, in that it provides that every person contributing or expending more than $100 other than by contribution to a political committee or candidate (including volunteers with incidental expenses in excess of $600) must make disclosure to the Federal Election Commission?
 
 
 [124]
 2 U.S.C. § 434(e) provides:
 (e) Contributions or expenditures by person other than political committee or candidate. Every person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year shall file with the Commission a statement containing the information required by this section. Statements required by this subsection shall be filed on the dates on which reports by political committees are filed but need not be cumulative.
 
 
 [125]
 Question 7(e) reads:
 Does 2 U.S.C. § 437a violate such rights, in that it requires any person who expends funds or commits any act for the purpose of influencing the outcome of an election or who publishes or broadcasts to the public any material advocating the election or defeat of a candidate, setting forth a candidate's position on any public issue, his voting record, or any official acts to file reports with the Commission as if such person were a political committee?
 
 
 [126]
 The remainder of § 437a is set forth in note 132 infra
 
 
 [127]
 As § 437a provides, any organization "expend(ing) any funds . . . for the purpose of influencing the outcome of an election" must make the disclosure specified
 
 
 [128]
 See text at note 132 infra
 
 
 [129]
 We point out, in later treatment of this aspect of § 437a, that coverage of nonpartisan public discussion of candidates' stands, voting records and other official acts depends upon whether the clause commencing with the words "or otherwise designed to influence" qualifies the "setting forth" of "the candidate's position on any public issue, his voting record, or other official acts." See text at notes 135-37 infra
 
 
 [130]
 Plaintiff New York Civil Liberties Union has sufficiently demonstrated a "threat of specific future harm," Laird v. Tatum, 408 U.S. 1, 14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), from the operation of § 437a to invoke judicial review of that section. See Findings III, Glasser P 15 (indicating that disclosure would cause loss of contributions from those who currently insist that their gifts remain confidential)
 
 
 [131]
 The court was addressing the Government's contention that the definition of "political committee" in § 301(d) of the 1971 Act (codified at 2 U.S.C. § 431(d) and left substantially unchanged by the 1974 Amendments) should be given a very broad reading. The court instead held that it should be given a narrow construction, thereby avoiding constitutional difficulties. See text at note 134 infra
 
 
 [132]
 In its entirety the exemption provision reads:
 The provisions of this section do not apply to any publication or broadcast of the United States Government or to any news story, commentary, or editorial distributed through the facilities of a broadcasting station or a bona fide newspaper, magazine, or other periodical publication. A news story, commentary, or editorial is not considered to be distributed through a bona fide newspaper, magazine, or other periodical publication if
 (1) such publication is primarily for distribution to individuals affiliated by membership or stock ownership with the person (other than an individual) distributing it or causing it to be distributed, and not primarily for purchase by the public at newsstands or by paid subscription; or
 (2) the news story, commentary, or editorial is distributed by a person (other than an individual) who devotes a substantial part of his activities to attempting to influence the outcome of elections, or to influence public opinion with respect to matters of national or State policy or concern.
 2 U.S.C. § 437a.
 
 
 [133]
 While § 437a purports not to apply "to any news story, commentary, or editorial distributed through the facilities of . . . a bona fide newspaper, magazine or other periodical publication," the published material "is not considered to be distributed through a bona fide newspaper, magazine, or other periodical publication if" the publisher "devotes a substantial part of (its) activities to attempting to influence the outcome of elections, or to influence public opinion with respect to matters of national or State policy or concern." How many of the Nation's great newspapers and magazines do not regularly endeavor and rightfully so to exert influences precisely of those types?
 
 
 [134]
 We note the similarity of "the purpose of influencing" in § 431(d), on the one hand, and "the purpose of influencing," the "advocating" and the "design() to influence" in § 437a, on the other
 
 
 [135]
 See text at notes 127-28, supra
 
 
 [136]
 See text at notes 127-28, supra
 
 
 [137]
 See text at notes 127-28, supra
 
 
 [138]
 An organization is not a political committee unless it "receives contributions or makes expenditures (as defined in the Act) during a calendar year in an aggregate amount exceeding $1,000." 2 U.S.C. § 431(d). Section 437a has no threshold amount. But it defies common sense to read an elaborate and lengthy provision like § 437a as merely a Congressional attempt to lower the threshold for reporting by groups which would be political committees if only they spent a little more. Moreover, even if a group falls short of the $1,000 threshold, it must still file reports under § 434(e) if its expenditures (other than those going to a candidate or political committee) exceed $100
 
 
 [139]
 The conference report describes § 308, which became 2 U.S.C. § 437a, in this fashion:
 The conference substitute follows the provisions of the Senate bill generally. A provision of the House amendment extended the duty to register as a political committee to any person committing any act to influence the outcome of any election. This provision is recast as a new section 308 of the Act, which will require any organization which expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or which publishes or broadcasts to the public material intended to influence public opinion with respect to candidates for Federal office to register with the Commission as a political committee and report the source and amount of its funds and of its expenditures. Since these organizations use their resources for political purposes, often having a direct and substantial effect on the outcome of Federal elections, it would be inappropriate to permit these organizations to conceal the interests they represent solely because the organizations are
 able to avoid reporting and disclosure under the technical definitions of political committee, contribution, and expenditure. The conference substitute does not apply to individuals acting on their own behalf or to news stories, commentaries, and editorials published in bona fide newspapers, magazines or other periodical publications.
 H.R.Rep.No.93-1438, 93d Cong., 2d Sess. 83 (1974).
 
 
 [140]
 During presentation of § 437a to the Senate for its action, Senator Cannon, who led the Senate conferees, had stated:
 (T)he thrust of this provision is to require organizations that communicate with the general public through advertisements, direct mailings, et cetera, in order to influence an election or to set forth a candidate's position on any public issue, his voting record, or other official acts, for the purpose of electing or defeating that candidate, to report as if that organization were a political committee.
 But this section does not reach an organization that limits itself to activities along the following lines: issuing communications directed to its members, making its position known to members of the press and to public officials, or participating in conferences and meetings and other discussions devoted to public issues. In other words, section 308 will cover organizations that use their funds to propagandize the general public but does not restrict internal communications or restrict the flow of news or the discussion of public issues.
 
 
 [120]
 Cong.Rec. S18526 (daily ed. Oct. 8, 1974)
 It was in expressing disagreement with Senator Cannon's interpretation that Representative Frenzel voiced the observations in text. His full statement follows:
 The Senator's statement might exclude Common Cause, the American Conservative Union, the American Civil Liberties Union and the environmental groups which sponsor the "dirty dozen" list. No one would argue that it is the purpose of this provision to exempt these groups, nor is it intended to exempt any other particular group.
 This provision is intended to apply indiscriminately and will bring under the disclosure provisions many groups, including liberal, labor, environmental, business and conservative organizations. Section (437a) does not make any exceptions. While there are exemptions made to other provisions of the law such as section 610 (18 U.S.C. § 610), no exemptions are made to this provision. The Commission and the courts should not allow what is clear from the legislative language of the bill and the report of the conferees to be changed by legislative history on the floor. The language of the bill and the report must take precedence over legislative history made on the floor.
 Id. at H10333 (daily ed. Oct. 10, 1974). Representative Hays, the head of the House conferees, also made clear the breadth of the section's intended coverage. In the course of summarizing the Act's main provisions, he stated:
 We also have a little thing in here which I think the Members might be interested in. That is, we require any organization which spends any money or commits any act for the purpose of influencing an election, must report as a political committee, except that if it only reports to its members, it is exempt; but if it goes national and issues reports purporting to condemn somebody for voting such a way, it has to report. We have to know the source of its income. If we want to know who that is aimed at, I do not want to say out loud, but their initials are C.C.
 Id. at H10327 (daily ed. Oct. 10, 1974). Representative Hays later made it clear that the organization referred to was Common Cause. Id. at H10330 (daily ed. Oct. 10, 1974).
 
 
 [141]
 Section 437a might, of course, leave open one avenue for groups wishing to maintain the privacy of their contributor lists while discussing public issues: they could refrain from mentioning candidates' positions or listing incumbents' voting records. But, to do this, the group would have to be extremely careful about mentioning even the names of those who held a particular position on an issue, lest one of them turn out to be a candidate for federal office, thereby triggering § 437a. Such watered-down and cautious discussion is hardly the "uninhibited, robust and wide-open" debate on public issues which the First Amendment was designed to foster. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)
 
 
 [142]
 See text at notes 138-41 supra. We emphasize that our holding on statutory vagueness and overbreadth rests on the peculiar context of § 437a, and not necessarily on qualities inherent in the language "for the purpose of influencing" and "design() to influence." In other situations, those phrases might be acceptable, as National Committee for Impeachment and ACLU v. Jennings, supra, demonstrate. It is only because the text and legislative history of § 437a prevent a similar interpretation that we reach a conclusion different from that reached in those two cases, and our holding is not meant to cast doubt on the continuing validity of the sections construed in those cases
 
 
 [143]
 Reply Brief at 92
 
 
 [144]
 Public financing is the subject of certified Questions 5 and 6:
 
 
 [5]
 Does any statutory provision for the public financing of political conventions or campaigns for nomination or election to the Presidency or Vice Presidency violate the rights of one or more of the plaintiffs under the First or Ninth Amendment, the Due Process Clause of the Fifth Amendment, or Article I, Section 8, Clause 1, of the Constitution of the United States?
 
 
 [6]
 Do the particular provisions of Subtitle H and § 6096 of the Internal Revenue Code of 1954 deprive one or more of the plaintiffs of such rights under the First or Ninth Amendment or Article I, Section 8, Clause 1, in that they provide federal tax money to support certain political candidates, parties, movements, and organizations or in the manner that they so provide such federal tax money?
 The passage of the public financing provisions marked the first time this country has authorized use of public funds to pay election campaign costs. Similar legislative schemes, however, have been in effect for some time in several states, Puerto Rico, and many European countries, including Germany, Sweden, Norway and Finland. See Developments in the Law Elections, 88 Harv.L.Rev. 1111, 1266 & n. 176; Casper, Williams v. Rhodes and Public Financing of Political Parties under the American and German Constitutions, 1969 Sup.Ct.Rev. 271, 288-302; Nils Andren Partisan Motivations and Concern for System Legitimacy in the Scandinavian Deliberations on Public Subsidies, in Comparative Political Finance 50 (A. Heidenheimer ed. 1970).
 
 
 [145]
 Plaintiffs assert that limiting public financing to presidential campaigns will not survive strict scrutiny. But
 the principle that calls for the closest scrutiny of distinctions in laws denying fundamental rights . . . is inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise. Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," . . . that a legislature need not "strike at all evils at the same time," . . . and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," . . . .
 Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966) (citations omitted).
 
 
 [146]
 "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States . . . ."
 
 
 [147]
 Plaintiffs also claim that, as with religion, the government is prohibited by the First Amendment from using public funds to finance presidential elections. Plaintiffs are simply wrong. The First Amendment does indeed prohibit the Congress from establishing religion or preventing its free exercise. But no one has ever seriously argued that both these twin prohibitions apply even by analogy in the area of freedom of speech or of association. While Congress, of course, may not prefer one political group over another, it certainly has the right and in some cases the duty, to encourage the exercise of the political freedoms that are embraced in the First Amendment's speech, press and association provisions. In Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), for example, the court held that, under the circumstances there presented, a state university had to do more than simply permit a student political organization to associate informally and engage in free speech; it was required to provide facilities for the exercise of those rights
 
 
 [148]
 Under the statutory scheme, whether or not public funding is available, the same spending limits apply to all candidates. 18 U.S.C. § 608(c)(1)(B), 26 U.S.C. §§ 9003(b), (c). To the extent that public funding is not available, private funding is not foreclosed. Id. § 9003(c)
 
 
 [149]
 26 U.S.C. § 9004(a)
 
 
 [150]
 Id. §§ 9033(b), 9034
 
 
 [151]
 "Major party," "minor party," and "new party" are defined in 26 U.S.C. § 9002 as follows:
 (6) The term "major party" means, with respect to any presidential election, a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 25 percent or more of the total number of popular votes received by all candidates for such office.
 (7) The term "minor party" means, with respect to any presidential election, a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 5 percent or more but less than 25 percent of the total number of popular votes received by all candidates for such office.
 (8) The term "new party" means, with respect to any presidential election, a political party which is neither a major party nor a minor party.
 
 
 [152]
 Id. § 9034
 
 
 [153]
 Even though the figures used for pre-election funding are not completely current, Congress has to some extent cured the problem by the provisions for post-election funding, based on the actual election results. Id. § 9004(a)(3)
 
 
 [154]
 In 1972 Presidential campaign spending alone totaled $94.4 million up 67 percent from $56.4 million in 1968; up 148 percent from $38.1 million in 1964; and up 247 percent from $27.2 million in 1960. Findings II A, P 51; I, P 89. In 1972 the reported spending by the candidates was Nixon $55.2 million and McGovern $38.2 million. Findings II A, P 51
 
 
 [155]
 Our conclusion is not disturbed by the fact that major parties, regardless of actual showing in the previous election, are entitled to equal payments from the Fund, whereas minor parties are tied to a level which is exactly proportionate to their track records. 26 U.S.C. § 9004(a). This feature simply reflects Congress's recognition that historically the only viable challenges to the incumbent major party have generally come from the other major party. Equal funding thus serves to reduce, or at least not to heighten, the advantages of incumbency. We have no doubt that is permissible for Congress to recognize "that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." Jenness v. Fortson, supra, at 441, 91 S.Ct. at 1976. Congress has here recognized those differences without foreclosing the opportunity of other parties to grow and eventually to take the place of those which are currently major parties
 
 
 [156]
 See note 145 supra
 
 
 [157]
 See, e. g., 42 U.S.C. § 1857c (1970) (Clean Air Act); 23 U.S.C. § 120 (1970) (Highway Trust Fund)
 
 
 [158]
 See note 154 supra
 
 
 [159]
 The Supreme Court succinctly demonstrated the arbitrariness of the Illinois statute in Moore :
 Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office.
 Moore v. Ogilvie, 394 U.S. 814, 819, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969).
 A milder requirement of geographic dispersal of support, which appeared in the statutory successor to the act struck down in Moore, was recently invalidated in Communist Party of Illinois v. Illinois State Board of Elections, 518 F.2d 517 (7th Cir. 1975). The milder scheme is also distinguishable, however, from the instant provisions which relate to a Presidential election rather than a state election.
 
 
 [160]
 We note at the outset that the burdens imposed by the 20-state requirement are arguably less onerous than the Illinois requirements challenged in Moore. The requirement here can, after all, be met by the actions of 20 individuals in a state, who are not themselves required to be registered voters; no state has fewer than 300,000 people, according to the 1970 census. U. S. Bureau of the Census, Statistical Abstract of the United States : 1973, at 14 (94th ed.) By contrast, the statute in Moore required the actions of at least 200 registered voters in a county; the 53 smallest counties in the state, combined, had only 6.6 percent of the registered voters in the state. 394 U.S. at 819, 89 S.Ct. 1493
 
 
 [161]
 Bode v. National Democratic Party, supra, 146 U.S.App.D.C. at 379, 452 F.2d at 1308
 
 
 [162]
 For the same reasons, we find no constitutional objection to the requirement that a candidate be on the ballot in 10 states before becoming entitled to general election funding. 26 U.S.C. § 9002(2)(B)
 
 
 [163]
 Getting on the November ballot by petition involves an entirely different set of burdens and financial costs than does the primary-convention route. Those pursuing the primary-convention route must seek to generate sufficient support to defeat other contenders for a major party nomination, and do so long before November. The petition route is tedious, but the only direct opposition faced by an independent is that of the party nominees in November. The primary-convention route, for which federal matching funds are provided, is generally much more expensive. It also involves direct opposition in nearly every primary entered, the risk that a skipped primary will benefit some other contender, and direct opposition at the convention
 While a candidate pursuing the petition route can build his campaign steadily toward the November general election, one following the primary-convention route has split objectives. He must do any array of things some counter-productive as far as the general election is concerned designed to garner delegate votes by the time of the convention. If he fails, his campaign has ended. If he succeeds, he must take the nomination to a different and far wider constituency than that required to win the nomination, and because of blood-letting and positions taken in the primaries, this shift of audience is often highly detrimental to a candidate. Of course, the candidate of a major party selected by the primary-convention process generally stands in a far stronger position than an independent also appearing on the November ballot. That is why the nomination of a major party is so sought after. But Congress may distinguish between paths to the White House, and may choose to apply public financing during
 the matching payment period only to the more contested ballot position route, so long as in doing so it does not effectively deny minor parties or independents ballot access, as in Williams v. Rhodes, supra, or increase the relative burden upon candidates pursuing those other paths.
 
 
 [164]
 For the 1972 and 1974 elections only, a party of intermediate size (one which polled between 2% and 200,000 votes in the preceding gubernatorial election) could choose between convention and primary for selecting its candidates. Starting in 1976 such a party would not have the option of holding a primary. 415 U.S. at 773 n.5, 94 S.Ct. 1296
 
 
 [165]
 See also note 145 supra. Cf. Jenness v. Fortson, supra, 403 U.S. at 440-441, 91 S.Ct. 1970
 
 
 [166]
 26 U.S.C. § 9002, after defining major and minor parties, states: "The term 'new party' means, with respect to any presidential election, a political party which is neither a major party nor a minor party." Id. § 9002(8). Apparently "new party" is an "all-others" provision which includes independents such as plaintiff McCarthy, who is the nominee of a group which calls itself The Committee For a Constitutional Presidency McCarthy '76. Compare 2 U.S.C. § 431(m), defining a "political party."
 
 
 [167]
 18 U.S.C. §§ 608, 610, 611, 613-17
 
 
 [168]
 Neither of the ex officio members can serve as chairman or vice chairman of the Commission. 2 U.S.C. § 437c(a)(5)
 
 
 [169]
 The Congressional appointees are actually appointed by the President pro tempore of the Senate and the Speaker of the House of Representatives upon the recommendations of the majority and minority leaders of their respective houses. Id. § 437c(a)(1). All appointments (including the Presidential appointments) are subject to confirmation by a majority of both Houses of Congress. Id
 The appointed members of the Commission, who at the time of their appointment cannot be elected or appointed officers or employees in the executive, legislative, or judicial branch of the federal government, id. § 437c(a)(3), generally serve a six year term. Id. § 437c(a)(2). The terms of the initial appointees are varied in order to assure that one term expires each year. See id.
 
 
 [170]
 The Commission argues that it "appears to have no general substantive rulemaking authority with regard to the Title 18 spending and contributions limitations, although it is authorized to make such rules in one limited area, that of allocating primary campaign expenditures, as between states when such expenditures are made for use in two or more states (§ 608(c)(4))." Brief at 55. See 2 U.S.C. § 438(d)(1). Intervening Defendants Common Cause and John Gardner, relying on id. § 437d(a)(8), argue that the Commission does have rulemaking authority over the relevant title 18 provisions. Supplemental Reply Brief at 17-18. See also Reply Brief for Plaintiffs at 107-08. Our disposition of Question 8(d) as unripe, infra, makes it unnecessary for us to resolve the issue
 
 
 [171]
 The Commission, relying on 2 U.S.C. § 437g(a)(5), also argues that it "appears" to have no independent civil enforcement authority with respect to the spending and contribution limitations in title 18. Brief at 54-55. But Intervening Defendants maintain that the Commission's independent enforcement authority covers title 18. Supplemental Reply Brief at 7-17. As with the dispute over the scope of the Commission's rulemaking authority, see note 170 supra, our disposition of Questions 8(b) and 8(c) as unripe, infra, eliminates the need to resolve whatever ambiguity there may be in the statute
 
 
 [172]
 See note 167 supra
 
 
 [173]
 The list in the text is not intended to be exhaustive. For example, the Commission also has the power under Subtitle H to institute civil actions for declaratory or injunctive relief concerning any matter covered by the Presidential Election Campaign Fund Act (26 U.S.C. §§ 9001-21), the Presidential Primary Matching Payment Account Act (id. §§ 9031-42), and section 302(a) of the Presidential Election Campaign Fund Act of 1966 (id. § 6096). See id. §§ 9010(c), 9040(c). And the Commission has the power to sue to obtain repayment of amounts that the Commission concludes are payable to the Secretary of the Treasury. See id. §§ 9010(b), 9040(b). The certified questions did not raise the issue of the constitutionality of the Commission's independent enforcement authority under Subtitle H
 
 
 [174]
 8. Do the provisions in the challenged statutes concerning the powers and method of appointment of the Federal Election Commission violate the rights of one or more of the plaintiffs under the constitutional separation of powers, the First, Fourth, Fifth, Sixth, or Ninth Amendment, Article I, Section 2, Clause 6, Article I, Section 5, Clause 1, or Article III?
 (The text of the six subparts to Question 8 are reprinted at notes 175, 182-83, 198 infra.)
 
 
 [175]
 8(a) Does 2 U.S.C. § 437c(a) violate such rights by the method of appointment of the Federal Election Commission?
 
 
 [176]
 See 1 Farrand, The Records of the Federal Convention of 1787 at 119 (rev. ed. 1966); 2 id. at 389, 539
 
 
 [177]
 See 1 id. at 119; 2 id. at 81-83, 405
 
 
 [178]
 Although the issue was not raised by any party to this litigation, it is possible to argue that the Commission violates the doctrine of separation of powers in that the President appoints two members of a legislative agency. But we can find no constitutional infirmity in the decision of the Congress to invite the participation of the executive in this innovative attempt at election reform. Joint participation on the Commission certainly does not involve the usurping by one branch of the power of another. Congress freely extended an invitation to the executive and the executive freely accepted
 Furthermore, this is not a case in which the legislative branch has delegated performance of its legislative responsibilities to the executive. Congress has merely decided that the Commission could more effectively meet its statutory responsibilities such as gathering and auditing campaign finance information, certifying eligibility of candidates for public monies, etc. if the knowledge, expertise, and political presence of the executive were represented through two executive appointees. Rather than violating the doctrine of separation of powers, we think this method of appointment recognizes "the inherent necessities of the governmental co-ordination." J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928).
 It is a method that Congress has frequently used in establishing other legislative commissions to gather facts and to recommend appropriate legislation. See, e. g., The National Study Commission on Records and Documents of Federal Officials (44 U.S.C. §§ 3315-24) and The Commission on Revision of the Federal Court Appellate System (86 Stat. 807, as amended, 88 Stat. 1153) whose members are appointed by representatives of all three branches of government.
 
 
 [179]
 In fact, there seems to be little, if any, disagreement on this issue. The Attorney General concedes in his Brief that the Commission is "predominantly legislative in its makeup." Brief at 2. He challenges only the grant of civil enforcement powers to the Commission on the ground that the law enforcement function is predominantly executive. Id. at 2-9. And even with respect to that issue, he urges the court to conclude that it is not ripe for determination. Id. at 2
 Plaintiffs also apparently agree that Congress has the power to appoint a commission to carry out legislative functions. Like Judges Tamm, MacKinnon, and Wilkey, however, they conclude that the Commission exercises executive functions and must therefore be appointed pursuant to the restrictions of article II, section 2. Brief at 258-66; Reply Brief at 93-113.
 
 
 [180]
 See --- U.S.App.D.C. page ---, 519 F.2d page 928, infra
 
 
 [181]
 See --- U.S.App.D.C. page ---, 519 F.2d page 921, infra
 
 
 [182]
 8(b) Do 2 U.S.C. §§ 437d and 437g violate such rights, in that they entrust administration and enforcement of the FECA to the Federal Election Commission?
 
 
 [183]
 8(c) Does 2 U.S.C. § 437g(a) violate such rights, in that it empowers the Federal Election Commission and the Attorney General to bring civil actions (including proceedings for injunctions) against any person who has engaged or who may engage in acts or practices which violate the Federal Election Campaign Act, as amended, or § 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18?
 8(d) Does 2 U.S.C. § 438(c) violate such rights, in that it empowers the Federal Election Commission to make rules under the FECA in the manner specified therein?
 8(e) Does 2 U.S.C. § 456 violate such rights, in that it imposes a temporary disqualification on any candidate for election to federal office who is found by the Federal Election Commission to have failed to file a report required by Title III of the Federal Election Campaign Act, as amended?
 
 
 [184]
 A variety of reports must be filed with the Commission, including statements of organization of political committees (2 U.S.C. § 433), reports of receipts and expenditures by political committees and candidates (id. § 434), reports from certain contributors to campaigns (id. § 434(e)), and statements concerning the financing of and expenditures in connection with Presidential nominating conventions (id. § 437)
 The Commission is responsible for developing forms for required reports and statements (id. §§ 438(a)(1), 434), regulating the manner of reporting unusual items (id. §§ 436(c), 437b), preparing a manual on uniform bookkeeping and filing methods (id. § 438(a)(2)), preserving reports and making them available to the public (id. §§ 438(a)(4), (5)), performing audits and field investigations (§ 438(a)(8)), and other similar functions.
 
 
 [185]
 26 U.S.C. §§ 9005, 9007-09
 
 
 [186]
 We intimate no view concerning the constitutionality of the Commission's power to initiate a civil suit to recover excess payments or improperly spent funds pursuant to id. §§ 9010(b), 9040(b). See note 173 supra
 
 
 [187]
 These serious doubts are apparently shared by the Special Counsel to the Commission. See Transcript of Oral Argument at 162-63, 171
 
 
 [188]
 The mere "threat" of civil enforcement by the Commission creates no additional "inhibitory effect" on plaintiffs, since the violations over which the Commission allegedly has civil enforcement authority are also subject to criminal sanctions. See 2 U.S.C. § 441
 
 
 [189]
 As with the threat of civil enforcement by the Commission, see note 188 supra, any alleged inhibitory effect from the threat of disqualification must take into account that the failure to file would also subject a candidate to criminal sanctions. See 2 U.S.C. § 441. Of course, it could be argued that a candidate might fear that a bi-partisan Commission, devoted to this Act full-time, might be more likely to start a disqualification proceeding than the Justice Department would be to start a criminal prosecution. But all such matters are entirely too speculative at this time to consider the matter ripe for adjudication
 
 
 [190]
 The Commission has published a notice of proposed rulemaking. See 40 Fed.Reg. 23833-34 (June 2, 1975)
 
 
 [191]
 See Transcript of Oral Argument at 171. Judge MacKinnon argues in his separate statement that the possibility that civil enforcement will be left exclusively to the Attorney General is irrelevant to the ripeness issue. --- U.S.App.D.C. page ---, 519 F.2d page 931, infra. His argument is based on a reading of 2 U.S.C. § 437g(a)(7), which provides that "upon request by the Commission the Attorney General on behalf of the United States shall institute a civil action for relief . . . ." (Emphasis added.) According to Judge MacKinnon, "(t)he use of the mandatory 'shall' quite clearly indicates Congress intended that the Attorney General would have no discretion to determine whether to initiate civil enforcement proceedings when he receives a referral from the Commission," thus leaving actual enforcement authority in the Commission
 Although we would agree that the use of the word "shall" in a statute is "normally the language of command," Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935), "shall" may sometimes "be directory only," and its interpretation "depends upon the background circumstances and context in which (it is) used and the intention of the legislative body . . . which used (it)." United States v. Reeb, 433 F.2d 381, 383 (9th Cir. 1970), cert. denied, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971). Indeed, Special Counsel to the Commission indicated at oral argument that both the Commission and the Attorney General are of the opinion that the Attorney General retains discretion in cases referred to him by the Commission. Transcript of Oral Argument at 162. There is no showing in this case of a convincing legislative history that would enable us to conclude that "shall" was intended to be the "language of command." In the absence of such legislative history, we are unable to agree with Judge MacKinnon that 2 U.S.C. § 437g(a)(7) establishes that Congress intended to eliminate the discretion that has traditionally vested in the Attorney General.
 
 
 [192]
 2 U.S.C. § 437d(a) provides:
 § 437d. Powers of Commission
 (a) The Commission has the power
 (1) to require, by special or general orders, any person to submit in writing such reports and answers to questions as the Commission may prescribe; and such submission shall be made within such a reasonable period of time and under oath or otherwise as the Commission may determine;
 (2) to administer oaths or affirmations;
 (3) to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties;
 (4) in any proceeding or investigation, to order testimony to be taken by deposition before any person who is designated by the Commission and has the power to administer oaths and, in such instances, to compel testimony and the production of evidence in the same manner as authorized under paragraph (3) of this subsection;
 (5) to pay witnesses the same fees and mileage as are paid in like circumstances in the courts of the United States;
 (6) to initiate (through civil proceedings for injunctive, declaratory, or other appropriate relief), defend, or appeal any civil action in the name of the Commission for the purpose of enforcing the provisions of this Act, through its general counsel;
 (7) to render advisory opinions under section 437f of this title;
 (8) to make, amend, and repeal such rules, pursuant to the provisions of chapter 5 of Title 5, United States Code, as are necessary to carry out the provisions of this Act;
 (9) to formulate general policy with respect to the administration of this Act and sections 608, 610, 611, 613, 614, 615, 616, and 617 of Title 18, United States Code;
 (10) to develop prescribed forms under subsection (a)(1) of this section;
 (11) to conduct investigations and hearings expeditiously, to encourage voluntary compliance, and to report apparent violations to the appropriate law enforcement authorities.
 
 
 [193]
 Id. § 437f provides:
 § 437f. Advisory opinions
 (a) Upon written request to the Commission by any individual holding Federal office, any candidate for Federal office, or any political committee, the Commission shall render an advisory opinion, in writing, within a reasonable time with respect to whether any specific transaction or activity by such individual, candidate, or political committee would constitute a violation of this act, of chapter 95 or chapter 96 of Title 26 of the U.S. Code, or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, United States Code.
 (b) Notwithstanding any other provision of law, any person with respect to whom an advisory opinion is rendered under subsection (a) who acts in good faith in accordance with the provisions and findings of such advisory opinion shall be presumed to be in compliance with the provision of this Act, of chapter 95 or chapter 96 of Title 26 of the U.S. Code, or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, United States Code, with respect to which such advisory opinion is rendered.
 (c) Any request made under subsection (a) shall be made public by the Commission. The Commission shall, before rendering an advisory opinion with respect to such request, provide any interested party with an opportunity to transmit written comments to the Commission with respect to such request.
 
 
 [194]
 Compare id. § 437d(a)(6) ("to initiate . . ., defend, or appeal any civil action in the name of the Commission for the purpose of enforcing the provision of this Act . . . .") with Question 8(c), note 183 supra. Compare 2 U.S.C. § 437d(a)(8) ("to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of this Act") with Question 8(d), note 183 supra
 
 
 [195]
 See Advisory Opinion AO 1975-1: National Political Party Conventions, 40 Fed.Reg. 29792 (July 15, 1975); Advisory Opinion AO 1975-4: Democratic National Committee (Democratic Party Telethon), id. at 29793
 
 
 [196]
 Brief at 259; Reply Brief at 104, 108
 
 
 [197]
 Transcript of Oral Argument at 139
 
 
 [198]
 8(f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it empowers the Federal Election Commission to authorize expenditures of the national committee of a party with respect to presidential nominating conventions in excess of the limits enumerated therein?
 
 
 [199]
 § 9008(d)(3) of Subtitle H provides:
 The Commission may authorize the national committee of a major party or minor party to make expenditures which, in the aggregate, exceed the limitation established by paragraph (1) or paragraph (2) of this subsection. Such authorization shall be based upon a determination by the Commission that, due to extraordinary and unforeseen circumstances, such expenditures are necessary to assure the effective operation of the presidential nominating convention by such committee.
 
 
 [200]
 See --- U.S.App.D.C. pages --- - ---, 519 F.2d pages 855-857 supra
 
 
 [201]
 9. Do 2 U.S.C. §§ 431(b), (d), (e), and (f); 434(e); 437a, 437d, 437g(a) (5)-(7), and 456; 18 U.S.C. §§ 591 (b), (d), (e) and (f); 608(b)(6), (c)(4), (e); Internal Revenue Code of 1954, §§ 9002(2), and (9); 9006(d); 9008(d)(3); 9032(2), (4), (8), and (9), and 9037 violate the constitutional rights of one or more of the plaintiffs in that they are excessively vague?
 
 
 [202]
 The provisions as to which we specifically find no vagueness are 2 U.S.C. §§ 431(b), (d), (e) and (f); 434(e); 437d(a)(7); 18 U.S.C. §§ 591(b), (d), (e) and (f), 608(b)(6), (c)(4), (e); 26 U.S.C. §§ 9002(2), 9008(d)(3), 9032(2), and (4)
 
 
 [203]
 The provisions the vagueness of which we deem unripe for resolution at this time are: 2 U.S.C. §§ 437d(a)(1)-(6), (8)-(11), and (b)-(d), 437g(a)(5)-(7), 456; 26 U.S.C. §§ 9002(9), 9006(d), 9032(8), and (9), 9037
 
 
 [204]
 The text of 2 U.S.C. § 437f is reprinted in full at note 193 supra. We have already held above that the grant of this advisory opinion power to the Commission is constitutional. See --- U.S.App.D.C. at pages --- - ---, 519 F.2d at pages 894-896 supra
 
 
 [205]
 In addition, the following three questions certified to this court ask whether the challenged statutes violate the Bill of Rights in providing that the government may bring criminal prosecutions against anyone who violates or is about to violate various sections of those statutes. Although there is nothing in the record to indicate that criminal prosecution is in any way imminent, and realizing that our test for ripeness does not require that such prosecution be imminent to test the provisions of statute addressed above, we must reach and answer negatively the implication of these questions that Congress does not have the power to impose criminal penalties for clear violation of the election laws. Challenge to the claimed "about to violate" powers of government is unripe and can only be addressed in a case with a more developed record on that issue
 3(i) Do 18 U.S.C. § 608 and § 9012 of the Internal Revenue Code of 1954 violate such rights (under the First, Fifth and Ninth Amendments and the Due Process Clause of the Fifth Amendment), in that they provide that the government may bring criminal prosecutions against anyone who violates or is about to violate the provisions recited in those sections?
 4(b) Do 18 U.S.C. § 608 and § 9012 of the Internal Revenue Code of 1954 violate such rights (under the First and Ninth Amendments and the Due Process Clause of the Fifth Amendment), in that they provide that the government may bring criminal prosecutions against anyone who violates or is about to violate the provisions recited in those sections?
 7(f) Does 2 U.S.C. § 441 violate such rights (under the First, Fourth and Ninth Amendments and the Due Process Clause of the Fifth Amendment), in that it provides criminal penalties for violations of Chapter 14 of Title 2, U.S.C.?
 
 
 *
 FAC is the trial court's abbreviation for First Amended Complaint
 
 
 [1]
 26 U.S.C. § 9011 provides:
 (b) Suits to implement chapter.
 (1) The Commission, the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or contrue (sic) any provision of this chapter.
 (2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subsection and shall exercise the same without regard to whether a person asserting rights under provisions of this subsection shall have exhausted any administrative or other remedies that may be provided at law. Such proceedings shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.
 
 
 [2]
 The Court took care in that initial order to base its decision to hear the case en banc upon Rule 35(a) of the Federal Rules of Appellate Procedure and upon the statutory enactment of long-standing judicial custom, 28 U.S.C. § 46(c), so as not to foreclose later argument under separation of powers that Congress may not compel a sitting en banc, as the plain words of § 437h would imply
 
 
 [3]
 This Court suggested, Memorandum 2-3 (April 14, 1975):
 Certain of the parties have questioned whether Subtitle H of the Internal Revenue Code (the public financing of presidential elections provisions) is subject to the procedures of Section 315(a). They cite 26 U.S.C. § 9011(b), which by its plain words commands a different review procedure the convening of a three-judge court for review of Chapter 95 of Subtitle H. It is the view of the other parties that the review provisions set forth in Section 315(a) are sufficiently broad that all constitutional questions must be certified to this court.
 To protect against the contingency that the Supreme Court might eventually hold that these issues should be decided by a three-judge court, either under 26 U.S.C. § 9011(b) or as to Chapter 96 under 28 U.S.C. §§ 2282, 2284, we suggest to the District Court that it certify the need for a three-judge court as to Subtitle H to the Chief Judge of this Circuit, in order that there may be parallel proceedings in that court and in this court with reference thereto.
 
 
 [1]
 Though these Acts spoke in terms of contributions and expenditures, the creation of additional committees prevented these provisions from serving as effective limitations or ceilings
 
 
 [2]
 Poor draftsmanship does, in fact, exist. For example, 2 U.S.C. § 437h, the provision establishing review of constitutionality by certification to this court and appeal to the Supreme Court does not include among its list of reviewable criminal sections, 18 U.S.C. § 591, the section which sets forth the definitions underlying those sections which are deemed reviewable
 
 
 [1]
 For present purposes, I accept the FECA's definition of "minor party" but would not distinguish between minor parties and new parties. Thus, by minor party I mean parties receiving less than 25% of the vote in the past election. See 26 U.S.C. § 9002(7), (8). For elections of Representatives, the determination could be made on a district or statewide basis
 I do not mean to intimate, however, that the FECA's definition is constitutionally required. Congress might, for example, define as minor those parties not qualifying for automatic ballot access under state law, thereby incorporating the lower thresholds employed by the states. See Developments in the Law Elections, 88 Harv.L.Rev. 1111, 1124 n.11 (1975). Alternatively, criteria such as present popularity, age or degree of organization might be used in some combination. The important point is that a line can be drawn separating major and minor parties so that small, controversial parties are not required to identify their contributors. See id. at 1250-51 & n.103.
 
 
 [2]
 I agree that the lesser threat of a chill or harassment, --- U.S.App.D.C. p. ---, 519 F.2d p. 908 infra, and the greater interests in disclosure, see id. at 1596-1597, justify requiring major parties to identify their contributors. By excising the unconstitutional applications, § 434 can be upheld. Cf. United States v. Harriss, 347 U.S. 612, 617-25, 74 S.Ct. 808, 98 L.Ed. 989 (1954); United States v. National Comm. for Impeachment, 469 F.2d 1135 (2d Cir. 1972)
 I am also troubled by the application of uniform contribution limits and expenditure ceilings to minor parties (or to unpopular or unknown candidates). Experience may demonstrate that greater latitude must be provided the minor parties if they are to function according to the constitutional scheme. There is not yet adequate evidence to decide this question. What evidence is available suggests that unlike disclosure of minor party contributors, see --- U.S.App.D.C. p. ---, 519 F.2d pp. 908-909 infra, contribution limits and expenditure ceilings pose no imminent threat to minor parties, see nn.30-31 infra. I am therefore prepared to postpone resolving the issues raised by limits and ceilings until more data is available.
 
 
 [3]
 In re Stolar, 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971); Baird v. State Bar, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); DeGregory v. New Hampshire Attorney General, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)
 
 
 [4]
 See Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Sweezy v. New Hampshire, supra note 3, 354 U.S. at 250, 77 S.Ct. 1203 (1957). See also T. Emerson, The System of Freedom of Expression 31 (1970)
 
 
 [5]
 New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)
 
 
 [6]
 Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting)
 
 
 [7]
 See cases cited note 3 supra. See also Robison, Protection of Associations from Compulsory Disclosure of Membership, 58 Colum.L.Rev. 614 (1958); Note, The Constitutional Right to Anonymity: Free Speech, Disclosure and the Devil, 70 Yale L.J. 1084 (1961)
 
 
 [8]
 Talley v. California, supra note 3, 362 U.S. at 64, 80 S.Ct. 536
 
 
 [9]
 This is all that is established by the experience of the State of Washington with disclosure, discussed in note 116 of the court's opinion
 
 
 [10]
 See nn.29-31 infra
 
 
 [11]
 Developments, supra note 1, at 1247; see Fleishman, Freedom of Speech and Equality of Political Opportunity: The Constitutionality of the Federal Election Campaign Act of 1971, 51 N.C.L.Rev. 389, 424 (1973); Redish, Campaign Spending Laws and the First Amendment, 46 N.Y.U.L.Rev. 900, 932 (1971). The court ignores the fragility of minor parties in suggesting that they could survive on contributions of under $100. At the very least, limiting minor parties to $100 contributions would impair their ability to compete, and would disadvantage them relative to major parties
 
 
 [12]
 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)
 
 
 [13]
 Sweezy v. New Hampshire, supra note 3, 354 U.S. at 251, 77 S.Ct. at 1212. Even when minor parties have no effect on public policy, they still play a number of vital roles:
 (A)s an outlet for frustration, often as a creative force and a sort of conscience, as an ideological governor to keep major parties from speeding off into an abyss of mindlessness, and even just as a technique for strengthening a group's bargaining position for the future, the minor party would have to be invented if it did not come into existence regularly enough. It is an indispensable part of the system . . .
 A. Bickel, Reform and Continuity 80 (1971).
 
 
 [14]
 See cases cited note 3 supra. Disclosure laws are especially suspect because they discriminate according to the content of speakers' views, burdening only unpopular positions. Cf. Chicago Police Dept. v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)
 
 
 [15]
 --- U.S.App.D.C. at ---, 519 F.2d at 866, 868 supra
 
 
 [16]
 Id., --- U.S.App.D.C. at ---, 519 F.2d at 868. See also United States v. Finance Comm. to Re-elect the President, 165 U.S.App.D.C. ---, 507 F.2d 1194 (1974); Pichler v. Jennings, 347 F.Supp. 1061 (S.D.N.Y.1972)
 
 
 [17]
 McCarthy Dep. at 17-18, 67-70
 
 
 [18]
 Buckley Dep. at 31
 
 
 [19]
 Wertheimer Dep. at 31-33
 
 
 [20]
 Crane Dep. at 38
 
 
 [21]
 Reed Dep. at 16-17, 31-34, 69-70
 
 
 [22]
 2 U.S.C. § 437a, discussed at --- U.S.App.D.C. at ---, 519 F.2d at 869-878, supra
 
 
 [23]
 Child Labor Tax Case, 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817 (1922)
 
 
 [24]
 The Court has held that a party seeking relief must establish that disclosure is being compelled; the mere possibility that it will be required in the future is insufficient to create a case or controversy. See California Bankers Ass'n v. Shultz, 416 U.S. 21, 55-57, 75-76, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); cf. United States v. Harriss, supra note 2, 347 U.S. at 626, 74 S.Ct. 808 (possibility of persons remaining silent because of fear they will be deemed lobbyists and prosecuted for failure to disclose is insufficient to invalidate disclosure requirement). For this reason I agree with the court that the challenge to the record keeping and audit provisions of the FECA, 2 U.S.C. §§ 432(b), (c), (d), 438(a)(8), is not yet ripe for review. See --- U.S.App.D.C. at ---, 519 F.2d at 864-865 supra
 
 
 [25]
 Compare, e. g., Bates v. Little Rock, supra note 3, and NAACP v. Alabama ex rel. Patterson, supra note 3, with, e. g., Gibson v. Florida Legislative Investigation Comm., supra note 3, and Shelton v. Tucker, supra note 3. See also Pollard v. Roberts, 283 F.Supp. 248 (E.D.Ark.), aff'd mem. 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968)
 
 
 [26]
 See cases cited note 3 supra. Even when upholding disclosure requirements, the Court has never relied on the state of the record, but has always looked to the strength of the governmental interests. See Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Konigsberg v. State Bar, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959). See also Stoner v. Fortson, 379 F.Supp. 704 (N.D.Ga.1974)
 
 
 [27]
 The Court has shaped both procedural and substantive rules to guard against anticipated but unproven chills. See, e. g., Bigelow v. Virginia, --- U.S. --- 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600 (1975); Erznoznik v. Jacksonville, --- U.S. ---, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975); Keyishian v. Board of Regents, 385 U.S. 589, 601, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Lamont v. Postmaster General, 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); New York Times Co. v. Sullivan, 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. California, 361 U.S. 147, 153, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)
 
 
 [28]
 --- U.S.App.D.C. at ---, 519 F.2d at 867 supra. The court's reliance on Stoner v. Fortson, 379 F.Supp. 704 (N.D.Ga.1974) is misplaced. Stoner involved the entirely separate problem of disclosure by "controversial" candidates in major party primaries. The Stoner court's refusal to exempt such candidates from disclosure can be justified because of the great difficulties in distinguishing "controversial" from noncontroversial candidates. Those same difficulties do not arise, however, in distinguishing major and minor parties. See note 1 supra. See also Developments, supra note 1, at 1250-51
 
 
 [29]
 In this century only 4 non-major party candidates for President have received over 5% of the vote. Finding I, P 85. Since 1932 non-major party candidates have never received more than 5% of the total vote cast for Congressmen. Id. In 1974, of the 286 minor party and independent candidates running for Congress, only 46 received more than 5% of the vote and none were elected. Findings II A, P 7
 
 
 [30]
 Minor parties seldom account for more than 2% of the funds expended in a race. See id. PP 12, 35, 51. Only 20 of the 286 non-major party Congressional candidates in 1974, and 21 of the 241 such candidates in 1972 spent over $10,000. Id. PP 19, 29, 41, 48
 
 
 [31]
 Only 6% of the contributions to minor parties are in amounts over $1,000. See id. PP 56, 73. In contrast, President Nixon raised 55% and Senator McGovern 34% of their budgets through contributions of over $1,000. Id. P 73
 
 
 [32]
 See A. Bickel, supra note 13, at 70-71; H. Bone, American Politics and the Party System 300-04 (1955); C. Ewing, Presidential Elections 108-09 (1940). See generally W. Hesseltine, The Rise and Fall of Third Parties (1948); D. Mazmanian, Third Parties in Presidential Elections (1974)
 
 
 [33]
 See --- U.S.App.D.C. at ---, 519 F.2d at 867 supra. The court alludes to two other evils disclosure might uncover or deter: illegal contributions and undue influence. Id. --- U.S.App.D.C. at --- n.14, 519 F.2d at 865 n.114. Disclosure can affect illegal contributions, however, only in the unlikely event that a party would disclose its own illegalities. The undue influence concern, while more substantial, arises only if a minor party candidate wins an election. A less restrictive alternative, which would leave unaffected contributors to unpopular, unsuccessful parties, would be to require disclosure only of winning minor party candidates
 
 
 [34]
 Because 18 U.S.C. § 614 prohibits contributions in the name of another, minor parties will be able to know the source of their donations unless one posits massive lawlessness
 
 
 [35]
 The limits on contributions imposed by 18 U.S.C. § 608(b)(1) make necessary conspiracies if stalking horses are to be launched
 
 
 [36]
 See, e. g., Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("Fear of serious injury cannot alone justify suppression of free speech and assembly"); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Cf. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (only advocacy of "imminent lawless action" can be proscribed)
 
 
 [1]
 While presidential electors are not officers or agents of the federal government (In re Green, 134 U.S. 377, 379 (10 S.Ct. 586, 33 L.Ed. 951)), they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States. The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated. To say that Congress is without power to pass appropriate legislation to safeguard such an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection. Congress, undoubtedly, possesses that power, as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption
 290 U.S. at 545, 54 S.Ct. at 290.
 
 
 [2]
 It is a misstatement for the majority opinion to assert that the so-called certification and audit functions of the Commission are similar to those exercised by the Comptroller General under 31 U.S.C. § 65(d). In practice, the General Accounting Office (GAO) does not certify appropriations. That is handled by the Office of Management and Budget, although the GAO does countersign some warrants. Generally the function of the GAO is to conduct a management review as to the efficiency with which appropriations are expended. Thus when the Election Commission acts in this respect, as it is authorized to do (26 U.S.C. §§ 9005, 9007-9), it is acting in the manner that executive departments of the federal government act. Moreover, there is nothing in the instant law to indicate that the normal functions of the GAO do not extend to the operations of the Commission or that Congress was providing for the two bodies to duplicate the same activity
 
 
 [3]
 The majority begins its analysis of the validity of the Commission's composition with a discussion of Article II, section 2, designed to show that the legislative branch has power to appoint its own inferior officers to carry out appropriate legislative functions. As I read the instant opinions, no one disagrees with this proposition. My disagreement with the majority arises instead from my conclusion that the powers vested in this Commission are not "appropriate legislative functions."
 
 
 [4]
 It might be argued that the President's role in nominating a minority of the members of a body performing functions constitutionally delegated to Congress in connection with regulating federal elections impermissibly involves the executive in the activities of the legislative branch. If this were the case, the unique composition of the Commission could result in its being unable to perform any governmental functions. However, the remainder of this discussion will presume that the Commission is a legislative body and thus may properly be vested with legislative duties
 
 
 [5]
 See Ponzi v. Fessenden, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922):
 The Attorney General is the head of the Department of Justice. Rev.Stat. § 346. He is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offenses be faithfully executed. United States v. San Jacinto Tin Co., 125 U.S. 273 (8 S.Ct. 850, 31 L.Ed. 747); In re Neagle, 135 U.S. 1 (10 S.Ct. 658, 34 L.Ed. 55); Kern River Co. v. United States, 257 U.S. 147, 42 S.Ct. 60, 66 L.Ed. 175; . . .
 Id. at 262, 42 S.Ct. at 311.
 
 
 [6]
 Another broad power exists in section 437d(a)(8) which authorizes the Commission
 to make, amend, and repeal such rules, pursuant to the provisions of chapter 5 of Title 5, United States Code, as are necessary to carry out the provisions of this Act;
 Obviously the promulgation of rules to implement portions of the Act which infringe upon the separation of powers will simply compound the constitutional violation. While the full import of this section will not be known until the Commission acts to promulgate rules, it has great potential for intrusion on functions not assigned to Congress by the Constitution.
 
 
 [7]
 The congressional desire to regulate the activities of the Attorney General with respect to enforcing the instant statute is also evidenced by section 437g(b) which provides:
 (b) In any case in which the Commission refers an apparent violation to the Attorney General, the Attorney General shall respond by report to the Commission with respect to any action taken by the Attorney General regarding such apparent violation. Each report shall be transmitted no later than 60 days after the date the Commission refers any apparent violation, and at the close of every 30-day period thereafter until there is final disposition of such apparent violation. The Commission may from time to time prepare and publish reports on the status of such referrals.
 While Congress clearly has power to require that executive officers supply information to the Commission, this section suggests an intent that the Commission is to play a more active role in assuring that the Attorney General enforces the statutes according to the desires of Congress.
 
 
 [8]
 One might argue that by calling the presumption "rebuttable," the House Report simply means that the Government could overcome it by showing lack of good faith or failure to comply with the terms of the advisory opinion. If the term has this limited meaning, however, all one need do is postulate a case where the Government is unable to make either showing. In that situation, the presumption comes into play to override any interpretation of the legality of the individual's conduct by either the Attorney General or the court which would conflict with the Commission's advisory opinion. It should follow automatically that vesting this power to override the prosecutor's or the court's interpretation of the law and the facts in a legislative body is unconstitutional
 
 
 [9]
 While obviously not a part of the Commission's enforcement powers, section 441 presents an interesting question of congressional intent:
 (a) Any person who violates any of the provisions of this subchapter shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.
 (b) In case of any conviction under this subchapter, where the punishment inflicted does not include imprisonment, such conviction shall be deemed a misdemeanor conviction only.
 Since the maximum penalties authorized by subsection (a) do not rise to the dignity of a felony, see 18 U.S.C. § 1, it is hard to understand what the purpose of subsection (b) could be.
 
 
 [10]
 Arguably, since the Commission has been vested with executive powers, the failure to appoint its members in compliance with Article II, section 2, has resulted in those members failing to meet the "qualification" requirement of section 315(b) of Pub.L. 93-443:
 (b) Until the appointment and qualification of all the members of the Federal Election Commission and its general counsel and until the transfer provided for in this subsection, the Comptroller General, the Secretary of the Senate, and the Clerk of the House of Representatives shall continue to carry out their responsibilities under title I and title III of the Federal Election Campaign Act of 1971 as such titles existed on the day before the date of enactment of this Act.
 If so, the clearly legislative functions would continue to be performed by these three designated officials and the formulation of policy and enforcement of the criminal provisions would be left to the executive branch in the same manner as with all other criminal statutes.